**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal No. 1:24-cr-221 (TNM)** |
| **JEFFREY FORTENBERRY,** | **Oral Argument Requested** |
| *Defendant.* | |

**CONGRESSMAN FORTENBERRY'S MOTION TO OBTAIN DISCOVERY ON
SELECTIVE PROSECUTION AND SELECTIVE ENFORCEMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

I.    Congressman Fortenberry's Nine-Term Service As a Member of the U.S. House
      of Representatives ............................................................................................. 3

II.   The Investigation .............................................................................................. 5

      A.    The Underlying Campaign Finance Investigation ................................... 5

      B.    The Government Secures the Informant's Cooperation, But He Does Not
            Implicate Congressman Fortenberry ..................................................... 6

      C.    The Government Initially Plans To Notify House Counsel Before
            Contacting Congressman Fortenberry ................................................... 7

      D.    The Government Changes Course and Asks Its Informant To Secretly
            Record Congressman Fortenberry ......................................................... 7

      E.    After Congressman Fortenberry Makes No Incriminating Statements in the
            First Call, the Government Asks the Informant to Record Another Call
            with the Congressman and Make Allegations Scripted by the Government .......... 8

      F.    The Government Interviews Congressman Fortenberry About the Secretly
            Scripted Allegations While Contemplating False Statement Charges ................ 9

      G.    The Government Misleads Defense Counsel About the Congressman's
            Status and Interviews Him Again ........................................................ 10

III.  The First Trial and Reversal .............................................................................. 11

IV.   The Decision to Retry the Case ......................................................................... 13

ARGUMENT ............................................................................................................. 14

I.    The Constitution Prohibits Prosecution on the Basis of Political Identity and
      Political Speech ............................................................................................... 14

II.   Discovery Regarding Potential Selective Prosecution Is Warranted When There Is
      "Some Evidence" of Discriminatory Effect and Purpose .................................... 15

      A.    There Is Evidence of Differential Treatment ......................................... 17

      B.    There Is Evidence of Discriminatory Purpose ...................................... 19

            1.    The Lead Prosecutor Engaged in Anti-Republican Political
                  Activity ................................................................................. 20

            2.    There Were Procedural Irregularities in This Case .................... 21

CONCLUSION .......................................................................................................... 26

i

## TABLE OF AUTHORITIES

### CASES

*Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11 (D.D.C. 1997)................................. 14, 22

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016)...................................................... 21

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) (Barrett, J.) ................................... 21

*Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930 (9th Cir. 2022) ................................ 21

*Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122 (D.C. Cir. 2023) ........................... 14, 16

*Ted Cruz for Senate v. Fed. Election Comm'n*, 542 F. Supp. 3d 1 (D.D.C. 2021),
    *aff'd sub nom.*, 596 U.S. 289 (2022)............................................................... 14

*United States v. Abair*
    746 F.3d 260 (7th Cir. 2014) ...................................................................... 18
    No. 12-cr-00076, ECF No. 84 (June 27, 2013)...................................................... 18
    No. 12-cr-0076, ECF Nos. 110-12 (N.D. Ind. May 9, 2014)......................................... 18

*United States v. Armstrong*, 517 U.S. 456 (1996) ........................................ 14, 15, 16

*United States v. Bass*, 536 U.S. 862 (2002) (per curiam) ............................................ 15

*United States v. Biden*
    ___ F. Supp. 3d ___, 2024 WL 1603774 (D. Del. Apr. 12, 2024) ................................... 14
    2024 U.S. Dist. LEXIS 62566 (C.D. Cal. Apr. 1, 2024) ........................................... 26

*United States v. Casellas-Toro*,
    807 F.3d 380 (1st Cir. 2015) ...................................................................... 18
    13-cr-00201, ECF No. 155 (D.P.R. Aug. 11, 2014) ................................................ 18
    13-cr-00201, ECF No. 172 (D.P.R. Jan. 29, 2016).................................................. 18

*United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc)................................... 16, 17

*United States v. Diggs*, 613 F.2d 988 (D.C. Cir. 1979) ............................................... 17

*United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) (en banc)....................................... 14

*United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023)....................................... 1, 12

*United States v. Greene*, 697 F.2d 1229 (5th Cir. 1983) ............................................. 14

*United States v. Griffin*, 549 F. Supp. 3d 49 (D.D.C. 2021)........................................... 15

*United States v. Haggerty*, 528 F. Supp. 1286 (D. Colo. 1981) ....................................... 21

*United States v. Hare*, 820 F.3d 93 (4th Cir. 2016) ................................................... 16

*United States v. Jones*, 159 F.3d 969 (6th Cir. 1998) ................................................. 16

\**United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) ........................................... 1, 14, 15, 19

*United States v. Khanu*, 664 F. Supp. 2d 28 (D.D.C. 2009) ...................................... 15

*United States v. Rahman*,
    805 F.3d 822 (7th Cir. 2015) .................................................................................. 18
    No. 11-cr-00103, ECF No. 132 (E.D. Wis. Feb. 6, 2016) ...................................... 18

*United States v. Sellers*, 906 F.3d 848 (9th Cir. 2018) ........................................ 16, 17

*United States v. Shelton*,
    997 F.3d 749 (7th Cir. 2021) .................................................................................. 18
    No. 14-cr-129, ECF No. 301 (N.D. Ind. Nov. 20, 2019) ....................................... 19
    No. 14-cr-129, ECF No. 339 (N.D. Ind. June 15, 2021) ........................................ 19

*United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972) ....................................... 16, 21

*United States v. Thorpe*, 471 F.3d 652 (6th Cir. 2006) ............................................. 15

*United States v. Torquato*, 602 F.2d 564 (3d Cir. 1979) ........................................... 14

*United States v. Tuitt*, 68 F. Supp. 2d 4 (D. Mass. 1999) .................................... 16, 18

*United States v. Washington*, 869 F.3d 193 (3d Cir. 2017) .................................. 16, 17

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ....................................................... 14

*Whren v. United States*, 517 U.S 806 (1996) ............................................................. 16

## OTHER AUTHORITIES

U.S. CONST. amend. V ................................................................................................ 14

18 U.S.C. § 1001 ................................................................................... 2, 11, 13, 17

28 U.S.C. § 528 ............................................................................................................ 24

5 C.F.R. § 2635.501 ..................................................................................................... 24

5 C.F.R. § 2635.502 ..................................................................................................... 24

H.R. 5163, 117th Cong. (2022) ..................................................................................... 4

H.R. Con. Res. 110, 113th Cong. (2014) ...................................................................... 4

H.R. Con. Res. 152, 114th Cong. (2016) ........................................................... 4

H.R. Con. Res. 75, 114th Cong. (2016) ............................................................. 4

H.R. Res. 259, 116th Cong. (2019) ................................................................... 4

FBI Domestic Investigations and Operations Guide ("DIOG") (Sept. 28, 2016) ......... 7, 9, 21, 22

Justice Manual .................................................................................... *passim*

Cong. Rsch. Serv., RS22890, House Office of the General Counsel (2014) ................................. 7

Interim Staff Report of the Comm. on the Judiciary and the Select Subcommittee of the
  Federal Government, The FBI's Breach of Religious Freedom:  The Weaponization
  of Law Enforcement Against Catholic Americans (Dec. 4, 2023) ............................................. 6

Congressman Jeffrey Fortenberry, through undersigned counsel, respectfully moves for discovery into whether he is being selectively prosecuted because of his political identity and speech. Discovery is warranted because similarly situated people have not been re-tried, there is evidence of anti-Republican bias, and there have been numerous procedural irregularities in this case. The Congressman respectfully requests oral argument on this motion under LCrR 47(f).

## INTRODUCTION

After Congressman Fortenberry resigned his seat, served the majority of his probationary sentence, and the Ninth Circuit reversed his conviction in *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023), the prosecution team decided to re-indict and retry him for purportedly making false statements and concealing material facts in a campaign finance investigation. The government does not contend that the Congressman was complicit in the underlying campaign finance violations. Although courts appropriately pay deference to prosecutorial discretion in the vast majority of cases, *see United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) (McFadden, J.), the decision to re-indict and retry this case is the kind of unprecedented prosecutorial decision that warrants discovery into government decision-making.

Defense counsel has been unable to identify a prior case in which the federal government, following reversal by a Court of Appeals, retried a defendant who had received a probationary sentence and had served most of it. Unlike the defendants who preceded him, Congressman Fortenberry—a member of the Republican Party, faithful Catholic, social conservative, and public sponsor of conservative positions, who consistently voted for positions advocated by President Trump—has been singled out by the government for re-prosecution despite the fact that he already served most of his probationary sentence. We asked the government attorneys whether they could identify precedent for such a re-prosecution. They could not.

In addition to this evidence of disparate treatment, there is more, including evidence of political bias and numerous procedural irregularities:

- The lead prosecutor, who supervised and participated in the investigation and prosecution of this matter, is a financial contributor to "Stop Republicans" and to Democratic candidates in swing elections outside of his jurisdiction, facts that give rise, at the very least, to the appearance of a political conflict of interest. "Stop Republicans" describes itself as a "grassroots-funded effort dedicated to resisting the Republican Party and Donald Trump's radical right-wing legacy." *See About Stop Republicans*, Stop Republicans, https://turnoutpac.org/stop-republicans/.  And the lead prosecutor's LinkedIn profile touts the outcome of the first trial against Congressman Fortenberry.

- The lead prosecutor has been elevated to serve as the Chief of the Criminal Division in the United States Attorney's Office for the Central District of California, but nevertheless is continuing to participate in this case from across the country as a Special Assistant United States Attorney ("SAUSA") despite his important responsibilities in California.

- During the underlying campaign finance investigation, the government initially planned to notify House Counsel before contacting Congressman Fortenberry, as is standard procedure when seeking to contact a sitting Member.  With the endorsement of the aforementioned lead prosecutor, however, the government changed course and opted instead to have an informant secretly record telephone calls with Congressman Fortenberry notwithstanding that (i) the government's own internal records reflected that the Congressman was not a subject of the investigation; and (ii) the government's own investigatory procedures require using the least intrusive investigatory means, especially when investigating matters pertaining to a public official.

- When Congressman Fortenberry made no incriminating statements on the first call with the government's informant, the government, apparently without seeking requisite approvals, asked the informant to initiate and secretly record a second call with the Congressman in which the informant would make incriminating allegations scripted by the government.

- A year later, the government, according to official investigatory records and again with the endorsement of the lead prosecutor, approached Congressman Fortenberry at his home, interviewed him "using a ruse" about potential national security risks, and secretly recorded the interview while armed with the secret recordings from a year prior in which the government's informant had made the scripted allegations.  The government expressly contemplated charging the Congressman for making false statements in the interview *before* the interview had even happened.

- Before a second interview of Congressman Fortenberry, the lead prosecutor told the Congressman's counsel that the Congressman was a subject trending toward a witness, and, during the interview, denied that "this was some bullshit [18 U.S.C. §] 1001 case,"

even though a then-extant internal government document showed the government was contemplating false statements charges.

- During the interview, the lead prosecutor, secretly armed with the transcript from Congressman Fortenberry's second call with the informant, asked whether the informant told Congressman Fortenberry that an intermediary had given the informant "thirty-thousand dollars cash to help fund your fundraiser," an attempted quotation of one of the allegations made by the informant in the recorded call.

- The government charged Congressman Fortenberry with multiple felonies for supposedly lying about allegations the government, through its informant, had made to him. In stark contrast, the government gave the people who actually knew about and participated in the underlying illegal contributions immunity (the informant) and deferred prosecution agreements (the foreign national and the intermediary who provided the money to the informant).

- In discussions following defense counsel's entry into this case, we explained how a retrial would contravene well-established principles in the Justice Manual, but the government nevertheless insists on proceeding.

Separation of powers principles ordinarily require courts to defer to the executive branch's prosecutorial decisions, but the Constitution importantly provides for some limited checks by the judiciary. When defendants make initial showings that executive officers are prosecuting for improper reasons, they are entitled to discovery. The evidence that similarly situated persons have not been re-prosecuted, that the lead prosecutor may be politically biased, and the litany of procedural irregularities highlighted above justify discovery into the government's decision-making.

## BACKROUND

## I.    Congressman Fortenberry's Nine-Term Service As a Member of the U.S. House of Representatives

For nearly twenty years, Congressman Fortenberry served as a Representative from Nebraska, during which time he maintained a national profile as a senior member of the House Appropriations Subcommittee with expertise in healthcare policy, foreign affairs, and agricultural policy. *Fortenberry, Jeff*, Biographical Directory of the United States Congress,

https://tinyurl.com/yc4hp45f; Press Release, *Chairman Frelinghuysen Announces Rep. Jeff Fortenberry To Lead the Legislative Branch Appropriations Subcommittee* (June 25, 2018), https://tinyurl.com/2s4zrb27; *Profile: Rep. Jeff Fortenberry*, Catholic Answers, https://tinyurl.com/2sstc27n. Congressman Fortenberry is a father of five daughters, and is well known as a faithful Catholic, social conservative, and member of the Republican Party. *E.g.*, Christine Rousselle, *How a Catholic Congressman Agreed To Be Part of a Pope Documentary*, Catholic News Agency (Apr. 17, 2018), https://tinyurl.com/y2php322; Rod Dreher, *Jeff Fortenberry: Crunchy Congressman*, The American Conservative (May 13, 2012), https://tinyurl.com/3vdeetdy.

Over his nine terms in Congress, Congressman Fortenberry sponsored myriad conservative bills and resolutions, and maintained a nationally-reported conservative voting record. Before the Congressman resigned in 2022 as a result of his conviction, he sponsored bills and resolutions to support unborn children and mothers[1] and to stop the persecution of Christians, Yezidis, and other religious minorities in the Middle East.[2] From at least 2009 to 2022, the National Right to Life gave Congressman Fortenberry a 100% rating for his pro-life voting record. *See, e.g.*, National Right to Life, *Action Center: See How Your Member of Congress Voted*, https://tinyurl.com/9jzefbkv. Additional reporting noted that the Congressman received numerous donations from gun-rights organizations and committees throughout his time in Congress. *Gun Money: How Much the NRA and Pro-Gun PACs Spend To Lobby Your Lawmakers*, Great Falls Tribune, https://tinyurl.com/2xar2her.

---

[1]    H.R. 5163, 117th Cong. (2022).

[2]    H.R. Res. 259, 116th Cong. (2019); H.R. Con. Res. 152, 114th Cong. (2016); H.R. Con. Res. 75, 114th Cong. (2016); H.R. Con. Res. 110, 113th Cong. (2014).

Congressman Fortenberry publicly supported President Trump.  Statistics showed he voted in line with the position of President Trump 92.3% of the time.  FiveThirtyEight, *Tracking Congress in the Age of Trump* (Jan. 13, 2021), https://tinyurl.com/yeykncf5.  Moreover, the Congressman helped with campaign fundraising efforts for President Trump and voted against the President's impeachment after giving a speech on the House floor where the Congressman described the process as a "regrettable" "blunt force political instrument."  PBS News, *Rep. Fortenberry: House Has 'Cathartic Moment' in Impeachment Process*, YouTube (Dec. 18, 2019), https://tinyurl.com/3r89hy85.

## II.    The Investigation

### A.    The Underlying Campaign Finance Investigation

In October 2015, the Federal Bureau of Investigation ("FBI") opened a criminal investigation, Operation Titan's Grip, into possible illegal campaign contributions involving Gilbert Chagoury, Toufic Baaklini, and another individual, referred to as "Individual H" in the Indictment.  Ex. 1, C.D. Cal. Mar. 17, 2022 Trial Day 2 AM Tr. 87:21-89:8, 93:11-22, 96:12-21, 104:7-16; Indict. ¶¶ 5, 12.  All three were part of an organization known as In Defense of Christians ("IDC"), which advocates for the protection of Christians in the Middle East.  Ex. 1, Trial Day 2 AM Tr. 109:19-110:09.  The FBI suspected that Mr. Chagoury, a foreign national, made illegal campaign contributions through the two intermediaries to various U.S. political campaigns and officials.  *E.g.*, Ex. 1, Trial Day 2 AM Tr. 94:17-95:19, 100:8-23, 105:10-106:21, 119:25-120:22; Ex. 2, C.D. Cal. Mar. 17, 2022 Trial Day 2 PM Tr. 12:22-13:8.

Unbeknownst to Congressman Fortenberry, Mr. Chagoury likely provided $30,000 to Mr. Baaklini, who in turn gave the money to the third individual, who in turn gave the money to several straw donors, who contributed to Congressman Fortenberry's campaign at a 2016 fundraiser in California.  Ex. 6, C.D. Cal. Mar. 21, 2022 Trial Day 4 PM Tr. 12:1-14:11, 17:6-9.  The

Congressman was also involved with IDC, and the fundraiser was hosted the day before the Congressman's induction into the Order of Saint Gregory, a high Catholic honor bestowed by the authority of the Pope.  Ex. 6, Trial Day 4 PM Tr. 8:23-9:5, 84:4-88:6.  Federal agents referred to the IDC pejoratively as "the cause."  Ex. 1, Trial Day 2 AM Tr. 110:10-13.[3]

### B. The Government Secures the Informant's Cooperation, But He Does Not Implicate Congressman Fortenberry

Early in the investigation, the government secured the third individual's participation as a confidential informant.  Ex. 1, Trial Day 2 AM Tr. 119:1-121:25; Ex. 2, Trial Day 2 PM Tr. 13:15-25; Ex. 3 (Sept. 8, 2016 Proffer Letter, JF00013964-13966).  The informant initially lied to the FBI about his involvement in illegal contributions, *see* Ex. 1, Trial Day 2 AM Tr. 118:10-12, but later provided details to the government agents about illegal campaign contributions that he, Mr. Chagoury, and Mr. Baaklini conspired to make to U.S. political campaigns, including a $30,000 donation to the 2016 fundraiser for Congressman Fortenberry, Ex. 1, Trial Day 2 AM Tr. 120:10-21, 126:11-15.  The informant did not implicate Congressman Fortenberry in the conspiracy.  *See* Ex. 4, C.D. Cal. Mar. 18, 2022 Trial Day 3 Tr. 17:16-18:23.  The FBI would later secure cooperation from Mr. Baaklini, who also lied initially to investigators.  Ex. 2, Trial Day 2 PM Tr. 10:11-11:17; Ex. 4, Trial Day 3 Tr. 67:6-14.  Mr. Baaklini later admitted wrongdoing, but did not implicate Congressman Fortenberry.  Ex. 4, Trial Day 3 Tr. 190:4-191:9; Ex. 5, C.D. Cal. Mar. 21, 2022 Trial Day 4 AM Tr. 43:3-17.

---

[3]    The Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government has since investigated the FBI for its "categorization of certain Catholic Americans as potential domestic terrorists," who the FBI deemed "radical-traditionalist Catholics."  Interim Staff Report of the Comm. on the Judiciary and the Select Subcommittee of the Federal Government, The FBI's Breach of Religious Freedom:  The Weaponization of Law Enforcement Against Catholic Americans 1 (Dec. 4, 2023).  The Committee concluded that the FBI's actions implicated "American civil liberties" and reflected "government overreach."  *Id.* at 2.

**C.    The Government Initially Plans To Notify House Counsel Before Contacting Congressman Fortenberry**

On September 8, 2017, the FBI requested approvals to interview numerous victims of the illegal campaign schemes, including Congressman Fortenberry, "not" as "subjects," but as witnesses. Ex. 7 at JF00001822 (Sept. 8, 2017 Interview Request, JF0001819-1824).[4] The FBI's interview requests explained that "there [was] probable cause to believe that Baaklini has conspired with others, including Chagoury … and [the informant] to circumvent campaign finance laws." Ex. 7 at JF00001820. In the approval request, the FBI confirmed that "House Counsel [would] be notified." Ex. 7 at JF00001823. The House General Counsel provides legal assistance to House congressional members, including "legal advice regarding requests from executive branch agencies." Cong. Rsch. Serv., RS22890, House Office of the General Counsel 1 (2014). And under FBI protocol, any FBI interview with a "Member of the U.S. Congress and their staffs" or with represented persons "require[s] supervisory approval." FBI Domestic Investigations and Operations Guide ("DIOG") §§ 18.5.6.4, 18.5.6.4.5 (Sept. 28, 2016), https://tinyurl.com/43fnkb4x. The lead prosecutor "concurred with the proposed interviews and plan[ned] to participate." Ex. 7 at JF00001823.

**D.    The Government Changes Course and Asks Its Informant To Secretly Record Congressman Fortenberry**

In March 2018, ahead of another election cycle and unaware of Operation Titan's Grip, Congressman Fortenberry reached out to the informant. Ex. 2, Trial Day 2 PM Tr. 27:19-28:6. The FBI had never followed through with its plan to reach out to House Counsel and interview the

---

[4] Under Justice Manual guidelines, a "'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation." Justice Manual § 9.11.151. A "'target' is a person as to whom the prosecutor … has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." *Id.*

Congressman.  Ex. 4, Trial Day 3 Tr. 54:24-57:7.  Despite the fact that the Congressman himself was still "not" a "subject" of the investigation, the FBI sought and received approval to secretly record a phone call between the informant and the Congressman, without notifying House Counsel. Ex. 8 (Mar. 27, 2018 Interview Approval, JF00002331-35).  The lead prosecutor concurred with the approval and "plan[ned] to participate."  Ex. 8 at JF0002334.  Although the Justice Manual requires consultation with DOJ's Public Integrity section for any "[i]nterview of [a] Member of Congress or Congressional Staffer," Justice Manual § 9-85.110, the interview request does not answer whether "DOJ-PIN notification and concurrence" would be sought,  Ex. 9 at JF00002330 (Mar. 23, 2018 Interview Request, JF00002327-30).

### E.     After Congressman Fortenberry Makes No Incriminating Statements in the First Call, the Government Asks the Informant to Record Another Call with the Congressman and Make Allegations Scripted by the Government

When the informant and the Congressman connected on April 9, 2018, the Congressman expressed his interest in another fundraiser and asked the informant for possible dates that might work.  Ex. 2, Trial Day 2 PM Tr. 28:22-24, 34:2-15.  The call gave the FBI no reason to suspect that the Congressman had participated in any criminal conduct.  *See* Ex. 2, Trial Day 2 PM Tr. 35:7-9.

Unsatisfied, government agents planned a second call:  This time, the agents wrote talking points for the informant, instructed the informant to call Congressman Fortenberry and make allegations about underlying suspicious campaign contributions, and recorded, listened to, and transcribed the call that ultimately took place on June 4, 2018.  Ex. 2, Trial Day 2 PM Tr. 35:17-41:15.  Government agents, including the lead prosecutor, apparently did not seek approval to do any of the above, instead relying on the limited approval they had received to conduct the first call in April 2018.  *See* Ex. 10 at JF00002450 (Feb. 27, 2019 Interview Approval Request, JF00002448-52) ("During a June 4, 2018, consensual recorded telephone, which was done at the

direction of the FBI with an approval date of Mach 22, 2018….").  And as for the talking points, the agents discarded them after the call, Ex. 4, Trial Day 3 Tr. 87:7-14, despite FBI guidelines requiring them to "retain records relating to investigative activities" for at least some period of time.  DIOG § 14.2.

F.    **The Government Interviews Congressman Fortenberry About the Secretly Scripted Allegations While Contemplating False Statement Charges**

Nine months later, in March 2019, the government agents requested approval to interview Congressman Fortenberry at his home in Nebraska to discuss the call that the agents had surreptitiously initiated between the Congressman and the informant.  Ex. 11 (Mar. 7, 2019 Interview Request, JF00002453-60).  Specifically, the agents requested permission to "utiliz[e] a ruse" when interviewing the Congressman that would "encompass his knowledge regarding IDC and its potential as a National Security risk if any."  Ex. 11 at JF00002456.

Government agents received approval to interview the Congressman.  Ex. 12 (Mar. 22, 2019 Interview Approval, JF00002482-87); *see also* Ex. 13 (C.D. Cal. Trial DX 1129).  Again, House Counsel would "not be notified," and the lead prosecutor concurred.  Ex. 12 at JF00002486.  And again, there was no indication that the Public Integrity Section was consulted.  Ex. 12 at JF00002486.  The approval also differed in material ways from the original request.  The approval did not authorize a ruse; instead, it approved a plan to "interview[] [the Congressman] about his conversation with the informant and his knowledge of the source of the $30,000 campaign contribution."  Ex. 12 at JF00002486.  The approval expressly contemplated charging Congressman Fortenberry for making false statements in the interview that had not yet occurred.  Ex. 12 at JF00002486.[5]

---

[5]    The government in discovery has produced a partial export of the government's investigation log, which lists entries by serial number.  Based on missing serial numbers, at least three log entries are missing between the request made for the interview and the approval;

On March 23, 2019, government agents showed up at the Congressman's home, but he was out inspecting flood damage to Lincoln residents. Ex. 18, C.D. Cal. Mar. 22, 2022 Trial Day 5 Tr. 96:7-12. When Mrs. Fortenberry answered the door, the agents told her that that they were doing a "background investigation" for a "national security matter," which they later admitted was a "ruse" designed to "intent[ionally] mislead the Congressman." Ex. 18, Trial Day 5 Tr. 99:25-100:14. The agents also told Mrs. Fortenberry that the Congressman was expecting them, which was not true. Ex. 18, Trial Day 5 Tr. 97:20-98:5. The agents came back around 8:30 PM when the Congressman was home. Ex. 18, Trial Day 5 Tr. 44:13-14. The earlier interaction with the agents had concerned Mrs. Fortenberry so much that the Congressman called the local police to have them check the agents' credentials and stay with the Fortenberrys throughout the late-evening interview. Ex. 18, Trial Day 5 Tr. 44:15-45:9, 52:20-21; Ex. 19, C.D. Cal. Mar. 24, 2022 Trial Day 7 Tr. 60:6-61:6.

During the interview, the agents asked Congressman Fortenberry about his connections to the informant and his knowledge of illegal campaign contributions. Indict. ¶ 21. The agents did not mention the calls they had recorded between the Congressman and the informant. *See* Ex. 20 (C.D. Cal., ECF No. 124 at 18-19). The agents thanked the Congressman for his help and when asked what they were trying to uncover, one agent responded, "with the way foreign influence is going … it's something that we're looking into, that's all." Ex. 21 (C.D. Cal. Trial Gov. Ex. 132T).

### G.    The Government Misleads Defense Counsel About the Congressman's Status and Interviews Him Again

Following the March 2019 interview, Congressman Fortenberry engaged former Assistant United States Attorney ("AUSA") and Congressman Trey Gowdy, and volunteered to sit for a

---

undersigned counsel has requested all missing log entries, but has not yet received them. Ex. 14 ¶ 5 (K. DeWilde Decl.).

second interview.  Attorney Gowdy first reached out to the lead prosecutor to ask about the Congressman's status.  The lead prosecutor told Attorney Gowdy that the Congressman was a "subject trending toward a witness," not a target in the investigation.  Ex. 22 (C.D. Cal., ECF No. 35-1, ¶¶ 9-12 (Gowdy Decl.)); *see also* Ex. 23, C.D. Cal. Mar. 23, 2022 Trial Day 6 Tr. 157:5-8. Internal government documents reflected that not only did the government consider Congressman Fortenberry to be a subject, *see* Ex. 12 at JF00002484, it was contemplating charging him for making false statements, Ex. 12 at JF00002486.  Operating under a misimpression regarding Congressman Fortenberry's status, on July 18, 2019, Attorney Gowdy accompanied the Congressman to a second interview in Washington, D.C., with the FBI and the lead prosecutor asking questions.  Indict. ¶ 21; Ex. 23, Trial Day 6 Tr. 157:9-23.  Without ever having told the Congressman or his counsel that the FBI had recorded the phone calls with the informant, the lead prosecutor asked the Congressman whether the informant told the Congressman that "Toufic Baaklini had given [the informant] thirty-thousand dollars cash to help fund your fundraiser?"  Ex. 24 (C.D. Cal. Tr. Gov. Ex. 155T).  Attorney Gowdy asked whether the lead prosecutor was "telling [him] that's what happened?"  Ex. 24.  Later, during a break, Attorney Gowdy asked the lead prosecutor whether "this was some bullshit [18 U.S.C. §] 1001 case."  Ex. 22 ¶ 17.  The lead prosecutor assured him it was not, Ex. 22 ¶ 17, even though the internal government memo expressly contemplated a false statement prosecution of Congressman Fortenberry.  Satisfied by the lead prosecutor's assurances, Attorney Gowdy permitted Congressman Fortenberry to finish the interview.  Ex. 22 ¶¶ 17-20.

## III.    The First Trial and Reversal

On October 19, 2021, over two years later and after President Biden took office, the government returned a three-count indictment in the Central District of California against the Congressman alleging violations of § 1001, based on purported inconsistencies between the

allegations the government scripted for its informant and the two government interviews in 2019. No. 21-cr-491, ECF No. 1 (C.D. Cal.). The persons who committed the underlying campaign finance violations were never charged. The government entered into an immunity agreement with the informant and deferred prosecution agreements with Messrs. Chagoury and Baaklini. *See* Ex. 6, Trial Day 4 PM Tr. 48:3-15; U.S. Attorney's Office, C.D. Cal., *Lebanese-Nigerian Billionaire and Two Associates Resolve Federal Probe into Alleged Violations of Campaign Finance Laws* (Mar. 31, 2021), https://tinyurl.com/2wr3rx7u. The government did not prosecute any of the straw donors.

The Congressman was convicted at trial, and resigned his seat in Congress. At sentencing, the court concluded that "by all accounts," the Congressman was "a man of exceptional character," who had "dedicated his life to public service … given voice to a persecuted community; and that his service also [came] at a cost to him personally, but more substantially to his family." Ex. 25 at 26-27 (C.D. Cal. June 28, 2022 Sentencing Tr.). The court sentenced him to two years' probation, 320 hours of community service, and a $25,000 fine. *See* ECF No. 220 (C.D. Cal. June 28, 2022) (judgment); Ex. 25 at 38.

The Congressman appealed; in the meantime, he completed his community service, paid his fine, and served the first 18 months of his probation. With approximately six months remaining on his probationary sentence, the Ninth Circuit reversed Congressman Fortenberry's conviction on improper venue grounds, while declining to address the alternative grounds for vacating his conviction based on errors at trial. *United States v. Fortenberry*, 89 F.4th 702, 713 (9th Cir. 2023).[6] The Ninth Circuit remanded for retrial, "if at all," in a proper venue. *Id.* That the Congressman

---

[6]    ECF No. 226 (C.D. Cal. July 6, 2022) (verifying probation commenced on June 28, 2022); Ex. 27 (January 4, 2024 email from United States Probation Office confirming its "interest in this matter has been closed").

had not completed his sentence by the time of reversal was happenstance.  Before the reversal, the

U.S. Probation Office for the District of Nebraska was considering a request for early termination

of probation, having found that the Congressman had "satisfied his fine, special assessments, and

community service" and was "in full compliance with his other probation conditions."  Ex. 26

(July-September 2023 Early Termination Emails).

## IV.    The Decision to Retry the Case

On May 8, 2024—nearly two years after Congressman Fortenberry's original conviction—

the U.S. Attorney's Office for the District of Columbia re-indicted Congressman Fortenberry on

two § 1001 charges based on the same factual allegations as the original indictment.  The

government's retrial team consists of one local AUSA and two SAUSAs from the Central District

of California, who participated in the original trial of Congressman Fortenberry, including the lead

prosecutor.

Undersigned counsel urged the government not to retry this case because doing so would

be inconsistent with the well-established principles laid out in the Justice Manual:

> Retrial of this matter would serve ***none*** of the purposes of criminal prosecution set forth in
> the Justice Manual because (i) the government already secured a highly-publicized
> conviction, (ii) Congressman Fortenberry resigned from Congress, (iii) Congressman
> Fortenberry served the majority of his probationary sentence, a sentence that was imposed
> in large part because he has lived an exemplary life, and (iv) even if a retrial were to result
> in conviction, Congressman Fortenberry likely would be sentenced to serve no more than
> the remaining six months of his prior probationary sentence.

Ex. 28 (T. Romero July 15, 2024 Ltr. to AUSAs Jonathan Hooks and Elizabeth Aloi); Ex. 29 (June-

August 2024 Emails between T. Romero and U.S. Attorney's Office).  When undersigned counsel

asked the prosecutors to "identify a single case where the government retried a defendant who had

received a probationary sentence and served most of it," they were unable to do so.  Ex. 29.  The

government decided to make Congressman Fortenberry's case the first.

**ARGUMENT**

**I.    The Constitution Prohibits Prosecution on the Basis of Political Identity and Political Speech**

Prosecutors may not bring criminal charges "for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  The Fifth Amendment protects individuals from "depriv[ation] of life, liberty, or property, without due process of law" and ensures equal treatment under the laws.  U.S. CONST. amend. V; *see Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).  Thus, prosecutors may not pursue criminal charges against defendants on the basis of "arbitrary classification[s]," *Armstrong*, 517 U.S. at 464, such as political identity or beliefs. *See, e.g.*, *United States v. Greene*, 697 F.2d 1229, 1236-37 (5th Cir. 1983); *United States v. Torquato*, 602 F.2d 564, 569 n.9 (3d Cir. 1979); *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (en banc); *United States v. Biden*, ___ F. Supp. 3d ___, 2024 WL 1603774, at *4 (D. Del. Apr. 12, 2024), *appeal filed*, No. 24-1703 (3d Cir. Apr. 17, 2024); *Judd*, 579 F. Supp. 3d at 4; *Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 16 (D.D.C. 1997).

Just as prosecutors may not prosecute and enforce the laws in violation of the Fifth Amendment, they likewise may not do so in violation of other constitutional protections, such as those provided by the First Amendment.  Relying on *Armstrong*, the D.C. Circuit has recognized a selective enforcement claim in the civil context predicated on political viewpoint discrimination. *See Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1137-38 (D.C. Cir. 2023).  Thus, prosecution on the basis of political speech or association is prohibited.  *See Ted Cruz for Senate v. Fed. Election Comm'n*, 542 F. Supp. 3d 1, 7 (D.D.C. 2021), *aff'd sub nom.*, 596 U.S. 289 (2022) ("[T]he First Amendment 'safeguards an individual's right to participate in the public debate through political expression and political association.'" (citation omitted)).

14

To be sure, "the 'presumption of regularity' applies to prosecutorial" decision-making, and courts are appropriately hesitant to second-guess prosecutorial judgment. *United States v. Griffin*, 549 F. Supp. 3d 49, 58 (D.D.C. 2021) (McFadden, J.) (cleaned up). But the presumption is rebuttable. To establish a claim of selective prosecution requiring dismissal of charges, a defendant must meet a "demanding" standard presenting "clear evidence" of discriminatory effect and discriminatory purpose. *See Armstrong*, 517 U.S. at 463-65 (citation omitted). At this stage, however, Congressman Fortenberry seeks only discovery in support of a selective prosecution claim, which requires a lesser showing.

## II.    Discovery Regarding Potential Selective Prosecution Is Warranted When There Is "Some Evidence" of Discriminatory Effect and Purpose

A defendant seeking to meet the high, but "not … impossible," standard of demonstrating selective prosecution, may seek discovery in support of a selective prosecution claim. *Id.* at 466, 468. To obtain discovery, a defendant must meet a "rigorous" burden of showing "a colorable claim" that selective prosecution occurred by presenting "some evidence" of discriminatory effect and purpose. *Judd*, 579 F. Supp. 3d at 5 (citations omitted); *see also United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam). "[S]ome evidence" of discriminatory effect requires "a credible showing" that "similarly situated individuals of a different [characteristic] were not prosecuted." *Armstrong*, 517 U.S. at 465, 470. This Court has recognized that evidence of discriminatory purpose typically includes "statistical disparities and other indirect evidence to show intent." *Judd*, 579 F. Supp. 3d at 4 (citing *United States v. Khanu*, 664 F. Supp. 2d 28, 33 (D.D.C. 2009)); *see also United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (recognizing in some cases evidence of discriminatory effect can be severe enough to support inference of discriminatory intent).

While the *Armstrong* discovery standard is demanding, an African American defendant charged with cocaine distribution met the standard when he showed that state prosecutions, but no single federal prosecution, of a white individual had occurred in an entire year across four counties of Massachusetts. *See United States v. Tuitt*, 68 F. Supp. 2d 4, 7-10 (D. Mass. 1999); *see also United States v. Steele*, 461 F.2d 1148, 1150-52 (9th Cir. 1972) (reversing census protestor's conviction after he showed that members of the census resistance movement were prosecuted for failing to answer the census, while other individuals who had not protested were not). An African American defendant charged with cocaine distribution who had significant evidence of racial animus on the part of prosecutors met the standard even though his white co-defendant was also prosecuted. *See United States v. Jones*, 159 F.3d 969, 976-78 (6th Cir. 1998).

The Constitution's prohibition against selective prosecution on impermissible grounds extends to selective enforcement decisions, such as choices to stop, seize, target, investigate, or arrest individuals. *See Wren v. United States*, 517 U.S 806, 813 (1996); *Frederick Douglass*, 82 F.4th at 1136. Neither the Supreme Court nor the D.C. Circuit Court has weighed in on the discovery standard that applies to claims of selective enforcement. The Third, Seventh, and Ninth Circuits, however, have held that courts should apply a more flexible standard. *See, e.g.*, *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc); *United States v. Washington*, 869 F.3d 193 (3d Cir. 2017); *United States v. Sellers*, 906 F.3d 848 (9th Cir. 2018). The Fourth Circuit has agreed that analyses by its sister circuits on this issue are "cogent" and "well taken." *United States v. Hare*, 820 F.3d 93, 99-101 (4th Cir. 2016).[7]

---

[7]    The reasons for permitting greater flexibility on selective enforcement discovery are twofold: (1) government agents (including prosecutors) acting in law enforcement or investigatory capacities are not entitled to the same kind of "presumption of constitutional behavior," that prosecutors acting as prosecutors receive; and (2) recovering pre-discovery statistics on individuals who could have been targeted for an investigation but were not is far more difficult than finding

*       *       *

The Congressman was a high-profile member of the Republican Party who supported President Donald Trump.  As discussed further below, it appears that no one situated similarly to the Congressman has faced retrial, and additional evidence casts doubt on prosecutorial motives. Furthermore, the D.C. Circuit has recognized that "concern for the integrity of the legislative process prompts careful inquiry into a congressman's claim of discriminatory prosecution." *United States v. Diggs*, 613 F.2d 988, 1004 (D.C. Cir. 1979).  This prosecution impacted the legislative process by forcing a sitting legislator out of office.

### A.    There Is Evidence of Differential Treatment

Defense counsel do not have access to a database of all prior federal retrials following reversal on appeal, but are unaware of examples in which the government has retried similarly situated defendants.  When undersigned counsel spoke with the prosecutors who made the decision to retry this case, they did not "identify a single case where the government retried a defendant who had received a probationary sentence and served most of it."  Ex. 29.  The evidence discussed below, based on reported cases in Westlaw and Lexis, shows that the government has treated other similarly situated defendants differently than Congressman Fortenberry.   After reviewing extensive Lexis and Westlaw appellate-conviction reversals over the last ten years, there appears to be no reported case where: (1) the defendant was sentenced to a probationary sentence, served the majority of the probationary sentence, and faced retrial following reversal; (2) the defendant served the majority of his sentence, and faced retrial following reversal on venue grounds; or (3) the defendant was charged solely with violating 18 U.S.C. § 1001, and faced retrial following

_____

pre-discovery statistics of individuals who could have been prosecuted but were not.  *See Davis*, 793 F.3d at 720; *Washington*, 869 F.3d at 216, 219, 221; *Sellers*, 906 F.3d at 853-54.

reversal.  Ex. 14 ¶¶ 2-3 (K. DeWilde Decl.).  This makes sense because scarce prosecutorial resources should not be used to retry cases that would not result in meaningful incremental punishment.  The lack of comparators over the past ten years, nationwide, warrants discovery.  *See Tuitt*, 68 F. Supp. 2d at 7-8.

Evidence also shows that the government does not re-prosecute defendants facing similar circumstances, but who lack the same political profile as the Congressman.  Ex. 14 ¶ 4.  In *United States v. Casellas-Toro*, for example, the defendant was sentenced to 21 months' imprisonment on a false-statements charge, and the First Circuit reversed on venue grounds after he had served 15 months of that sentence.  807 F.3d 380, 390, 392 (1st Cir. 2015); 13-cr-00201, ECF No. 155 (D.P.R. Aug. 11, 2014) (judgment).  We have been unable to find evidence of the government retrying the defendant elsewhere following remand.  *See id.*, ECF No. 172 (D.P.R. Jan. 29, 2016) (dismissal); Ex. 14 ¶ 4(a).  Similarly, in *United States v. Abair*, the defendant was sentenced to two years' probation for structuring currency transactions, and the Seventh Circuit reversed based on a prejudicial evidentiary ruling. 746 F.3d 260, 261-63 (7th Cir. 2014).  On remand, the government moved for dismissal and indicated it did not intend to retry the case, even though the defendant had served less than half of her sentence.  *See* No. 12-cr-00076, ECF No. 84 (N.D. Ind. June 27, 2013) (sentencing); *id.*, ECF Nos. 110-12 (N.D. Ind. May 9, 2014) (motion and order for dismissal).  And in *United States v. Rahman*, the defendant was convicted only of false statements, and after the Seventh Circuit reversed based on a suppression issue, the government dismissed the indictment.  805 F.3d 822, 830, 839 (7th Cir. 2015); No. 11-cr-00103, ECF No. 132 (E.D. Wis. Feb. 6, 2016).  Finally, in *United States v. Shelton*, after the Seventh Circuit reversed wire fraud convictions of a defendant who had served her 12-month probationary sentence, the government moved to dismiss the indictment.  997 F.3d 749, 773 (7th Cir. 2021); No. 14-cr-129, ECF No. 301

(N.D. Ind. Nov. 20, 2019) (sentencing); *id.*, ECF No. 339 (N.D. Ind. June 15, 2021) (motion to dismiss).

The irregularity of the decision to retry Congressman Fortenberry is further underscored by the fact that the government did not prosecute anyone else in connection with its Operation Titan's Grip investigation. This includes those who were actually complicit in the underlying campaign finance violations—the informant, Mr. Baaklini, and Mr. Chagoury—who received immunity or deferred prosecution agreements. *See supra*, p. 12. According to the government, two of those individuals lied in government interviews. *See supra*, p. 6 (the informant); *supra*, p. 6 (Baaklini). And no straw donor was charged. Only Mr. Chagoury maintains a public status similar to the Congressman, but he has been widely known for extensive ties and donations to prominent Democrats.[8]

Congressman Fortenberry has met the burden of showing some evidence of differential treatment to support discovery into a selective prosecution claim.

### B.    There Is Evidence of Discriminatory Purpose

There is also evidence tending to support a showing of discriminatory intent including: (1) anti-Republican political activity by the lead prosecutor; and (2) procedural irregularities during the investigation period, all of which involved approval and oversight by the same lead prosecutor. *Cf. Judd,* 579 F. Supp. 3d at 8-9 & n.9 (noting "troubling" discrepancies between

---

[8]      *E.g.*, Charles B. Babcok & Susan Schmidt, *Voters Group Donor Got DNC Perk:  Man with Nigeria Ties was at Clinton Dinner*, Wash. Post (Nov. 22, 1997), https://tinyurl.com/mrxpusfu; Joseph Tanfani, *He Was a Billionaire Who Donated To the Clinton Foundation.  Last Year, He Was Denied Entry Into the U.S.*, L.A. Times (Aug. 28, 2016), https://tinyurl.com/bdz4trbt; Diamon Naga Siu & Josh Gerstein, *Clinton Foundation Donor, Feds Settle Over Leaks*, Politico (July 31, 2017), https://tinyurl.com/mhft4e94.

prosecution decisions against January 6 and Portland rioters but also finding that multi-administration decisions undermined finding of discriminatory purpose).

### 1.    The Lead Prosecutor Engaged in Anti-Republican Political Activity

The lead prosecutor referenced in the background section has donated dozens of times over the past ten years to Act Blue, including the Democratic Congressional Campaign Committee, Democratic Victory PacUnlimited, the Democratic National Committee, Biden for President, and Kamala Harris for Senate.  While donations to campaigns and committees do not themselves violate any law or regulation for federal prosecutors, the lead prosecutor also took his donations a step further, donating to Stop Republicans twice in January 2021, nine months before the first indictment of Congressman Fortenberry.  Ex 30 (Lead Prosecutor's Combined Donations). Moreover, the lead prosecutor donated multiple times to Democrats running in important swing elections outside of his home state and jurisdiction, contributing to Mike Johnston (D) for Senate in Colorado in 2019 and to Raphael Warnock (D) for Georgia multiple times in 2020 and 2021. Ex 30; *see also* Jacob Pramuk, *A Guide to 2020's Most Important Senate Races*, CNBC (Nov. 9, 2020),  https://tinyurl.com/2k6n5umt.

While there is certainly no prohibition against federal prosecutors carrying political viewpoints, or making political contributions, the donations to Stop Republicans and the out-of-jurisdiction contributions combined with other evidence of differential treatment and prosecutorial irregularities discussed below support the request for discovery.  That is especially so given the public statements fixated on the high-profile nature of the Congressman's trial and conviction.  For example, since the first trial the lead prosecutor's LinkedIn has lauded "he and his team" for "secur[ing] the first federal convictions of a sitting US Congressmember (Jeff Fortenberry) in decades."  Ex. 31 (Lead Prosecutor's LinkedIn Profile).

### 2.    There Were Procedural Irregularities in This Case

Defendants bringing selective prosecution claims may point to procedural irregularities as circumstantial evidence of bias and discriminatory or malicious purpose.  *See United States v. Haggerty*, 528 F. Supp. 1286, 1293 (D. Colo. 1981) ("[T]he government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution.").  Thus, census protestors who showed that background reports were uniquely prepared for multiple protestors created an "inference of discriminatory selection."  *Steele*, 461 F.2d at 1152. Discrimination claimants in the civil context likewise routinely rely on procedural irregularities to establish discriminatory purpose.  For example, complaints alleging that university investigators have interrogated students for confessions, taken inaccurate notes, shared privileged information, and conducted incomplete investigations have moved past motions to dismiss.  *E.g.*, *Doe v. Columbia Univ.*, 831 F.3d 46, 49-52, 56-57 (2d Cir. 2016); *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 939-41 (9th Cir. 2022); *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (Barrett, J.).

There were several procedural irregularities in this case.

***Abandoning the plan to notify House Counsel before contacting Congressman Fortenberry.***  In 2017, the government originally planned to interview victim witnesses, including Congressman Fortenberry, only after notifying House Counsel.  *See supra*, p. 7.  The original plan would have accorded with FBI investigation protocol, which generally requires government agents to reveal "the true purpose of the interview at the outset."  DIOG § 18.5.6.1.  The original plan also would have accorded with known government practices to conduct defensive briefings with government officials who have come into contact with suspicious individuals.  Ex. 23, Trial Day 6 Tr. 160:11-23.  And finally, the plan would have accorded with DIOG requirements to use "particular care … when considering whether the planned course of action is the least intrusive

method" of investigation when the investigation "involve[s] the activities of a domestic public official." DIOG §§ 10.1.2.1, 10.1.3. The government abandoned that plan.

*Using an informant to secretly record conversations with the Congressman when he was not a subject of the investigation, in violation of DOJ guidelines.* When the Congressman reached out to the informant in March 2018, government agents abandoned protocol. Despite internal documents recognizing that Congressman Fortenberry was not even a subject, *supra*, p. 8, government agents, with the lead prosecutor's approval, decided to skip debriefing practices and secretly record a call between the informant and the Congressman, without notifying House Counsel. The request to set up the call also failed to indicate whether DOJ's Public Integrity Section had been notified, as required by DOJ policy. Justice Manual § 9-85.110; *supra*, p. 8.

*Using an informant to make incriminating allegations in a second secretly recorded call with the Congressman, apparently without seeking the requisite approvals.* When the initial call showed only that the Congressman was interested in having another fundraiser ahead of an election cycle, government agents planned a second call. *Supra*, p. 8. This time, agents provided scripted talking points to the informant to make allegations about suspicious campaign donations to the Congressman. *Supra*, p. 8. The government agents apparently did not seek new approval for the second call, failed to preserve the talking points they provided to the informant in violation of government record-keeping practices, DIOG § 14.2, and made a purposeful attempt to turn a sitting Congressman into an investigation subject in violation of policy commands to use "least intrusive means" of investigation, particularly when a public official is involved, DIOG §§ 10.1.2.1, 10.1.3; *supra*, p. 8-9. When government agents "ha[ve] a number of options" but "chose the most drastic option" instead, that is "probative, although not dispositive evidence of possible discriminatory intent," which is sufficient to support discovery. *Branch Ministries*, 970 F. Supp. at 17

(concluding that plaintiffs produced sufficient evidence to raise a colorable claim of intentional discrimination by IRS).

*Interviewing the Congressman using a "ruse" in an apparent effort to generate inconsistencies with the allegations the government scripted for the informant.* When agents sought to interview Congressman Fortenberry face-to-face nearly a year later, the agents requested to "utiliz[e] a ruse" when interviewing the Congressman that would "encompass his knowledge regarding IDC and its potential as a National Security risk if any." *Supra*, p. 9. The interview approval provided in discovery did not sign off on the ruse, lacked any indication of whether DOJ's Public Integrity Section had been notified, and expressly contemplated charging the Congressman for making false statements in the interview that had not even happened yet; the lead prosecutor concurred. *Supra*, p. 9. Despite not receiving approval to utilize a ruse, the government agents admittedly utilized one when they showed up at the Congressman's home unannounced and told his wife that they wanted to speak with him about a "national security matter," all with the intent to mislead the Congressman into speaking with them. *Supra*, p. 10. And when the Congressman later asked agents what they were seeking to uncover, one agent responded, "with the way foreign influence is going … it's something that we're looking into, that's all." *Supra*, p. 10.

*Misleading the Congressman's counsel.* Before the second interview, Attorney Gowdy— a former AUSA with experience in government investigations and knowledge of the difference between a target, subject and witness—reached out to the lead prosecutor regarding the Congressman's status. The lead prosecutor represented that the Congressman was a "subject trending toward a witness." *Supra*, p. 11. In fact, an internal government document at the time showed that the Congressman was very much a subject, and the government was already contemplating charges against him, which demonstrates that if his status was trending, it was

toward a target. *Supra*, p. 11. And when the lead prosecutor's accusatory questioning about precisely what was said in the second call with the informant raised concerns for Attorney Gowdy, he asked the lead prosecutor whether "this was some bullshit 1001 case." *Supra*, p. 11. The lead prosecutor, who had just asked a question that purported to track the secret transcript of the secretly recorded call, assured Attorney Gowdy it was not. *Supra*, p. 11. Only with those assurances did Attorney Gowdy allow the interview to continue. *Supra*, p. 11. The lead prosecutor's assurances left out the facts that: he had access to the secret transcript, he had just asked a question that attempted to track it, and internal documents showed that the government was already contemplating a § 1001 charge against the Congressman. *Supra*, p. 11. This conduct was, at the very least, irregular.

***Allowing the lead prosecutor to participate in and supervise this matter given the appearance of bias.*** At a minimum, the lead prosecutor's donations to Stop Republicans and swing races outside his district warranted a close look by the Justice Department before assigning him to try, and retry the Congressman far away from the lead prosecutor's home base. Ethical standards for executive branch employees require employees to "take appropriate steps regarding their participation in particular matters involving specific parties that may cause a reasonable person with knowledge of the relevant facts to question their impartiality." 5 C.F.R. § 2635.501(1); *see also id.* § 2635.502(a)(3); 28 U.S.C. § 528 (mandating regulations which "require the disqualification" of a prosecutor "from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof"). Employees must "analyze such appearance issues" and "receive authorization to participate in such matters, using the procedures" outlined in the regulations. 5 C.F.R. § 2635.501(1). Accordingly, the Justice Manual advises prosecutors to "contact [their]

designated Ethics Official for advice or approval" to participate in a matter when they are "asked to participate in a matter that might cause a reasonable person to question his or her impartiality." Justice Manual § 1-4.020. Defense counsel do not have access to internal government ethics processes, but it appears that there was some breakdown in the process; either the lead prosecutor did not disclose his Stop Republicans donations to ethics officials, or ethics officials did not address the issue because there is, at the very least, an appearance problem.[9]

**Retrying this case in contravention of Justice Manual principles.**    According to the Justice Manual, the purposes of criminal prosecution include   "punishment," "deterrence," "protection of the public," and "rehabilitation."   Justice Manual § 9-27.110, cmt.  Retrial would serve none of these purposes.  This is not a case where protection of the public ever was an issue. And no further punishment or rehabilitation is warranted because Congressman Fortenberry resigned from Congress, suffered a very public conviction, and served most of his probationary sentence already.  Nor would retrial promote deterrence.  Congressman Fortenberry, as a first-time offender in his 60s, poses no meaningful risk of recidivism, a point the sentencing court endorsed. *See* Ex. 25 at 28 (Sentencing Tr.).  As for general deterrence, the government already has sent a very public message that it will prosecute false statement cases.

The Manual further provides that, in deciding whether to prosecute, the government should weigh, among other factors, the person's "history with respect to criminal activity" and "personal circumstances," the "interests of any victims," the "probable sentence or other consequences if the person is convicted," the "nature and seriousness of the offense," and the "person's culpability in connection with the offense."  Justice Manual § 9-27.230.  The Congressman has no criminal

---

[9]    Concerns about the lead prosecutor's political contributions were raised on the eve of the prior trial, so presumably ethics officials knew about the donations by that time. Ex. 32, C.D. Cal. Feb. 11, 2022 Pretrial Conference Tr. 45:2-8.

history; there were no alleged victims of the offense; the probable sentence upon conviction would be a few months of probation; as to seriousness, even the government argued for only a six-month sentence, *see* ECF No. 213, at 38 (C.D. Cal. June 14, 2022); and the more culpable persons who committed the underlying offenses were not prosecuted.

The Justice Manual underscores that "[f]ederal law enforcement resources are not sufficient to permit prosecution of every alleged offense," and "[i]t is important that limited federal resources not be wasted."  Justice Manual § 9-27.230, cmt.1, 2.  The minimal probationary sentence "likely to be imposed if prosecution is successful" should lead a neutral decisionmaker to conclude that such a sentence would not "justify the time and effort of prosecution."  Justice Manual § 9-27.230, cmt.9.  This is particularly true because retrial here involves two separate U.S. Attorneys' Offices, and the expenditure of cross-country resources, when both offices reported being "resource strapped" and unable to "get up to speed" when declining an opportunity to work on the prosecution of Hunter Biden.  *United States v. Biden*, 2024 U.S. Dist. LEXIS 62566, at *53-54 (C.D. Cal. Apr. 1, 2024).

## CONCLUSION

Congressman Fortenberry has presented evidence that, but for his political identity and speech, he would not have been targeted, charged, or re-tried.  Congressman Fortenberry respectfully requests that the Court order the government to produce the following discovery:

1. Data regarding appellate court reversals showing whether or not the government retried the case following reversal when the defendant had served most of his or her probationary sentence.

2. The prosecution memorandum and other decision-making documents regarding the charging, trial, and retrial decisions in this case.

3. Communications (including on personal devices or platforms) evidencing negative statements by the prosecutors or agents in this case about Congressman Fortenberry, the Republican Party, or other prominent Republicans.

4.  Documents regarding the apparent procedural irregularities identified in this motion (not notifying House Counsel before contacting Congressman Fortenberry, not seeking requisite approvals or providing requisite notifications, not using least intrusive means in matters involving a public official, misleading defense counsel, vetting of the lead prosecutor's donations, retrying this case) including the applicable rules, the decision-making documents, and the documents evidencing the reason(s) for the procedural departure.

To date, the government has declined Congressman Fortenberry's request for this information.

Date: October 29, 2024

Respectfully submitted,

/s/ *Tobin J. Romero*
Tobin J. Romero (Bar. No. 461273)
Jonathan B. Pitt (Bar No. 479765)
Andrew P. Lemens (Bar No. 156487)
Kristen A. DeWilde (Bar No. 90012738, *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
Tel: (202) 434-5000
F: (202) 434-5029
tromero@wc.com
jpitt@wc.com
alemens@wc.com
kdewilde@wc.com

*Counsel for Jeffrey Fortenberry*