# Exhibit 3

**1**

1            UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2      HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

3

4   UNITED STATES OF AMERICA,

5                    Plaintiff,

6    v.                                    Case No.
                                           2:21-cr-00491-SB-1
7   JEFFREY FORTENBERRY,

8                    Defendant.
    _____

9

10

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                           JURY TRIAL
13                       MARCH 24, 2022
                           8:10 A.M.
14                   LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22    _____

23                   JUDY K. MOORE, CRR, RMR
                  FEDERAL OFFICIAL COURT REPORTER
24                  350 WEST 1ST STREET, #4455
                  LOS ANGELES, CALIFORNIA 90012
25                        213.894.3539

```
 1                         APPEARANCES

 2   FOR THE GOVERNMENT:        MR. MACK E. JENKINS
                                MS. SUSAN S. HAR
 3                              MR. J. JAMARI BUXTON
                                Assistant United States Attorneys
 4                              312 North Spring Street
                                Suite 1500
 5                              Los Angeles, California 90012

 6

 7   FOR THE DEFENDANT:         MR. JOHN L. LITTRELL
                                Bienert Katzman Littrell Williams, LLP
 8                              903 Calle Amanecer
                                Suite 350
 9                              San Clemente, California 92673

10                              MR. RYAN V. FRASER
                                Bienert Katzman Littrell Williams, LLP
11                              601 West 5th Street
                                Suite 720
12                              Los Angeles, California 90071

13                              MR. GLEN E. SUMMERS
                                Bartlit Beck, LLP
14                              1801 Wewatta Street
                                Suite 1200
15                              Denver, Colorado 80202

16                              MS. KALLY A. KINGERY
                                Kingery Law
17                              9595 Wilshire Boulevard
                                Suite 900
18                              Beverly Hills, California 90212

19

20

21

22

23

24

25
```

**3**

1                           I N D E X

2    DEFENSE WITNESSES:
        CELESTE FORTENBERRY
3           Direct Examination by Mr. Summers, Page 21
            Cross-Examination by Ms. Har, Page 65
4           Redirect Examination by Mr. Summers, Page 81
            Recross-Examination by Ms. Har, Page 86

5

6

7    DEFENSE EXHIBITS                      OFFERED    RECEIVED

8    Exhibit 1077                            37          37

9    Exhibit 1061 (Page 1)                   42          42

10   Exhibit 1068 (Page 1)                   52          52

11   Exhibit 1106 (Time stamp 1:48 to 2:53)  57          57

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**21**

1            MR. SUMMERS:  Thank you, your Honor.  Good morning,
2   everyone.  The defense would like to call Mrs. Celeste
3   Fortenberry.
4                        CELESTE FORTENBERRY,
5   called as a witness by the defense, was sworn and testified as
6   follows:
7            COURTROOM DEPUTY:  Would you please state and spell
8   your full name for the record.
9            THE WITNESS:  Celeste Fortenberry.  C-E-L-E-S-T-E,
10  F-O-R-T-E-N-B-E-R-R-Y.
11           COURTROOM DEPUTY:  Thank you.
12           THE COURT:  Mr. Summers?
13           MR. SUMMERS:  Thank you, your Honor.
14                       DIRECT EXAMINATION
15  BY MR. SUMMERS:
16  Q.    Good morning, Mrs. Fortenberry.
17  A.    Good morning.
18  Q.    How are you holding up today?
19  A.    It's been hard.  I'm nervous, and it's been really rough,
20  but I'm trying to keep it together.
21  Q.    I take it you are married to Congressman Fortenberry, the
22  defendant in this case?
23  A.    Yes.
24  Q.    How long have the two of you been married?
25  A.    Almost 26 years.

1  Q.    When did you first meet?

2  A.    I first met Jeff in about mid summer of '93.  And Jeff

3  met me in late summer of '93.

4  Q.    What do you mean by that?

5  A.    Well, he doesn't remember meeting me the first time.  We

6  were -- I was working at Franciscan University of Steubenville

7  in Ohio, and he was pursuing a Master's in theology.  And a

8  bunch of us got together for lunch, and he was part of the

9  group.  And I introduced myself and I said, "Where are you

10 from?"  And he said, "Louisiana."  I said, "Oh, my mother's

11 from New Orleans.  I used to live in Louisiana."  And we had a

12 conversation.  I thought we hit it off and...

13 Q.    And what happened after that?

14 A.    A few weeks later we met again at a friend's house, and

15 he didn't remember meeting me.  It was like first time for him.

16 I was really excited to see him, but...

17 Q.    Is that the way he sort of is at times?

18 A.    Yes.

19 Q.    For you, in the 25 years that you've been married, have

20 you come to learn about your husband's family upbringing?

21 A.    Yes.

22 Q.    And his background?

23 A.    Of course.

24 Q.    Have you met his family?

25 A.    Yes.  I love his family.

1  Q.    Very, very briefly, what sort of upbringing did he have?

2  A.    His father was killed when he was about 12 years old, so

3  he was -- he and his sister were raised by his mother.  And she

4  raised him to be a person of honor and integrity and faith.

5  Q.    Does the Congressman come from family money?

6  A.    No.  His mother has always worked.

7  Q.    How old is she?

8  A.    She's 83 and she's still working.

9  Q.    Did the Congressman make a bunch of money with some

10  start-up or something like that?

11  A.    No.

12  Q.    Now, where do you and your husband live?

13  A.    We live in Lincoln, Nebraska.

14  Q.    And how long have you lived there?

15  A.    Since 1996.

16  Q.    I'd like to just very briefly show you an exhibit.  I

17  think there's no objection.  This is Exhibit 1074.

18        MR. SUMMERS:  With the Court's permission, may I

19  publish?

20        THE COURT:  Yes.

21        MR. SUMMERS:  Thank you, your Honor.

22  BY MR. SUMMERS:

23  Q.    Mrs. Fortenberry, we've put in front of you and published

24  in the courtroom what we've marked as Exhibit 1074.  Can you

25  just tell me what Exhibit 1074 is?

1    A.    That's our house.

2    Q.    And how long have you lived in this particular home?

3    A.    Since 2001.

4    Q.    Does anyone else live in your home with you, with you and

5    the Congressman?

6    A.    We have five daughters.  One is married and has a baby

7    and no longer lives at home, and another one has moved out as

8    well, so we're losing them, but...

9    Q.    Is that a good thing or a bad thing?

10    A.    It's a little of both.

11    Q.    Now, what about during the summer of 2018, June of 2018,

12    who all was living in the home with you?

13    A.    Four of our daughters.

14    Q.    And during the trial, we saw some young women over here

15    on the right side of the aisle.  Have those been your

16    daughters?

17    A.    Yes.

18    Q.    And do we see two of them in the courtroom today?

19    A.    Yes, our oldest and our youngest.

20    Q.    Now, did you have any pets or anyone else at the home at

21    the time, back in the June 2018 time period?

22    A.    I can't remember if we still had chickens or if the

23    opossums had gotten them.  We had bees and we had a dog.

24    Q.    What kind of dog?

25    A.    A beagle named Porsche.

**25**

1  Q.    Generally speaking, what's the cell service like at your
2  house?

3  A.    It's not -- it's not great.  It's spotty.

4         MS. HAR:  Objection, your Honor.  Vague as to time.

5         MR. SUMMERS:  I'll get to the relevant time, your
6  Honor.

7         THE COURT:  Why don't you establish a foundation for
8  the relevant time now, please.

9         MR. SUMMERS:  Of course.

10 BY MR. SUMMERS:

11 Q.    Mrs. Fortenberry, back in the June 2018 time period, just
12 generally speaking, what was the cell service like at your
13 home?

14 A.    Spotty.

15 Q.    Was it good enough that you could generally use the cell
16 phones?

17 A.    It was good enough.  Every once in a while we'd have
18 aggravating drops, but I mean, that's what cell phones do,
19 right, but...

20 Q.    So --

21 A.    But the kids complain all the time about the cell
22 service, my tech experts.

23 Q.    Have you ever had to do anything -- let me ask you this:
24 Do you work?

25 A.    Yes, I do.

**26**

1  Q.    Do you use your cell phone for work when you're at home?

2  A.    Yes, I do, to a point.  I have a client that insisted

3  that I buy a landline phone because he's been complaining about

4  my cell service for years.

5  Q.    And when did you purchase that landline phone?

6  A.    Last year.

7  Q.    And did the client pay for it?

8  A.    Yes.

9  Q.    Mrs. Fortenberry, do you also have a home in Washington

10  D.C.?

11  A.    No.

12  Q.    Now, the Congressman has been a member of the House of

13  Representatives for almost 20 years; is that right?

14  A.    Yes.

15  Q.    Have you never -- is it your testimony that you've never

16  had a home in Washington D.C.?

17  A.    No.  In 2005 when he was first sworn in, we did purchase

18  a townhouse about 12 or 13 miles from the Capitol, but it was

19  too expensive, we couldn't sustain it, so we had to sell it a

20  few years later.

21  Q.    So where does your husband stay when he's in Washington

22  D.C.?

23  A.    In his office.  He sleeps on his couch.

24  Q.    How much time does he generally spend in Washington D.C.?

25  A.    I can't say exactly.  He splits his time between D.C. and

1  Lincoln.  An ordinary week is he flies to D.C. on Monday or

2  Tuesday.  He flies home on Thursday or Friday, depending.  And

3  he's -- he spends the weekend with us in Lincoln.

4  Q.    If he flies home on Thursday, on a Thursday, what does he

5  typically do on Friday?

6  A.    He works in his district office.

7  Q.    Is that a Government office?

8  A.    Yes.

9  Q.    That he has in Lincoln, Nebraska?

10 A.    Yes.

11 Q.    And if he comes back later, or he does that, what does he

12 typically -- where does he -- where is he typically on the

13 weekends?

14 A.    Typically on weekends he's with us.  He's -- but

15 inevitably there's something that comes up that he needs to do

16 in the district.  You know, it's different all the time, but

17 there's...

18 Q.    Sure.  When he's at home in Lincoln at the house we saw

19 in Exhibit 1077, does he have a home office that he uses for

20 telephone calls?

21 A.    He has a home office, but he doesn't use it for phone

22 calls.

23          MS. HAR:  Objection.  Vague as to time.

24          THE COURT:  Clarify the time.  The answer will

25 stand, however.

**28**

1  BY MR. SUMMERS:

2  Q.    Would your answer be any different if we went back five

3  years to the present, or is it the same throughout that entire

4  time period?

5  A.    Same.

6  Q.    Now, what about specifically in June of 2018?

7  A.    He would not have used the office for phone calls.

8  Q.    Why not?

9  A.    The cell service is terrible down there.

10  Q.    Any other reasons?

11  A.    There's nowhere to sit.  It's basically storage.  He

12  doesn't use it to work; he uses it to put stuff.

13  Q.    Okay.

14          MR. SUMMERS:  And I'd like to just show you for

15  identification purposes only, if we could do that,

16  Ms. Graciano, Exhibit -- this is Exhibit 1077.  May I go ahead

17  and --

18          THE COURT:  Yes.

19          MR. SUMMERS:  Thank you.  Well, hold on.

20  BY MR. SUMMERS:

21  Q.    Mrs. Fortenberry, do you see what we've marked for

22  identification as Exhibit 1077?

23  A.    Yes.

24  Q.    Does this -- can you tell me what this photograph is?

25  A.    This is Jeff's basement office.

**29**

1   Q.    Is this a recent photograph?

2   A.    Yes.

3   Q.    Does it generally resemble the way the office looked back

4   in June of 2018?

5   A.    No.  It was worse in June of 2018.  He's cleaned it up a

6   lot.  You couldn't walk in there before.

7   Q.    Okay.

8           MR. SUMMERS:  Your Honor, I'd like to move the

9   admission of Exhibit 1077.

10          MS. HAR:  Objection, your Honor.

11          THE COURT:  I'll allow it.  Go ahead.

12          MR. SUMMERS:  Thank you, your Honor.

13          Ms. Graciano, if we could please publish.

14  BY MR. SUMMERS:

15  Q.    And, Mrs. Fortenberry, if your husband were to have

16  received a call back in early June of 2018, is there any

17  possibility in your mind and based on your observations of him

18  and how he uses his office, that he would have taken the call

19  there?

20  A.    No.

21  Q.    So when the Congressman is at home on the weekends, does

22  he sometimes take phone calls?

23  A.    Yes.

24  Q.    Or place phone calls?

25  A.    Yes.

1  Q.    Does he sometimes make fundraising calls?

2  A.    Yes.

3          MS. HAR:  Objection.  Vague as to time.

4          THE COURT:  Overruled.

5  BY MR. SUMMERS:

6  Q.    Does he sometimes call people asking them to make

7  contributions to his campaign?

8  A.    Yes.

9  Q.    Does he sometimes ask people to host fundraisers?

10  A.    Yes.

11  Q.    Do you oftentimes overhear these calls?

12  A.    Yes.

13  Q.    Now, when he makes these calls, does he have a habit as

14  to where he might be or is there a pattern?  Where would he

15  typically be in the home?  If he's not in the office, where is

16  he typically when he makes these phone calls?

17  A.    It's different, but he is usually doing something else at

18  the same time, for fundraising calls specifically.  He will be

19  in the kitchen cooking or washing up.  He'll be doing things in

20  the yard.  He'll be walking the dog.  He'll be driving.  He'll

21  be -- he's been on the roof fixing the chimney or raccoon

22  damage.  He does something else at the same time.

23  Q.    Now, I think you indicated that if there -- that this is

24  for fundraising calls?

25  A.    Yes.

1  Q.    Are there times where he acts differently?

2  A.    Oh, yes.  For instance, just recently he had a conference

3  call with a Ukrainian General about the war there, and that is

4  "clear the deck," everybody out, complete focused attention.

5           MS. HAR:  Objection, your Honor.  403.

6           THE COURT:  I'm simply going to let you handle this

7  on cross-examination.

8  BY MR. SUMMERS:

9  Q.    Does the Congressman have to make and receive lots of

10 fundraising calls?

11 A.    Yes.

12 Q.    Is he allowed to do that from his office in Washington

13 D.C.?

14 A.    No.

15 Q.    Is he allowed to do it from his Government office in

16 Lincoln, Nebraska?

17 A.    No.

18 Q.    Given that, does he do a lot of this from home?

19 A.    Yes.

20 Q.    Does the Congressman ever sit down at the dining room

21 table or somewhere to make these sorts of calls?

22 A.    Yes, but again, he'll be doing something else.  He'll be

23 going through the mail, he'll be -- sometimes his office will

24 give him a stack of letters to sign and he'll be writing

25 personal notes on them.  He really hates doing fundraising

1  calls, and doing something else kind of helps him through it.

2  Q.    Okay.  Let's talk about the Congressman's fundraising

3  calls.  I think you indicated previously that you've overheard

4  him make lots of them?

5  A.    Yes.

6  Q.    Are there times where you can hear both sides of the

7  conversation?

8  A.    Yes.

9  Q.    When would that occur?

10 A.    If he's put the phone on speaker; or if he's driving in

11 the car, obviously, he's doing it hands-free.  And if I'm with

12 him, I hear it.

13 Q.    Over the years that he's been a Congressman, how many

14 fundraising calls have you overheard him make?

15 A.    Hundreds.  I don't know.

16 Q.    Do they typically follow a set pattern?

17 A.    Yes.

18 Q.    Can you please describe that set pattern for us?

19 A.    Certainly.  You know, obviously, he greets the person and

20 he spends time talking about points of commonality.  If he's

21 talking to a farmer or rancher, he'll talk about ag issues and

22 they'll express concerns with what's going on or things that

23 are going well.  If he's talking to a banker, obviously, it's

24 financial issues.  He'll ask about their families particularly

25 if he knows them.  And then --

**33**

1  Q.    So they know people in common.  Is that something he
2  might mention or discuss?
3  A.    Oh, yes.  Yes.  "Have you seen so-and-so lately?  How is
4  he or she doing?"
5  Q.    So after going through that and establishing those points
6  of commonality and warming things up, does he -- what happens
7  next in these calls, typically?
8  A.    Then he'll make the ask.  And it generally goes like,
9  "I'm sorry to have to do this, but you know campaigns are
10 expensive and we have to run every year" -- "every other year
11 and you've been so generous in the past, I was wondering if you
12 could help us out again."
13 Q.    Okay.  Does he often say that it's hard to raise money?
14 A.    Yes.
15 Q.    What does he typically do if the person he's speaking
16 with indicates some hesitation to give again or to hold another
17 fundraiser?
18 A.    He'll say, "Of course I understand.  Whatever you can do.
19 It doesn't have to be as much.  It can" -- you know --
20 "whatever you can do.  We really appreciate it because you know
21 how hard this is."
22 Q.    And what if it's a fundraiser he's asking for, what
23 typically would he say?
24 A.    It's the same thing, sort of thing.  "It could be a
25 smaller event.  It doesn't have to be anything elaborate.  It

**34**

1  can be simple."

2  Q.    He tries to get whatever the person's willing to do?

3  A.    Exactly.

4  Q.    Even if it's less?

5  A.    Yes.

6  Q.    Now, the jury's heard some testimony in this case about a

7  call the Congressman received on June 4th of 2018.  I know

8  you've been sequestered, you haven't been allowed to be in the

9  courtroom for much of the testimony.

10  A.    Yes.

11  Q.    But what I'd like to ask you is if you know where you

12  were in the days immediately leading up to that call.  Do

13  you -- as you sit here today, do you know where you were the

14  first few days of June, before June 20th -- June 4th to 18?

15  A.    Yes.

16  Q.    Where were you?

17  A.    Jeff and I were in Finland and Estonia.

18  Q.    Why were you in Finland and Estonia?

19  A.    We were attending a conference.  It was members of --

20  other members of Congress.  It was bipartisan and it was -- the

21  issue was Russia.  It was dealing with things like Russian

22  aggression toward Ukraine and --

23          MS. HAR:  Objection, your Honor.  403.

24          THE COURT:  Sustained.

25  BY MR. SUMMERS:

1  Q.    Do you know when you returned from Finland, this trip to

2  Finland and Estonia?

3  A.    Yes.

4  Q.    And before we get to that, do you know what the time

5  difference is between Lincoln and Finland?

6  A.    Oh, it's -- I want to say it's at least seven hours.  It

7  might be eight.

8  Q.    And how long were you there, roughly?

9  A.    About a week.

10  Q.    When did you return to Lincoln from Finland?

11  A.    Late Sunday night, June 3rd.

12  Q.    Was this on a Government jet of some sort?

13  A.    No.  No.  It was commercial.

14  Q.    And you said you got back late the night of June 3rd?

15  A.    Yes.

16  Q.    Do you recall roughly what time?

17  A.    I want to say we landed sometime after 9:00, so we were

18  probably home around 10:00, maybe a little later.

19  Q.    What did you do when you got home?

20  A.    I probably greeted the kids and went to bed.  I don't

21  remember.

22  Q.    Now, what happened the next day?  So let's now move

23  forward to June 4th.  You've returned to Lincoln, your home.

24  What was going on that day?

25  A.    Well, we were --

**36**

1  Q.    Oh, before we do that, I'd like to show you for

2  identification what we've marked as Exhibit 1061.  I'm going to

3  go ahead and ask Ms. Graciano just to put it on your screen and

4  the Court's and counsel's.

5            Mrs. Fortenberry, can you please tell me what

6  Exhibit 1061 is.

7  A.    Yes.  That's my briefing book from our conference in

8  Finland.

9  Q.    This is something you received?

10 A.    Yes.

11 Q.    That documents the trip?

12 A.    Yes.

13 Q.    What's the purpose of the briefing book?

14            MS. HAR:  Objection, your Honor.  Relevance.  403.

15            THE COURT:  Sustained.  You could publish it now.  I

16 will receive it for the limited purpose that we discussed.

17            MR. SUMMERS:  Thank you, your Honor.

18            Ms. Graciano, if you could please publish.

19 BY MR. SUMMERS:

20 Q.    If we look at the cover page, Mrs. Fortenberry, do you

21 see the dates of the trip?

22 A.    Yes.

23 Q.    May 29th to June 3, 2018?

24 A.    Yes.

25 Q.    Were those, in fact, the dates of the trip?

**37**

1  A.     Yes.

2            MR. SUMMERS:  And, your Honor, I move Exhibit 1061

3  into evidence.

4            THE COURT:  Received.

5            MS. HAR:  And, your Honor, would that be just the

6  first page of 1061?

7            THE COURT:  It is.

8  BY MR. SUMMERS:

9  Q.     So moving forward now to the day of June 4, 2018, I take

10 it you and your husband were both at home?

11 A.     Yes.

12 Q.     What happened that day?  What was going on that day?

13 A.     Well, we were exhausted from the trip, and I -- I was

14 getting ready to get on a plane that day with our third

15 daughter Katherine, so I was unpacking and packing and doing

16 laundry and catching up with the kids and catching up with the

17 mail and getting Katherine to the hospital for blood work

18 because she was having surgery.  That's why we were going to

19 Charleston.

20 Q.     So it's June 4.  You've just returned from Finland.  If

21 I'm hearing you correctly, you were about to leave for

22 Charleston, South Carolina?

23 A.     Yes.

24 Q.     When were you leaving for Charleston?  That same day or

25 some other day?

1  A.    That same day, June 4th.

2  Q.    The same day?

3  A.    Yes.

4  Q.    And, very briefly, what was the nature of the surgery

5  that Katherine was to have?

6          MS. HAR:  Objection.

7  A.    She had a tumor in her ear.

8          THE COURT:  One second.

9          MS. HAR:  Objection.  403.

10         THE COURT:  Sustained.  She was going to have some

11  surgery.  Move on, please.

12  BY MR. SUMMERS:

13  Q.    Mrs. Fortenberry, does your daughter Katherine have

14  severe health issues?

15  A.    Yes.

16         MS. HAR:  Objection, your Honor.

17         THE COURT:  Sustained on 403 grounds.

18         MR. SUMMERS:  Your Honor, may we have a brief

19  sidebar?

20         THE COURT:  You may not.  Please continue.

21  BY MR. SUMMERS:

22  Q.    Did anything unusual happen that day other than preparing

23  to leave for this surgery?

24  A.    I'm sorry.  Yes.  Besides getting ready for the surgery,

25  yes, my husband came to me to talk about a phone call he had

**39**

1  received.

2  Q.    Do you have an understanding today as to who made that

3  phone call to him?

4            MS. HAR:  Objection, your Honor.  Hearsay.

5            THE COURT:  Sustained.

6  BY MR. SUMMERS:

7  Q.    Did your husband tell you who called him?

8  A.    Yes.

9  Q.    Who called him?

10           MS. HAR:  Objection, your Honor.  Hearsay.

11 A.    Dr. Ayoub.

12           THE COURT:  Sustained.

13           MS. HAR:  Move to strike, your Honor.

14           THE COURT:  It is stricken.

15           MR. SUMMERS:  And, your Honor, just offering for the

16 background and not hearsay purpose.  We haven't gotten into the

17 substance of the communication.  But I understand the Court's

18 ruling.  Just for purposes of future questions.

19 BY MR. SUMMERS:

20 Q.    Mrs. Fortenberry, what did your husband tell you he heard

21 on that call?

22           MS. HAR:  Objection.  Hearsay.

23           THE COURT:  Sustained.

24 BY MR. SUMMERS:

25 Q.    Without repeating what your husband told you, did he --

1  how did he appear?

2  A.    Confused and concerned.

3  Q.    Without repeating what he said to you, what concerns, if

4  any, did you have based on what you heard?

5           MS. HAR:  Objection.  Calls for hearsay.

6           THE COURT:  Sustained, not necessarily on that

7  ground.

8  BY MR. SUMMERS:

9  Q.    Mrs. Fortenberry, did you have a conversation with your

10  husband --

11  A.    Yes.

12  Q.    -- about that call?

13  A.    Yes.

14  Q.    What did you talk about -- what did you talk about during

15  that conversation?

16           MS. HAR:  Objection.  Hearsay.

17           THE COURT:  Sustained.

18  BY MR. SUMMERS:

19  Q.    During that conversation, did you have any concerns about

20  so-called conduit or straw man contributions to the

21  Congressman's campaign?

22           MS. HAR:  Objection.

23  A.    No.

24           MS. HAR:  Calls for hearsay.

25           THE COURT:  Sustained.

**41**

1              MS. HAR:  Move to strike.

2              THE COURT:  The answer is stricken.

3              MR. SUMMERS:  And let me -- I don't want to ask the

4    same question, but I think I'm going to ask it differently.

5    But my memory -- but I want to ask what I think is a different

6    question.

7              THE COURT:  All right, Counsel, but you understand

8    the parameters, they're fairly clear.  I've just ruled on it

9    more than one time.

10   BY MR. SUMMERS:

11   Q.    Without revealing what he said or what you said, what, if

12   any, concerns did you have in your mind?

13             MS. HAR:  Objection.  Calls for hearsay.

14             THE COURT:  Sustained again, not necessarily on

15   those grounds.  And I've already ruled on this.

16   BY MR. SUMMERS:

17   Q.    At the end of the conversation, did you give your husband

18   any advice?

19   A.    Yes.

20   Q.    What was that advice?

21   A.    I told him to talk to a lawyer.

22             MS. HAR:  Objection.  Hearsay.  Relevance.

23             THE COURT:  Sustained.

24   BY MR. SUMMERS:

25   Q.    Did you make any decisions?

**42**

1  A.    We decided to talk to a lawyer.

2  Q.    What happened after that conversation?

3  A.    I went back to laundry and packing and being with the

4  kids and getting ready to drive to Omaha to catch a flight to

5  Charleston so that I could get my daughter into her pre-op

6  appointments for her surgery on Wednesday.

7  Q.    Do you have a good recollection of the events of that

8  week at a high level?

9  A.    Yes.

10            MR. SUMMERS:  With the Court's permission, I'd like

11  to show the witness a demonstrative and I'd like to go ahead

12  and publish it to the jury, again, for demonstrative purposes

13  only.

14            THE COURT:  Is there an objection?

15            MS. HAR:  No objection, your Honor.

16            THE COURT:  All right.

17  BY MR. SUMMERS:

18  Q.    Mrs. Fortenberry, have you put together --

19            THE COURT:  And this is which exhibit?

20            MR. SUMMERS:  This has been marked...

21            THE COURT:  As 1017?

22            MR. SUMMERS:  As 1017, but again, it's only

23  demonstrative, not to be received into evidence as an exhibit,

24  per se.

25            THE COURT:  Very well.

**43**

1  BY MR. SUMMERS:

2  Q.    Mrs. Fortenberry, have you prepared the information

3  contained in demonstrative Exhibit 1017?

4  A.    Yes.

5  Q.    Does this depict the events at a high level of the week

6  of June 3rd?

7  A.    Yes.

8  Q.    It says here that on Sunday, June 3rd, you returned from

9  Finland.  I think we covered that?

10  A.    Yes.

11  Q.    And then Monday, June 4, it says, "Ayoub call" and

12  "Katherine and I fly to Charleston."  That's what you just

13  testified about?

14  A.    Yes.

15  Q.    Then it says the next day, Tuesday, June 5th, "Jeff flies

16  to Washington D.C." and then "Jeff flies to Charleston."  What

17  do you remember of your husband's schedule on Tuesday,

18  June 5th?

19  A.    He flew to Washington that morning and he -- I think he

20  voted, and he flew to Charleston that night to be with us.

21  Q.    Was there -- I think you may have hinted to it or

22  testified to it.  Was there a reason he had to go to D.C.

23  rather than flying directly to Charleston?

24  A.    I think he had votes.

25  Q.    Did he then proceed on to Charleston?

**44**

1   A.      Yes.

2   Q.      Here it says Wednesday, June 6th, "Katherine's surgery in

3   Charleston."   Without getting into the details, did she have

4   surgery that day?

5   A.      Yes, she did.

6   Q.      And again without getting into any details, was it a

7   major surgery?

8   A.      Yes.

9              MS. HAR:  Objection, your Honor.  It's 403.

10             THE COURT:  Overruled.  The answer will stand.

11             MR. SUMMERS:  And if I might, your Honor...

12  BY MR. SUMMERS:

13  Q.      Has she had a lot of surgeries?

14             MS. HAR:  Objection.

15  A.      She's had five open-heart surgeries.

16  BY MR. SUMMERS:

17  Q.      Without any detail --

18             THE COURT:  When there's an objection, if you would

19  just kindly pause.

20             THE WITNESS:  I'm sorry, your Honor.

21             THE COURT:  The objection is sustained as to the

22  last question.

23  BY MR. SUMMERS:

24  Q.      Here it says that on Thursday, June 7th, she was in

25  recovery, and then it says that, "Jeff flies to D.C."  Did your

1  husband travel back to Washington D.C. on the 7th?

2  A.    Yes.

3  Q.    Do you recall why?

4  A.    Yes, for votes.  So he missed votes on Wednesday, but he

5  wanted to get back and vote as much as he could before the end

6  of the week.

7  Q.    And then under Friday, June 8th, it indicates that he

8  flew back to Lincoln.  Is that your recollection?

9  A.    Yes, Lincoln or Omaha.

10  Q.    And it says that, "Jeff calls FEC lawyer."  Is it your

11  recollection that he called a lawyer that day?

12  A.    Yes.

13  Q.    To get advice relative to the phone call he received from

14  Dr. Ayoub?

15  A.    Yes.

16          MS. HAR:  Objection, your Honor.  Lacks foundation.

17  Hearsay.

18          THE COURT:  Sustained.

19          MR. SUMMERS:  I'm just asking about her

20  understanding, your Honor, if I may?

21          THE COURT:  Her understanding is not relevant.

22  BY MR. SUMMERS:

23  Q.    Then it looks like you flew home on Saturday, June 9th,

24  is that correct, with your daughter?

25  A.    Yes.

**46**

1  Q.    And it says, "Dance recital."  What was your dance

2  recital?

3  A.    Our two daughters were in a dance recital, so we got --

4            MS. HAR:  Objection.

5  A.    We landed, brought Katherine home, and I went straight to

6  the theater and I fell asleep.

7  BY MR. SUMMERS:

8  Q.    Without getting into --

9            THE COURT:  One second.  We're going to have to take

10  a five-minute break.  We have a technical issue.

11            So, members of the jury, please don't speak to

12  anyone about the case, the people, or the subject matter

13  involved.  Continue to keep an open mind.  We just need five

14  minutes.  It's now 9:09, so 9:15.

15            (Recess from 9:09 a.m. to 9:17 a.m.)

16            THE COURT:  Back on the record in U.S. versus

17  Fortenberry with all present who were previously present,

18  including the witness.  You may continue with your direct

19  examination.

20            MR. SUMMERS:  Thank you, your Honor.

21  BY MR. SUMMERS:

22  Q.    Mrs. Fortenberry, before the brief break, we were talking

23  about the June 4, 2018, call from Dr. Ayoub, and then we talked

24  about some of the subsequent events that week.  Do you recall

25  that?

1  A.    Yes.

2  Q.    I'd like to take you back now to that call from Dr.

3  Ayoub.  Have you heard that call?

4  A.    Yes.

5  Q.    Did you hear it back at the time?

6  A.    No.

7  Q.    Have you heard it since?

8  A.    Since -- I'm sorry.  Since when?

9  Q.    Have you heard it more recently?

10 A.    Yes.

11 Q.    When have you heard it?

12 A.    I want to say February of this year.

13 Q.    In connection with this --

14 A.    Yes.

15 Q.    -- litigation, with this case?

16 A.    Yes.

17 Q.    When you heard it, did you hear any sounds that gave you

18 clues or hints as to where your husband might have been when

19 that call -- when he received that call?

20 A.    Yes.

21       MS. HAR:  Objection.  Speculation.  Foundation.

22       THE COURT:  Overruled.

23 BY MR. SUMMERS:

24 Q.    What did you hear on the call that gave you some

25 information as to where he might have been?

**48**

1  A.    They sound like kitchen noises.  It sounds like water

2  running, it sounds like the teapot being put on the stovetop,

3  it sounds like the cast-iron skillet being put on the stovetop.

4  It sounds like he's making breakfast.

5  Q.    Have you listened to that call very carefully a few

6  times?

7  A.    Yes.

8  Q.    And were these sounds loud, or were they kind of soft in

9  the background?

10  A.    I don't remember if they were loud or soft, but they were

11  very identifiable.

12  Q.    Were you here in the courtroom when that call was

13  played --

14  A.    No.

15  Q.    -- at the beginning of the trial?

16  A.    No.

17  Q.    Based on the things that you've heard in the background

18  of that call, do you have a belief as to where your husband

19  likely was during that call?

20  A.    Yes.

21  Q.    Where do you believe he was?

22  A.    I believe he was in the kitchen.

23  Q.    And what do you believe he was doing?

24  A.    Cooking.

25  Q.    Is that something he does with some frequency?

**49**

1  A.    Every day that he's at home.

2  Q.    What sorts of things does he cook?

3  A.    Fried eggs generally.

4  Q.    Anything else?

5  A.    Toast, coffee in a French press.

6  Q.    Okay.  I'd like to put an exhibit on the screen just for

7  you.  This is a document that we've marked for identification

8  purposes as Exhibit 1137.  I'm going to direct your attention

9  only to one page, to the third page of the document.

10        MR. SUMMERS:  Ms. Graciano, this should not be

11  published to the jury yet.  Well, my iPad went to sleep.  Okay.

12  Hold on.  It should come up.

13  BY MR. SUMMERS:

14  Q.    Mrs. Fortenberry, do you have in front of you Page 3 of

15  what we've marked as Exhibit 1136?

16  A.    Yes.

17  Q.    Can you please tell me what it is?

18  A.    It's my phone in the kitchen.

19  Q.    Let's pause there.  Do you have a -- what sort of phone

20  do you have?

21  A.    I have an iPhone.

22  Q.    And who's your cell provider?

23  A.    AT&T.

24  Q.    What sort of phone did the Congressman have back in June

25  of 2018?

**50**

1  A.    He had an iPhone 6.

2  Q.    And who was the carrier?

3  A.    AT&T.

4  Q.    So you both had the same carrier?

5  A.    Yes.

6  Q.    And you have an iPhone now, and he had an iPhone then?

7  A.    Yes.

8  Q.    Is the cell service in the kitchen about the same today

9  as it was back then?

10  A.    Yes.

11  Q.    And I see in this exhibit that it looks like this was on

12  5G.  You probably didn't have 5G back in 2018, did you?

13  A.    No.

14  Q.    But was the quality of the service roughly comparable?

15  A.    Yes.

16        MR. SUMMERS:  With the Court's permission, I'd like

17  to publish and move into evidence only Page 3 of Exhibit 1136.

18        MS. HAR:  Objection to relevance.  Speculation and

19  foundation.

20        THE COURT:  Sustained on foundation grounds.

21  BY MR. SUMMERS:

22  Q.    Let me ask you this, Mrs. Fortenberry:  Generally

23  speaking -- and we'll start with today, then I'll move to 2018.

24  How many bars do you get in the kitchen?

25  A.    One or two.

**51**

1  Q.    And was that the same in 2018?

2  A.    Yes.

3  Q.    I'd like to fast-forward now to March of 2019.  The jury

4  has heard some testimony about what they call an interview that

5  occurred on March 23rd of 2019.  Are you familiar with that

6  incident?

7  A.    Yes.

8  Q.    First I'd like to talk to you about where you were the

9  week before.  Where were you the week before March 23rd of

10  2019?

11  A.    Jeff and I were in Kenya.

12  Q.    Why were you in Kenya, briefly?

13  A.    We were attending a conference with the International

14  Conservation Caucus.  It was on sustainability, wildlife

15  conservation, antipoaching measures, things that our Government

16  funds, programs that our Government funds or is thinking about

17  funding.

18  Q.    And, again, you were with him on this trip?

19  A.    Yes.

20         MR. SUMMERS:  I'd like to put on the screen what

21  we've marked as Exhibit 1068 just for identification purposes

22  at this time.

23  BY MR. SUMMERS:

24  Q.    Mrs. Fortenberry, do you see what we've marked as

25  Exhibit 1068?

1  A.    Yes.

2  Q.    Can you please tell me what it is?

3  A.    This is the briefing book for our trip to Kenya.

4  Q.    Is this something that you received?

5  A.    Yes.

6          MR. SUMMERS:  And, your Honor, I'd like to go ahead

7  and move for admission of Exhibit 1068, just the first page and

8  just for limited purposes.

9          MS. HAR:  No objection to the first page, your

10  Honor.

11          THE COURT:  The first page will comprise this

12  exhibit and it's received with that restriction.

13          MR. SUMMERS:  Thank you, your Honor.

14  BY MR. SUMMERS:

15  Q.    If we look at the front cover of the briefing book, do

16  you see the dates of the trip?

17  A.    Yes.

18  Q.    March 15th to 22, 2019?

19  A.    Yes.

20  Q.    Those were the dates of the trip?

21  A.    Yes.

22  Q.    And it looks like the date range ends in March -- on

23  March 22nd.  Did you return to Lincoln that day?

24  A.    Yes.

25  Q.    Before we talk about your return to Lincoln, while you

1  were in Kenya, did anything happen that was not anticipated?

2  A.    Yes.

3          MS. HAR:  Objection.  Relevance.

4          THE COURT:  I'm going to sustain the objection, but

5  maybe you can ask another question that demonstrates the

6  relevance here.

7          MR. SUMMERS:  Yes, your Honor.

8  BY MR. SUMMERS:

9  Q.    Mrs. Fortenberry, while you were in Kenya, did

10 anything -- first of all, let me ask you this:  When you were

11 in Kenya, were you sleeping well, the two of you?

12 A.    No.

13 Q.    Was there a difference in the time zones?

14 A.    Yes.

15 Q.    Did anything else occur that interrupted what the

16 Congressman -- that interrupted the Congressman's sleep?

17 A.    Yes.

18         MS. HAR:  Objection.  Relevance.

19         THE COURT:  Overruled.

20 BY MR. SUMMERS:

21 Q.    Mrs. Fortenberry, what happened that interrupted the

22 Congressman's ability to sleep while you were in Kenya?

23 A.    There was a bomb cyclone in Nebraska that it was a

24 500-year flood.  It caused, I think, like, $2.7 billion of

25 damage just in Nebraska.  Displaced thousands and thousands of

**54**

1  people, destroyed homes, killed cattle, destroyed -- it was,

2  again, like I said, a 500-year flood.

3  Q.    And just generally -- I'm not asking you to become a

4  meteorologist, but generally speaking, what was your

5  understanding of the nature of the weather event?  How does

6  this occur, just very briefly?

7             MS. HAR:  Objection, your Honor.  403.

8             THE COURT:  Sustained.

9  BY MR. SUMMERS:

10 Q.    Mrs. Fortenberry, did this event occur while you were in

11 Kenya?

12 A.    Yes.

13 Q.    And did you observe the Congressman having to deal with

14 that event in some way?

15 A.    Yes.  He was on the --

16 Q.    What did you observe?

17 A.    He was on the phone every night in our bed talking to

18 mayors of towns that were dealing with flood damage.  He was

19 talking to military at Offutt Air Force Base and STRATCOM that

20 also had endured a lot of damage.  He was talking to staff

21 and -- he spent every night talking on the phone, trying to

22 coordinate flood relief.  And he considered more than once

23 returning home.

24 Q.    Was he trying to secure emergency relief from the Federal

25 Government to help?

**55**

1  A.    Yes.

2          MS. HAR:  Objection.  403.

3          THE COURT:  Sustained.

4  BY MR. SUMMERS:

5  Q.    Mrs. Fortenberry, how much sleep was your husband getting

6  that week in Kenya?

7  A.    Not much at all.

8  Q.    You mentioned Offutt Air Force Base and something called

9  STRATCOM.  What is STRATCOM?

10          MS. HAR:  Objection.  403.

11          THE COURT:  Sustained.  I'm not going to permit all

12  of the details.  Next question, please.

13  BY MR. SUMMERS:

14  Q.    When you -- according to the briefing book and your prior

15  testimony, you returned to Lincoln, Nebraska, on March 22nd of

16  2019; is that correct?

17  A.    Yes.

18  Q.    When did you land?

19  A.    We landed in Omaha around dusk.

20  Q.    And so dusk in March would be roughly what time, to the

21  best of your kind of guesstimation?

22  A.    I don't know.

23  Q.    5:00, 6:00, something like that?

24  A.    Probably, yes.

25  Q.    What did you do upon landing in Omaha?

**56**

1  A.    We went directly to Offutt Air Force Base to inspect

2  flood damage and meet with the military, Army Corps of

3  Engineers, and --

4  Q.    Was there a reason why there was particular concern about

5  this military base?

6           MS. HAR:  Objection.

7  A.    Because STRATCOM is --

8           MS. HAR:  Your Honor, 403.

9           THE COURT:  Sustained.

10  BY MR. SUMMERS:

11  Q.    So you landed in Omaha.  Again, that was a commercial

12  flight, I take it?

13  A.    Yes.

14  Q.    And you went to Offutt Air Force Base to view the flood

15  damage.  When, to the best of your recollection, did you return

16  home the night of March 22nd?

17  A.    Late.  Late.  I don't know.  It was dark.  We were tired.

18  It was late.  Omaha is an hour away.

19  Q.    What did your husband do the next morning?

20  A.    He went back out to inspect flood damage in his

21  Congressional district, in the small towns, in the rural

22  communities.  He was talking to mayors, law enforcement.  He

23  was with the Governor of Nebraska.  He was with Senator Ben

24  Sasse of Nebraska.

25  Q.    Did he get much sleep the night of March 22nd --

**57**

1    A.    No.

2    Q.    -- to the best of your recollection?

3          Now, at some point that day, did a couple of

4    gentlemen come knocking on the door?

5    A.    Yes.

6    Q.    Very briefly -- I don't want you to get in any detail

7    because we're going to cover it, but generally, briefly, what

8    do you recall of them coming to the door?  Do you recall what

9    you were doing and whether -- was it announced, those sorts of

10   things, but very briefly?

11   A.    I don't recall what I was doing.  It was not expected at

12   all.  I answered the door.  There were two men standing there.

13   They flashed a badge.  I didn't understand their names.  They

14   said they were with the FBI and that they wanted to talk to my

15   husband.  And I said he was out looking at flood damage.

16   Q.    Okay.

17          MR. SUMMERS:  What I'd like to do now is to play a

18   video of that encounter, I believe without objection, your

19   Honor.

20          THE COURT:  This is...

21          MR. SUMMERS:  Exhibit 1106 from time stamp 1:48 to

22   time stamp 2:53.

23          THE COURT:  Ms. Har?

24          MS. HAR:  No objection, your Honor.

25          THE COURT:  Very well.  And it will be received.

58

1              MR. SUMMERS:  Thank you, your Honor.

2              Garrison, go ahead.  Do we have sound?

3              (Video playing.)

4    BY MR. SUMMERS:

5    Q.    Mrs. Fortenberry, does the video we just saw as

6    Exhibit 1106 provide a fair and accurate representation of

7    those events?

8    A.    Yes.

9    Q.    When the officers -- let me ask you this:  How did you

10   feel after that interaction with the officers?

11             MS. HAR:  Objection.  Relevance.

12             THE COURT:  Sustained, on legal relevance grounds.

13             MR. SUMMERS:  Yes, your Honor.  And let me just

14   fast-forward a little bit.

15   BY MR. SUMMERS:

16   Q.    Later, did you communicate with your husband about this

17   encounter?

18   A.    Yes.

19   Q.    Did you tell him what had occurred?

20   A.    Yes.

21   Q.    Did he seem -- how did he react to it?

22   A.    He was very concerned because I was very scared.

23             MR. SUMMERS:  Having laid that foundation, your

24   Honor, I'd like to go back now to what she felt and what she

25   communicated to the Congressman, if I might.

1    THE COURT:  The objection is -- is going to continue

2    to be sustained, so she could describe just as she has her

3    husband, but her views and her -- her feelings, while the Court

4    is not dismissive of them as a person, are legally irrelevant.

5    MS. HAR:  And move to strike, your Honor.

6    THE COURT:  Let's move on.  Go ahead.

7    BY MR. SUMMERS:

8    Q.    Mrs. Fortenberry, did you call your husband that --

9    later -- strike that.

10   Did you call your husband after this encounter with

11   the FBI?

12   A.    Yes.

13   Q.    Did you eventually get ahold of him?

14   A.    Yes.

15   Q.    What did you tell him?

16   MS. HAR:  Objection.  Hearsay.

17   THE COURT:  Overruled.  This is just simply being

18   offered for the effect, if any, on the defendant.

19   BY MR. SUMMERS:

20   Q.    Mrs. Fortenberry, what did you tell your husband about

21   that encounter?

22   A.    I told him two men came to the door, they said they were

23   FBI, but I wasn't sure.  I didn't know if they were pretending,

24   if they meant us harm.  And I was very scared and I asked for a

25   card, they didn't have a card.  I asked if his office knew.

**60**

1  They said, oh, yes, the office knows.  But it was a Saturday,

2  and his office would have known that he wouldn't have been home

3  because he was inspecting flood damage.  So why would they have

4  come to the house?  So it was -- it was just -- it was -- I

5  was -- it was suspicious and it was very frightening.

6  Q.    Did you communicate to your husband that you thought the

7  officers were lying?

8  A.    Yes.

9  Q.    Did you communicate to your husband that you were scared?

10  A.    Yes.

11  Q.    You said you were agitated.  Was that communicated, do

12  you think, to your husband?

13  A.    Yes.

14          MS. HAR:  Objection, your Honor.  Leading.

15  Misstates testimony.  Relevance.

16          THE COURT:  It is leading.  And the response is

17  stricken.

18  BY MR. SUMMERS:

19  Q.    Did you discuss with your husband things that had

20  happened in the past that may have had you on edge?

21  A.    Yes.

22          MS. HAR:  Objection, your Honor.  Vague.  Relevance.

23          THE COURT:  This is now 403.  I think the picture is

24  reasonably clear.  Let's move to the next point.

25  BY MR. LITTRELL:

**61**

1   Q.    What was your husband's reaction?

2   A.    He called the police.

3   Q.    Did he call the police?

4   A.    Yes.

5   Q.    Did they arrive at your house later that day?

6   A.    Yes.

7   Q.    Now, the jury's heard some testimony about an interview

8   that occurred that evening, and I think it was -- I think the

9   record will establish it was around 8:30 at night.  Did you

10  participate in that interview?

11  A.    No.

12  Q.    Did you see any part of it?

13  A.    A little piece of it, yes.

14  Q.    What happened?  Did you pop in or walk through, or how --

15  how did you come to observe any of it?

16  A.    I -- I don't remember.  I know I had an activity with one

17  of our daughters, so I was not able to be there.  When I came

18  home, I stepped into the room for a small portion of it.  I

19  didn't understand what was going on.  I listened for a little

20  bit, and then I went to take care of my -- our children and the

21  dog.

22  Q.    So let me ask you this:  Do you recall what room in the

23  house that conversation took place in?

24  A.    Yes.

25  Q.    What room was it?

**62**

1  A.    The living room.

2  Q.    Was that sort of the formal room or more the family room

3  where you hang out?

4  A.    It's the formal room.

5  Q.    And what's the lighting like in that room?

6  A.    There is no overhead light.  It's dark at night.

7  Q.    There was some testimony earlier in this case about your

8  husband being presented with photographs.  Is the lighting in

9  that room at night --

10          MS. HAR:  Objection, your Honor.  403.

11  BY MR. SUMMERS:

12  Q.    How is the lighting in that room at night?

13  A.    It's dark in that room.  There are a couple of lamps that

14  don't cast much light.  There's no overhead light.

15          THE COURT:  And that answer will stand to the extent

16  there's an objection to how the lighting was that evening.

17  BY MR. SUMMERS:

18  Q.    Mrs. Fortenberry, how has the indictment against your

19  husband affected your life thus far?

20  A.    We've spent --

21          MS. HAR:  Objection, your Honor.

22          THE COURT:  One second.

23          MS. HAR:  Relevance.  403.

24          THE COURT:  The objection is sustained.

25  BY MR. SUMMERS:

**63**

1  Q.    Mrs. Fortenberry, is the Government paying for your

2  defense in this case?

3  A.    No.

4  Q.    Who's paying for it?

5  A.    We are.

6          MS. HAR:  Objection, your Honor.  403.

7          THE COURT:  Sustained.  Counsel, please move on.

8  BY MR. SUMMERS:

9  Q.    Mrs. Fortenberry, you testified earlier you've been

10  married to your husband for 25 years.  Do you feel that you

11  know him well?

12  A.    Yes.

13  Q.    Is he an honest man?

14  A.    Yes.

15  Q.    Is there any -- to your mind, is there any chance, any

16  chance, he would have willfully and knowingly lied to the

17  agents about the subject of this case, about that call with Dr.

18  Ayoub?

19          MS. HAR:  Objection.  403.

20  A.    No.

21          MS. HAR:  Argumentative.  Speculation.

22          THE COURT:  Just reframe the question, please.  You

23  can generally ask this type of question but in a different way.

24  BY MR. SUMMERS:

25  Q.    Mrs. Fortenberry, do you believe there's any possibility

**64**

1   your husband intentionally lied to the FBI or to the Department

2   of Justice?

3           MS. HAR:  Objection.

4   A.    No.

5           MS. HAR:  403.  Argumentative.

6           THE COURT:  Sustained.  The answer is stricken.

7   BY MR. SUMMERS:

8   Q.    Based on your knowledge of your husband, do you

9   believe -- do you believe that he would have been truthful in

10  his interactions with the FBI and the Department of Justice?

11  A.    Yes.

12          MS. HAR:  Objection.

13          THE COURT:  Sustained.  The jury's to disregard the

14  response.

15          And please bear in mind the rule and what you can

16  and cannot ask.  You can ask generally about his character.

17  BY MR. SUMMERS:

18  Q.    Mrs. Fortenberry, does your husband care deeply about

19  matters of national security?

20  A.    Yes.

21          MS. HAR:  Objection, your Honor.  Relevance.

22          THE COURT:  Sustained.  Move on, please.

23  BY MR. SUMMERS:

24  Q.    Have you ever seen your husband or learned of your

25  husband trying to lie or deceive members of the Federal

**65**

1  Government?

2          MS. HAR:  Objection.  Improper.

3  A.    No.

4          MS. HAR:  403.

5          THE COURT:  The objection's overruled.  That answer

6  will stand.

7          MR. SUMMERS:  Thank you, your Honor.  I have no

8  further questions.

9          THE COURT:  Cross-examination?

10                   CROSS-EXAMINATION

11  BY MS. HAR:

12  Q.    Good morning, Mrs. Fortenberry.

13  A.    Good morning.

14  Q.    How are you?

15  A.    I'm well.  How are you?

16  Q.    Great.  Thank you.

17          I want to talk a little bit first about the

18  defendant, your husband.  How long has he been a member of

19  Congress?

20  A.    He was elected in 2004.

21  Q.    And so he's been in that position for almost two decades?

22  A.    He was sworn in in 2005, yes.

23  Q.    And you've been with him during that time, during all

24  that time he's held that position, correct?

25  A.    Yes.

1  Q.    And you know his job, the parameters of his job, fairly

2  well?

3  A.    Yes.  I couldn't do his job.

4  Q.    Sure.  Sure.  I understand that.  But you understand that

5  he -- his job entails a lot of travel, right?

6  A.    Yes.

7  Q.    That's pretty routine?

8  A.    He travels to Washington every week.  He's on a plane

9  every week, yes.

10 Q.    He also has probably a fair amount of international

11 travel that's part of his job?

12 A.    Define "fair amount."

13 Q.    Well, how often would you say that he travels

14 internationally?

15 A.    I...  Maybe at least once a year.

16 Q.    And as part of a routine part of his job, he probably

17 has -- would you agree that he has a lot of meetings?

18 A.    Yes.

19 Q.    And he has a lot of calls?

20 A.    Yes.

21 Q.    He deals with a lot of important issues; he has a lot of

22 important dealings, right?

23 A.    Yes.  He's a member of Congress.

24 Q.    Yeah.  Exactly.  And a lot of those -- that important

25 business, that's going to be handled over phone calls, right?

**67**

1  That's a big part of his job?  To the extent you know.

2  A.    You know, when I am in his office with him in D.C., he's

3  having in-person meetings, he's going to his committee

4  meetings, his subcommittee hearings.  He's -- most of it --

5  most of his job in D.C. is in person.

6  Q.    Okay.  I understand.  I'll focus my questions a little

7  bit more because I believe earlier on cross you were talking

8  about the -- or excuse me --

9  A.    I think it was direct.

10  Q.    Direct.  Thank you.  On direct, you were testifying about

11  the sort of hundreds of fundraising calls that you've observed

12  your husband participate in, right?

13  A.    Those are not official business, as I think we've

14  outlined.  Those are part of campaign business, which is

15  completely separate.

16  Q.    And as part of that campaign business, he has to make and

17  take hundreds of fundraising calls, correct?

18  A.    He -- he does make fundraising calls, yes.

19  Q.    And that happens year over year?

20  A.    Yes.

21  Q.    Does it increase during election years?

22  A.    It increases near the end of the reporting quarter.

23  There are goals usually that the campaign has, and near the end

24  of the quarter, the fundraising accelerates a little bit so

25  that the numbers that the campaign posts are favorable.

1   Q.    And I also believe you may have made a reference to the

2   fact that this isn't something he particularly enjoys, right?

3   A.    He loathes it.

4   Q.    He loathes it, but it's necessary, right?

5   A.    It's -- unfortunately, yes.

6   Q.    Which is why he has to do these calls over and over

7   again, right?

8   A.    Yes.

9   Q.    And it's -- the reason why those calls are important is

10  because campaigns are expensive?

11  A.    Yes.

12  Q.    In order to run for re-election, you need money?

13  A.    Yes.

14  Q.    So every single one of those fundraising calls is an

15  opportunity to get some of that money?

16  A.    It is also an opportunity to speak with constituents,

17  hear their concerns, talk about issues, catch up with them on

18  what's going on with them.  It's a little bit of --

19  Q.    And, ultimately, to get --

20  A.    Ultimately, it's to raise money.

21  Q.    To raise money?

22  A.    To be able to stay in Congress.

23  Q.    And in order to have these folks to provide this money as

24  part of the fundraising, it's important that he connects with

25  whoever he's speaking with, right?

1           THE COURT:  Rephrase your question, please.

2  BY MS. HAR:

3  Q.    You talked about the fact that on these fundraising calls

4  the defendant, he'll raise points of commonality, right?  Is

5  that what you testified to?

6  A.    Yes.

7  Q.    And he does that so that there -- it seems like there

8  would be a sincere connection.  That's a part of the

9  fundraising -- that's part of the fundraising, right?

10  A.    Without trying to sound like it's an act, because it

11  isn't, there is a certain amount of autopilot that he goes on.

12  He -- he can have these conversations, as I said, doing a lot

13  of other things because he doesn't even have to think about it.

14  Q.    So he doesn't have to think about who the person is that

15  he's speaking with on the other line?

16  A.    Of course he thinks about that, but he doesn't have to

17  be -- have focused attention on what he's saying.  It's -- this

18  is something he is very -- he has a great facility with talking

19  to people.

20  Q.    And in making these calls, is -- the point of the call is

21  to get -- is to do the fundraising, right?

22  A.    Yes.

23           MS. HAR:  Sorry.  May I have one moment?

24           THE COURT:  Yes.

25  BY MS. HAR:

1  Q.    So if I'm understanding, there's some amount of

2  preliminaries on the calls that maybe he's not necessarily

3  focused on, right?

4  A.    I'm sorry.  Could you repeat the -- could you repeat the

5  question?

6  Q.    All right.  So let me ask you something else.  You talked

7  a bit about the cell phone service at your house, and it

8  sounds -- I believe you testified that your house doesn't have

9  particularly good cell phone service.  Is that fair?

10 A.    That is fair.

11 Q.    It sounds like it's sort of plagued you.

12 A.    We live in Nebraska.  The state has kind of lousy cell

13 phone service.  There are -- I'll be making a road trip down

14 Highway 2, I'll be talking to my mom, and I'll say, "Oh, Mom,

15 I'm about to hit that spot.  I'm going to lose you," and then

16 for the next 20, 25 miles, I've got nothing.

17 Q.    Yeah.  That makes sense.  And you would have to tell your

18 mom that, "Hey, I'm about to hit this bad spot," right?

19 A.    That happens.  And sometimes it just -- I just lose her.

20 Q.    Yep.  And then if you just lose her, the call drops?

21 A.    Sometimes, sometimes not.  Sometimes it comes in and out.

22 Q.    Comes in and out.  And then if it's out for moments,

23 you'd probably say something like, "I can't really hear you,"

24 right?

25 A.    It depends.

**71**

1  Q.    That Nebraska reception, again?

2  A.    It depends.  It really -- it depends.

3  Q.    And if that -- if your mom was talking on the other line

4  and you couldn't hear what she said, you would ask her, "Could

5  you repeat that?"

6  A.    You know, it depends.  A lot of the time there are -- you

7  think there are context clues and so you -- you don't want to

8  have a conversation where you keep saying, "I'm sorry, what did

9  you say?  What did you say?  What did you say?"  So if you

10 catch a word here and there, you kind of fill in the blanks of

11 what you assume that the person on the other end would have

12 said.

13 Q.    Okay.  What if this was an important call?

14 A.    I'm sorry.  Could you --

15 Q.    Yeah.  If you had -- if you were on an important call and

16 you --

17 A.    Can you define "important call"?

18          MR. SUMMERS:  Objection, your Honor.  I think we're

19 pushing limits of speculation.

20          THE COURT:  Overruled.  Well, the objection is

21 sustained, just not on that ground.  The question is vague.

22          MS. HAR:  May I have another moment, your Honor?

23          THE COURT:  Yes.

24 BY MS. HAR:

25 Q.    Okay.  And I know we were talking there probably more

1  about Nebraska as an entire state, but it is the case that your

2  house, the photo that was shown by Mr. Summers, you have bad

3  cell phone reception there?

4  A.    We have spotty cell phone reception.

5  Q.    You have spotty cell phone reception.  And I believe you

6  testified that because of that spotty cell phone reception,

7  your husband has to move around the house, right?

8  A.    I don't think I said that.

9  Q.    He'll go to different areas where he can -- to get better

10 cell phone service?

11 A.    I don't think that's how I said it.

12 Q.    Does he try to avoid dead zones in his house?

13 A.    He doesn't take calls in his basement office.  He

14 generally is doing something, so the moving around is that he's

15 doing something.  He's working in the yard, he's walking the

16 dog, he's in the car, he's cooking, he's washing up, he's doing

17 the honey-do list, he's on the roof.

18 Q.    And why is it that he doesn't take calls in his office?

19 A.    As I said earlier, there's nowhere to sit, it's a mess,

20 and there's terrible cell phone coverage.

21 Q.    Yeah, so part of the reason why --

22 A.    It's a storage room.  It's not really a working office.

23 Q.    Yeah.  Part of the reason why he doesn't take calls in

24 his office is because of the bad cell phone reception.  He's

25 trying to get better cell phone reception somewhere else in the

1  house, right?

2  A.     No.   The primary reason is, as you saw in the picture,

3  it's not a pleasant place to be.

4  Q.     Okay.   I'm going to go ahead and now show you what has

5  been, I believe, admitted into evidence as 1061 -- I'm sorry --

6  1050.

7           MR. SUMMERS:  Objection, your Honor.  Beyond the

8  scope and no foundation that this witness was privy to this

9  calendar, this document.

10           THE COURT:  Sustained at this point for lack of

11  foundation.

12  BY MS. HAR:

13  Q.     Mrs. Fortenberry, you testified extensively about what

14  was going on on June 4, 2018, right?

15  A.     Yes.

16  Q.     And what you were doing that day and -- correct?

17  A.     Yes.

18  Q.     And what the defendant was doing that day?

19  A.     I don't know if I testified extensively, but yes.

20  Q.     And you're generally familiar with what was going on in

21  terms of the schedule on June 4, 2018?

22  A.     I did not look at my husband's calendar.  That's -- I

23  don't have access to it, unless I ask to look at it, but I do

24  know that a day after a trip, we've been gone for a week, we're

25  about to be gone for another week, we spend it with our

**74**

1  children.  And our children are very anxious for our attention,
2  and it's a recovery day and it's a family day.  And that
3  wouldn't show up on the schedule.
4  Q.    Right.  So that was an important day for you to be with
5  your family, correct?
6  A.    Important isn't a word I would use, but it is a day that
7  we would be spending as much as we can catching up, catching up
8  with mail, being with our kids, and then as I said, preparing
9  to go for Kathryn's surgery.
10 Q.    And the same was true for the defendant?
11 A.    Yes.  And preparing for surgery is stressful.
12 Q.    Yeah.  That was the day that he -- that was a stressful
13 day for you and for your husband?
14 A.    We were exhausted, concerned.  We were managing a lot of
15 things.  We were trying to be present to our children.  And we
16 were concerned about our daughter's upcoming surgery.
17 Q.    Understood.  There was a lot going on and a lot of
18 important family matters that day?
19 A.    Again, important isn't the word I would use for a family
20 and -- so I don't say, oh, yes, on this schedule being with my
21 family is important.  I mean, that's who we are.
22 Q.    And I apologize.  I'm not really talking about the
23 schedule anymore.  I'm just trying to get a feel for the fact
24 that, on that day, it sounds like family was the focus?
25 A.    Again, I wouldn't say family was the focus, but the

1  schedule is as clear as can be with all the other things that

2  were going on because, again, our children deserve our

3  attention.

4  Q.    Understood.  And so on that day, you're aware that your

5  husband did have a call?

6  A.    Yes.

7  Q.    You're aware that that call was a fundraising call?

8          MR. SUMMERS:  Objection, your Honor.  I was

9  precluded from getting into the call.  Beyond the scope.

10          THE COURT:  Well, I think you did get into it,

11  nonetheless, so go ahead and continue.

12  BY MS. HAR:

13  Q.    And --

14          THE COURT:  Just at a high level, as you have just

15  now done.

16  BY MS. HAR:

17  Q.    And you're aware that that call was scheduled on the

18  defendant's calendar for one hour?

19          MR. SUMMERS:  Objection.  Lack of foundation.

20  BY MS. HAR:

21  Q.    Are you aware of that?

22          THE COURT:  That question, you can ask.

23  A.    Can you repeat the question?

24  BY MS. HAR:

25  Q.    Are you aware that on your husband's calendar for June 4,

1 || 2018, he had a one-hour call scheduled?

2 ||          MR. SUMMERS:  Objection.  Counsel is just --

3 ||          THE COURT:  Just give me the legal ground, please,

4 || for the objection.

5 ||          MR. SUMMERS:  Foundation.  Argumentative.

6 ||          THE COURT:  Overruled.  You can answer.

7 || A.    Now that you're telling me, I am aware that it was

8 || scheduled, but I know when I schedule things on my calendar I

9 || put the beginning time and it schedules it automatically for an

10 || hour but it doesn't mean I'm going to spend an hour on it.  I

11 || don't know how his calendar works, but it may be that they just

12 || block that off.

13 ||          MS. HAR:  Objection, your Honor.  Non-responsive.

14 || Move to strike everything after the answer.

15 ||          THE COURT:  The entire answer is stricken.

16 || BY MS. HAR:

17 || Q.    Mrs. Fortenberry, you are aware that your husband, just

18 || the fact that he had a call on the morning of June 4, 2018,

19 || correct?

20 || A.    I am aware of that fact.

21 || Q.    And you're also aware of the fact that that call was a

22 || fundraising call, correct?

23 || A.    Yes.

24 || Q.    One of the things that he is loathed to do, right?

25 || A.    He does not enjoy fundraising calls.

1  Q.    But he still did that fundraising call on June 4, 2018,

2  correct?

3  A.    He does his duty even when it's painful.

4  Q.    Yep.  And part of that duty is to raise money, right?

5  A.    Yes.

6  Q.    For his re-election campaign?

7  A.    Yes.

8  Q.    So that he can keep doing the job that he's been doing

9  for about 20 years?

10  A.    I think you did ask me that, but yes.

11  Q.    Okay.  All right.  And I believe on direct you testified

12  about your review of the call that was recorded on June 4,

13  2018.  Do you remember that?

14  A.    Yes.

15  Q.    And I believe you testified as to some of the things that

16  you believe that you heard on that recorded call.  Do you

17  remember that?

18  A.    Yes.

19  Q.    And --

20  A.    It's hard to tell because the recording is not from his

21  side of the call, it's from the other side, so it's -- it's,

22  you know, not where he was; it's where the caller was.

23           MS. HAR:  Objection, your Honor.  Non-responsive.

24  Move to strike.

25           THE COURT:  Everything after "it's hard to tell."

78

1          MS. HAR:  Your Honor, at this time I'd like to play

2    what's been admitted as Government's 113.

3          MR. SUMMERS:  Objection, your Honor.  I'm going to

4    object this is cumulative and 403.

5          THE COURT:  Overruled.  You may play it.

6          MS. HAR:  Thank you, your Honor.

7          (Audio playing.)

8          MS. HAR:  I'm going to pause there just sort of in

9    the interest of time.

10   BY MS. HAR:

11   Q.    Mrs. Fortenberry, you have, however, reviewed -- or

12   listened to this entire recording previously, correct?

13   A.    Yes.

14   Q.    You've listened to it several times?

15   A.    This is now my third time.

16   Q.    I believe you testified earlier that in -- you're aware

17   that this is a ten-minute recording, based on the --

18   A.    If you tell me so, yes.

19   Q.    Does that sound about right?

20   A.    I don't have a good sense of time.

21   Q.    You testified you heard in this call kitchen sounds.

22   A.    Yes.

23   Q.    And in reviewing it right now in court, did you hear

24   those sounds again?

25   A.    Yes, I did.

**79**

1  Q.    And that led you to believe that your husband was cooking

2  on this call?

3  A.    Yes.  It's a very real possibility; I would say even a

4  high probability.  I'm not going to say with absolute certainty

5  because I wasn't there.  I was quite possibly at the hospital

6  getting blood work for our daughter.

7  Q.    Understood.  And it's a very high possibility because he

8  cooks a lot, right?

9  A.    He cooks his breakfast, yes.

10 Q.    He cooks his breakfast every day?

11 A.    When he's home.  Sometimes I cook it for him, but most of

12 the time I let him do it.

13 Q.    That sounds fair.

14         MR. SUMMERS:  Objection.  Commenting on the

15 evidence, your Honor.  I know it's trivial, but...

16         THE COURT:  Sustained.  And the jury's is instructed

17 to disregard.  Ms. Har, please be mindful.

18         MS. HAR:  I apologize.

19 BY MS. HAR:

20 Q.    It's routine for him to cook breakfast when he's home?

21 A.    Yes.  Yes.

22 Q.    I believe your -- and your belief is that he was in the

23 kitchen, correct?

24 A.    It is a strong possibility that he was in the kitchen.

25 The sounds are consistent with him making breakfast.

**80**

1  Q.    Right.

2  A.    The water running, filling the teapot, the teapot going

3  onto the stove, those sounds, I hear them every day, and that's

4  what those sound like.  But, again, it's -- it's impossible to

5  be absolutely sure, but I have a high degree of -- there's a

6  high degree of probability.  There's no metaphysical certitude.

7  Q.    And the reason why it's a probable or possible guess on

8  your part is because you weren't there.  You were not there

9  during this call, correct?

10           MR. SUMMERS:  Objection.  Asked and answered, your

11  Honor.

12           THE COURT:  Sustained.

13  BY MS. HAR:

14  Q.    I'm going to ask you now about March 2019.  And I believe

15  you testified previously about the fact that there was a -- I

16  believe you called it a 500-year flood?

17  A.    Yes.  I believe I heard someone describe it that way,

18  possibly at the air force base.

19  Q.    Do you have an understanding of what a 500-year flood

20  means?

21  A.    That it doesn't happen very often, that it's a big, big

22  deal.

23  Q.    Based on your understanding, this was an unexpected

24  event?

25  A.    I think the severity of it was.  Again, this is -- this

**81**

1  was a long time ago, but from what I remember from -- and,

2  again, I was also getting off an international flight, was very

3  tired, but from what I think I recall from the conversations at

4  the base, that they expected a certain level and it far

5  exceeded the level they expected.

6  Q.    So the degree of what the flood actually was, that was

7  unexpected, right?

8  A.    Could you rephrase the question?

9            MR. SUMMERS:  Objection.  403, your Honor.

10           THE COURT:  Sustained.

11  BY MS. HAR:

12  Q.    No one could have planned that this major flood would

13  have happened exactly at this time, correct?

14           MR. LITTRELL:  Same objection, your Honor.

15           THE COURT:  Sustained.

16           MS. HAR:  May I have a moment, your Honor?

17           THE COURT:  Yes.

18           MS. HAR:  No further questions, your Honor.

19           THE COURT:  Mr. Summers, redirect?

20           MR. SUMMERS:  Very briefly, your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. SUMMERS:

23  Q.    Mrs. Fortenberry, I'd like to start by going back to the

24  tape-recording of the call with Dr. Ayoub.  If we could please

25  go ahead and play -- I'd like to play just a very short portion

**82**

1  of it.

2              BY MR. SUMMERS:  Could we please go ahead and play

3  audio clip 1.  Hold on a second.  Let's make sure you're

4  plugged into the sound.  You should be plugged into the court

5  system right now.

6              THE COURT:  And please do indicate the portion that

7  you're playing.

8              MR. SUMMERS:  I don't have the exact timestamps,

9  your Honor, but we could provide them at the break, if that's

10 possible.

11             THE COURT:  All right.

12             MR. SUMMERS:  Please go ahead.

13             (Audio playing.)

14             MR. SUMMERS:  You need to change your output to the

15 court system, please.

16             Your Honor, while they're getting that ready, when I

17 conclude my questions, I would like to make a brief offer of

18 proof to the Court outside the presence of the jury.

19             THE COURT:  Please continue.

20             (Audio playing.)

21             MR. SUMMERS:  Please replay that one more time.

22             (Audio playing.)

23 BY MR. SUMMERS:

24 Q.   Mrs. Fortenberry, is that the water you referenced in

25 your direct examination?

83

1  A.    Yes.

2  Q.    Did it sound to you -- what did it sound to you like?

3  A.    It sounds like water going into the teapot.

4        MR. SUMMERS:  Now let's go ahead and play the next

5  clip, audio clip 2.

6        (Audio playing.)

7        MR. SUMMERS:  Stop.  Play it one more time, please.

8        (Audio playing.)

9  BY MR. SUMMERS:

10 Q.    What does that sound like to you, Mrs. Fortenberry?

11 A.    That sounds like something being put on the stove.

12 Q.    Something metallic?

13 A.    Yes.

14 Q.    Like a pot or a pan?

15 A.    Pan, yes.  The teapot or the cast-iron skillet.

16       MR. SUMMERS:  Now let's go to the next time clip,

17 please.

18       And, your Honor, I don't have the time stamp, but

19 this occurs -- well, I'll play it for the witness instead of

20 speaking.

21       Go ahead and play the next clip, please.

22       (Audio playing.)

23       MR. SUMMERS:  Let's stop right there and let's play

24 it one more time.

25       (Audio playing.)

1  A.     That's the teapot sound.  Sorry.

2  BY MR. SUMMERS:

3  Q.     Hold on.  Please hold on.

4         MR. SUMMERS:  Please play that clip one more time.

5         (Audio playing.)

6  BY MR. SUMMERS:

7  Q.     Did that sound like a door to you, Mrs. Fortenberry?

8  A.     No.  That sounds like the teapot going onto the stove.  I

9  suppose it could be a door, but it sounds to me like the

10 teapot.

11         MR. SUMMERS:  Let's go ahead and play it one more

12 time, please.

13         (Audio playing.)

14         THE COURT:  Is there a question?

15         MR. SUMMERS:  Yes.

16 BY MR. SUMMERS:

17 Q.     What does that sound like to you?  And don't let me

18 suggest any answer.  What do you think that likely was?

19 A.     I think it was the teapot.

20 Q.     Okay.  Thank you.  Now, you heard the tape in almost its

21 entirety just a moment ago during cross-examination.  Knowing

22 your husband, do you believe that if he clearly heard that

23 there had been a conduit contribution or straw man contribution

24 to his campaign, do you believe he would have reacted the way

25 he did on that call?

1              MS. HAR:  Objection, your Honor.

2              THE COURT:  Sustained.

3  BY MR. SUMMERS:

4  Q.    Mrs. Fortenberry, have you ever observed your husband

5  carry on or appear to carry on a conversation when he's not

6  hearing what the speaker is saying?

7  A.    Many times.

8              MS. HAR:  Objection.  Argumentative.  Vague.

9              THE COURT:  Sustained.

10  BY MR. SUMMERS:

11  Q.    Mrs. Fortenberry, have you ever personally been engaged

12  in conversations with your husband where he doesn't hear you

13  and yet continues on with the conversation?

14  A.    Yes.

15              MS. HAR:  Objection.  Speculation.

16              THE COURT:  Sustained.  The answer is stricken.  The

17  jury should disregard it.

18  BY MR. SUMMERS:

19  Q.    Mrs. Fortenberry, despite having just heard that call

20  again, do you stand by your answer on direct examination that

21  you believe your husband would have testified or spoken

22  truthfully to the officers?

23  A.    Yes.

24              MS. HAR:  Objection.  Argumentative.  Irrelevant.

25              THE COURT:  Sustained.  The answer is stricken and

**86**

1  should be disregarded.

2          MR. SUMMERS:  Your Honor, I have no further

3  questions subject to the offer of proof I'd like to make.

4          THE COURT:  Any recross?

5          MS. HAR:  Just briefly, your Honor.

6          THE COURT:  Yes.

7                    RECROSS EXAMINATION

8  BY MS. HAR:

9  Q.    Mrs. Fortenberry, in that recording, you recognized the

10 sound of a teapot?

11 A.    It sounds very much like the teapot going onto the stove.

12 Q.    So the recording accurately sounded like the sound of the

13 teapot that you know that -- excuse me.  Let me rephrase.

14 A.    I'm sorry.  I don't know what you mean.

15 Q.    I don't know.  You're familiar with the sound of a teapot

16 in your own kitchen, correct?

17 A.    Yes.

18 Q.    And in the recording that you heard, it accurately

19 sounded like that teapot, as you know that sound?

20 A.    It accurately sounded like that teapot?  I'm sorry.

21         MR. SUMMERS:  Your Honor, objection.  403.  This has

22 been asked and answered and covered.

23 A.    It sounds --

24         THE COURT:  One second.

25         Just rephrase it.  It's a bit vague.

87

1  BY MS. HAR:

2  Q.    Did it sound like your teapot in that recording we just

3  listened to?

4  A.    As I said, yes, it did.

5  Q.    Did it sound like the cast-iron skillet that -- did it

6  sound like the cast-iron skillet?

7  A.    Yes, it did.  And the sequence of sounds, my husband is a

8  man of routine, and the sequence of sounds matches the daily

9  routine of him making breakfast, filling the teapot -- running

10 the water, filling the teapot, putting the teapot on the stove,

11 putting the skillet on the stove, frying the eggs.

12 Q.    And the recording accurately captured all of those sounds

13 as you know it?

14 A.    "Accurately" is a curious word, so could you please

15 explain it?

16          THE COURT:  Counsel, any further questions?

17          MS. HAR:  No, your Honor.

18          THE COURT:  All right.  You are excused subject to

19 being recalled.  Please watch your step going down.

20          Mr. Littrell, your next witness?

21          MR. LITTRELL:  May I have a moment, your Honor.

22          THE COURT:  Yes.

23          MR. LITTRELL:  Can we take a brief break, your

24 Honor?

25          THE COURT:  Very well.  It's now 10:20.  We'll take