# Exhibit 4

**1**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,

               Plaintiff,

 v.                           Case No.
                                 2:21-cr-00491-SB-1

JEFFREY FORTENBERRY,

               Defendant.
_____


REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
MARCH 23, 2022
8:01 A.M.
LOS ANGELES, CALIFORNIA


_____

JUDY K. MOORE, CRR, RMR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, #4455
LOS ANGELES, CALIFORNIA 90012
213.894.3539

```
 1                          APPEARANCES

 2   FOR THE GOVERNMENT:      MR. MACK E. JENKINS
                              MS. SUSAN S. HAR
 3                            MR. J. JAMARI BUXTON
                              Assistant United States Attorneys
 4                            312 North Spring Street
                              Suite 1500
 5                            Los Angeles, California 90012

 6

 7   FOR THE DEFENDANT:       MR. JOHN L. LITTRELL
                              Bienert Katzman Littrell Williams, LLP
 8                            903 Calle Amanecer
                              Suite 350
 9                            San Clemente, California 92673

10                            MR. RYAN V. FRASER
                              Bienert Katzman Littrell Williams, LLP
11                            601 West 5th Street
                              Suite 720
12                            Los Angeles, California 90071

13                            MR. GLEN E. SUMMERS
                              Bartlit Beck, LLP
14                            1801 Wewatta Street
                              Suite 1200
15                            Denver, Colorado 80202

16                            MS. KALLY A. KINGERY
                              Kingery Law
17                            9595 Wilshire Boulevard
                              Suite 900
18                            Beverly Hills, California 90212

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2   GOVERNMENT WITNESSES:
       SPECIAL AGENT EDWARD CHOE
 3         Cross-Examination by Mr. Fraser, Page 28
           Redirect Examination by Ms. Har, Page 57
 4


 5
     DEFENSE WITNESSES:
 6     HONORABLE ANNA ESHOO
           Direct Examination by Mr. Littrell, Page 89
 7         Cross-Examination by Mr. Jenkins, Page 109
           Redirect Examination by Mr. Littrell, Page 136
 8

 9     HAROLD W. GOWDY, III
           Direct Examination by Mr. Littrell, Page 140
10         Cross-Examination by Mr. Buxton, Page 177
           Redirect Examination by Mr. Littrell, Page 209
11

12     ANDREW R. BRANER
           Direct Examination by Ms. Kingery, Page 216
13         Cross-Examination by Mr. Buxton, Page 265
           Redirect Examination by Ms. Kingery, Page 276
14

15

16

17   EXHIBITS                      OFFERED      RECEIVED

18   Defense Exhibit 1129            49            49

19   Defense Exhibit 1013           102           102

20   Defense Exhibit 1014           104           104

21   Defense Exhibit 1109           149           149

22   Defense Exhibit 1110           155           155

23

24

25
```

1   and so this is now their second witness, and we're in the

2   defense case, past the Government's case.

3            All right.  Next witness.

4            MR. LITTRELL:  Yes, your Honor.  The defense calls

5   the Honorable Anna Eshoo.

6                      HONORABLE ANNA ESHOO,

7   called as a witness by the defense, was sworn and testified as

8   follows:

9            COURTROOM DEPUTY:  Would you please state and spell

10   your full name for the record.

11            THE WITNESS:  My first name is Anna, A-N-N-A.

12   Middle initial G.  And the last name is Eshoo, E-S-H-O-O.

13            COURTROOM DEPUTY:  Thank you.

14            THE COURT:  Mr. Littrell?

15                      DIRECT EXAMINATION

16   BY MR. LITTRELL:

17   Q.    Good morning, Congresswoman.

18   A.    Good morning.

19   Q.    Can you hear me?

20   A.    Yes, very well.

21   Q.    Please make sure you speak right into that microphone so

22   everyone can hear.

23   A.    Uh-huh.

24   Q.    Thank you.  Can you -- now, can you tell us a little bit

25   about the work that you do?

**90**

1   A.   About the work that I do?

2   Q.   What is your occupation?

3   A.   I'm a member of Congress.

4   Q.   And what does that mean?

5   A.   I'm one of 435 Representatives.  There are 100 senators

6   but 435 members of the House.  My Congressional district is

7   here in California, in northern California, the Silicon Valley,

8   Stanford University District, very distinguished district.

9   Q.   And what is the difference between the Congress and the

10  Senate?

11  A.   Well, the Constitution spells out the difference in the

12  bodies, but the House of Representatives is the only place

13  where no one can ever be appointed.  So if I decide today to

14  resign or if God calls me today, there isn't any appointment by

15  the Governor or the Senators.  There is a direct election.  So

16  we are -- we really are the fullness of the word

17  "representative."

18  Q.   And who do you represent?

19  A.   I represent approximately 750,000 constituents.

20  Q.   And remind us where your district is again.

21  A.   It's northern California.  It's on the peninsula.

22  Stanford University is the geographic center, and it's known as

23  Silicon Valley.

24  Q.   And how long have you been in the House of

25  Representatives?

**91**

1  A.    I was first elected in 1992.

2  Q.    So how many years is that?

3  A.    How many years?  Let's see.  That is -- it's 30 years, 15

4  terms.

5  Q.    And did your election to the House of Representatives

6  mark any milestones for Congress?

7  A.    Well, it was known as the year of the woman.  I guess

8  they only meant it for that time, but...  We've changed that.

9  Q.    Were there any Armenian-American Congresswomen in

10  Congress at that point?

11  A.    No.

12  Q.    So you're the first?

13  A.    First, uh-huh.

14  Q.    I want to talk a little bit about you.  What did you do

15  before you served in Congress?

16  A.    I was a member of the San Mateo County Board of

17  Supervisors for ten years.

18  Q.    And what about before that?

19  A.    Before that, I -- well, I raised my children, two

20  beautiful children.  At one time I was a Chief of Staff for Leo

21  McCarthy, who was the speaker of the California State

22  Legislature.

23  Q.    Now -- so I want to talk a little bit about what it means

24  to serve in Congress, but first I want to talk about how one

25  becomes elected to Congress.  You mentioned you were first

1   elected in 1992?

2   A.    Uh-huh.

3   Q.    And can you describe a little bit about how you ran for

4   office and got elected?

5   A.    Well, I think that the first thing that comes to mind is

6   that it's difficult because the races are always highly

7   competitive, not -- and in each party.  In my case, it was a

8   seat that was always represented by Republicans, and very fine

9   Republicans.  I don't know if people here remember Pete

10  McCloskey, but he was somewhat of a legend.  So they're highly

11  competitive, far more difficult for women when I ran.  And

12  it's -- you have to reach an awful lot of people, 750,000

13  people.  So it's like building a business, and then by election

14  day you have to be on the big board.  So it is -- and it costs

15  money.  And it costs far more now, today, than it did when I

16  first ran.

17  Q.    Are you a Republican?

18  A.    I'm a Democrat.

19  Q.    You mentioned that caused -- made it more difficult for

20  you to be elected.

21  A.    Uh-huh.

22  Q.    Why is that?

23  A.    Because it has been a Republican district.

24        MR. JENKINS:  Objection.  403.  401, your Honor.

25        THE COURT:  I'll overrule it, but please take the

1   message.

2   BY MR. LITTRELL:

3   Q.      You can answer.

4   A.      What was the question again?

5   Q.      Why was it particularly difficult for you to get elected

6   in your district in 1992?

7   A.      Well, I wasn't the typical candidate.  A, I was a woman;

8   that I wasn't -- I didn't come out of any of the companies in

9   Silicon Valley at that time; I had a different background.

10  And, you know, I think that my biography was very different

11  than other candidates.

12  Q.      When you say your biography, what do you mean by that?

13  A.      Well, I -- you know, I didn't come strictly from a

14  business background.  I spent many years raising my children,

15  and, you know, you can get short shrift for that.  Women very

16  typically do a great deal of volunteer work at their children's

17  school and the community, but men are paid for what they do.

18  And so if you're a volunteer, that's another lane.  There

19  isn't -- it's not considered high value.

20  Q.      Did you fund your own campaign?

21  A.      Did I fund my own campaign?

22  Q.      Yes.

23  A.      No.  I'm not a wealthy woman, so I couldn't fund my own

24  campaign.

25  Q.      So did you have to do fundraising?

**94**

1   A.     Yes.

2   Q.     Can you describe that process?

3   A.     Well, it's a -- it's a difficult process because if --

4   when you're running for office and haven't run before, you

5   don't know how to do it.  You have to ask others how it's done.

6   You try to bring in someone that will organize it.  And you

7   have to be the one that works the hardest at it, because if you

8   don't, others don't want to help you.  So you have to set the

9   standard.  You have to set the standard.

10   Q.     And what is the work of fundraising?  What does that

11   entail?

12   A.     It means calling people.

13   Q.     And calling --

14   A.     In some cases, you're on the phone and calling people

15   that you know and asking, which is really hard to do.  It's

16   not -- it's never been -- it's not a favorite thing of mine to

17   do.  Or there are friends that host things at their homes for

18   you.  Some things are held, like, in community centers.  It

19   depends on the person that's hosting.  And sometimes it's in a

20   business setting, in someone's office.  So the settings vary,

21   but they are -- I can't think -- in my case where, you know, I

22   knew the people and they were willing to do that to help.

23   Q.     What makes it hard to ask people for money?

24   A.     Well, I mean, just think of it.

25          MR. JENKINS:  Objection at this point.  Relevance.

1 403. Improper opinion.

2       THE COURT: Sustained.

3 BY MR. LITTRELL:

4 Q. Now, is it illegal to ask donors to support you

5 financially?

6 A. No. I mean, we have campaign finance laws; running for

7 Congress, of course, Federal election laws; and in California,

8 there -- the FPPC; and locally, we had ordinances in San Mateo

9 County.

10 Q. So if an interest group or an affinity group wanted to

11 support your candidacy, they could donate to you; is that

12 correct?

13 A. You know, it's up to the candidate. It's up to the

14 candidate.

15 Q. Now, do you serve on any committees in Congress?

16 A. Yes.

17 Q. Which committees do you serve on?

18 A. I serve on the House Energy and Commerce Committee.

19 Q. Any others?

20 A. No. That's an exclusive committee, so it's the only

21 committee you serve on. But I did serve for almost a decade on

22 the House Intelligence Committee.

23 Q. What's the House Intelligence Committee?

24 A. It's a select committee that oversees our intelligence

25 community, 16 agencies.

1  Q.    Can you give us an example of a few of those agencies

2  that you oversaw?

3  A.    FBI.  I mean, everyone here would recognize that.  And

4  the NSA, the FBI, the CIA.  And it was during a very tough

5  chapter in our country's history, during the Iraq war.

6  Q.    Now, do you -- can you explain to the jury what a caucus

7  is?

8  A.    A caucus is -- it's a unit of members that volunteer to

9  devote very specially some of your Congressional time, which we

10  have very little of because the schedule is so jammed, around a

11  given issue.  So there may be a cancer caucus.  There may be an

12  ALS caucus.  There can be a Vietnamese-American caucus.  There

13  probably are -- I'm not sure, but I think there are probably at

14  least a hundred or more caucuses in the House.

15  Q.    Could you participate in any of the -- any caucuses in

16  Congress?

17  A.    Oh, yes.  I'm a member of many caucuses, many of them

18  related to healthcare and otherwise.

19  Q.    Now, I want to talk a little bit about your relationship

20  with Congressman Fortenberry.  Do you see him in the room?

21  A.    There you are.

22  Q.    How did you first meet Congressman Fortenberry?

23  A.    Well, where we see members gathered is on the floor of

24  the House, and so I know I met Jeff there.

25  Q.    And how is the floor of the House organized?

1  Q.    How is it organized?

2  A.    Yes.  How do you know --

3  A.    Well, there's the -- anyone who has watched the State of

4  the Union, the President comes down the center aisle.  So if

5  the President is coming down the aisle, on the right-hand side

6  is the Republican side of the aisle, and on the left-hand side

7  is the Democratic side of the aisle.  But you can sit, stand,

8  walk around wherever you want.  In the Senate, they have their

9  own desks, but there aren't very many of them, so -- there are

10 many of us.

11 Q.    So do you recall meeting Congressman Fortenberry on the

12 floor of the House of Representatives?

13 A.    Uh-huh.  He came over to me.

14 Q.    When he came over to you, where did he come from?

15 A.    He must have been on his side of the aisle.  I don't -- I

16 don't really recall.

17 Q.    So he crossed the aisle to come meet with you on your

18 side of the aisle?

19 A.    Yeah.  It's not that stayed.  You know, I mean, many

20 times I come onto the floor from the Republican side because

21 I'm coming from a different part of the Capitol.  So, you know,

22 there aren't chains going down the middle aisle where you can't

23 cross and talk.  It's a -- the House is kind of a rough and

24 tumble place.  It's noisy, 435 people.  So it's -- but -- and

25 we're comfortable wherever we are.  You seem -- it actually is

1  a place when votes are taking place where members get to speak

2  to other members.  Otherwise, we're in our offices or we are in

3  committee or subcommittee hearings.  So it's an important time

4  when we're on the floor.

5  Q.    You mentioned votes.  Can you just describe a little bit

6  about what it means to vote in Congress?

7  A.    Well, I wish I'd brought my card in with me so I could

8  hold it up.  We have -- it's a little machine that is -- well,

9  where did -- see where the jury is sitting?  There's a little

10  machine every other row at each end of the row, and there are

11  three lights.  And you put your card in -- you slip the card in

12  and you can vote aye, you can vote nay, you can vote present.

13  Q.    And what are you voting about, just generally?

14  A.    Oh, my goodness.  Well, I have voted on some of the most

15  consequential votes.  War resolution.

16  Q.    Anything else?

17  A.    Genocide resolutions.

18  Q.    Anything else?

19  A.    Oh, my goodness, yes.  Well, our nation's budget for

20  sure.  That funds this building.  This is a Federal building.

21  Q.    So you mentioned --

22  A.    On healthcare, on reforms, criminal justice, energy.

23  It's just about everything that one can think of.

24  Q.    Now, you mentioned Congressman Fortenberry met you in the

25  House of Representatives.  Do you recall the topic that brought

**99**

 1  you together?

 2  A.   I do.

 3  Q.   And what was that?

 4  A.   I do.  Well, he approached me and said that he knew that

 5  I was -- he knew my background.  I'm half Armenian and half

 6  Assyrian, not Syrian but Assyrian.  And he knew that -- about

 7  some of the work that was being done at that time to try to

 8  protect the Christians in the Middle East.  And I really

 9  welcome that because there are very few that were interested in

10  it.  I mean, that's not exactly headline news.

11  Q.   And do you know how long Congressman Fortenberry has been

12  serving in the House of Representatives?

13  A.   Well, I looked it up so that I would refresh my memory.

14  He began serving, was sworn in 2005, I think.

15  Q.   And was it around that time that he approached you?

16  A.   No.  I think it was later than that.

17  Q.   How many years ago was it?

18  A.   Well, you know, I'm not sure.

19  Q.   Was it more than ten years ago?

20  A.   Oh, yes.

21  Q.   Was it more than 15 years ago?

22  A.   What was 15 years ago?  It may have been.  It may have

23  been.

24  Q.   And what exactly did -- did you and Congressman

25  Fortenberry talk about issues that concerned you both?

1  A.    Yes, very much so.

2  Q.    What did you discuss at that point?

3  A.    Well, what we were confronting at the time was -- well,

4  the United States had invaded Iraq.  Throughout Iraq are some

5  of the most ancient of faiths; the Ninewa Plain Christians,

6  many minority groups and faiths.  Now, in my case, there were

7  very large communities of Assyrians.  And because they're

8  minorities and because of their faith, they were being

9  persecuted.  I mean, it's the story of my family, both on my

10  mother's side and my father's side.  My grandparents fled

11  because they were being slaughtered.  So this was very real to

12  me.  And that Jeff would be interested in this, that he would

13  care about it, was a real boost, I think, to the effort.

14         I just would like to add something.  A former

15  member, Frank Wolf from Virginia, and myself had founded the

16  Religious Minority in the Middle East Caucus, and when he

17  retired, Jeff became the Republican co-chair of that effort.

18  It's a very important one because it was a caucus.  It wasn't a

19  large caucus.  Now, again, this is an issue that not very many

20  members were interested in.

21  Q.    Did you perceive Congressman Fortenberry's interest in

22  this topic to be sincere?

23  A.    Oh, absolutely.

24  Q.    Why?

25  A.    Well, first of all, he knew a great deal about it.  He

1    understood the history of the region.  He understood the

2    bloodlines.  He understood the faith.  So he came -- he came to

3    the table with considerable knowledge and his own faith.  We're

4    both, as we say in the House, for the record, we're both Roman

5    Catholics.  And so that meant a great deal to me as well.

6    Q.    So did you and Congressman Fortenberry work on issues to

7    protect persecuted religious minorities after that point?

8    A.    Very much so.

9    Q.    What sort of work did you do with Congressman

10   Fortenberry?

11   A.    Well, first of all, it was very important for us to have

12   documentation of what was taking place, and so documentation

13   comes, in this particular situation, from families, from

14   relatives in the United States that were getting reports from

15   their relatives in that region.

16   Q.    And how did you gather that information?

17   A.    Well, there were religious leaders that we met with.

18   Q.    And can you --

19   A.    And I can't remember the name of the sister, but she was

20   a Dominican nun that traveled to the United States more than

21   once.  In fact, I think she testified as well.

22   Q.    And did you pass any legislation with Congressman

23   Fortenberry on this issue?

24   A.    We did.

25            MR. LITTRELL:  I'd like to show the witness what's

1  been marked as Defense Exhibit 1013 for the witness only.  And

2  I would just -- I will move this into evidence if there's no

3  objection from the Government.

4           THE COURT:  Is there an objection?

5           MR. LITTRELL:  1013.

6           MR. JENKINS:  No objection, your Honor.

7           THE COURT:  It will be received.  You may publish

8  it.

9  BY MR. LITTRELL:

10 Q.    Congresswoman Eshoo, do you see what's on your screen?

11 A.    I don't have my glasses with me.  Oh, that's better.

12 Q.    Can you describe to the jury what that is?

13 A.    Well, it reads at the top, "In the House of

14 Representatives July 24, 2014, Mr. Fortenberry for himself,

15 Ms. Eshoo, Mr. Wolf, and Mr. Van Hollen submitted the following

16 concurrent resolution which was referred to the Committee on

17 Foreign Affairs."  And then it --

18 Q.    Yeah, maybe just read that first line here, "Section."

19 A.    It says, "Calling for urgent international intervention

20 on behalf of Iraqi civilians facing a dire humanitarian crisis

21 and severe persecution in the Nineveh Plains region of Iraq."

22 Q.    And what was that -- what did that refer to?

23 A.    It refers to what was taking place on the ground in Iraq

24 to this minority group.

25 Q.    And calling your attention to the date of that

**103**

1  resolution, do you see that?

2  A.    Yes, July 24th, 2014.

3  Q.    And why did -- did you work with Congressman Fortenberry

4  on that concurrent resolution?

5  A.    Yes.  Where we really had to work hard was to get

6  co-sponsors for it.

7  Q.    Why was that so hard?

8  A.    Well, because if you only have two people out of 435,

9  it's not going anywhere.  You have to -- as you build

10  co-sponsorship, it's important for something like this -- well,

11  it is for everything, but it isn't always the result that we

12  get -- that, A, that it would be bipartisan because this is

13  really a non-partisan issue, the persecution of innocent

14  people.  And you want to build support, and that's what

15  co-sponsorship means.  So you ask others to add their names

16  to -- see, we're the -- the names that I read at the top, we're

17  the original sponsors, and then you add co-sponsors.  And the

18  more you get, you're building eventually a vote.

19          MR. LITTRELL:  Now I'd like to show the witness

20  what's been marked as Defense Exhibit 1014.  Witness only.

21  BY MR. LITTRELL:

22  Q.    Could you just describe what this is?

23  A.    Yes.  This is a letter on the letterhead, it says,

24  "Congress of the United States.  Washington D.C."  It's dated

25  August 1st, 2014.  And the letter is to the Honorable Barrack

1  Obama, President of the United States of America, The White

2  House, 1600 Pennsylvania Avenue, Washington D.C.

3  Q.    Okay.  Could you look to the bottom of the letter where

4  the signatures appear?

5  A.    Yes.

6  Q.    Do you see your signature there?

7  A.    I do.  Mine is on the far right.  In the middle is Jeff

8  Fortenberry.  And on the left is Frank Wolf.  And I referenced

9  him earlier.  He was a great voice in the Congress for human

10 rights.

11        MR. LITTRELL:  Your Honor, move to admit Defense

12 Exhibit 1014.

13        MR. JENKINS:  Objection.  One, it's not in our

14 binders.  Two, 403, 401.  Cumulative.

15        THE COURT:  Let's make sure they have a copy of it.

16 But it will be received.

17 BY MR. LITTRELL:

18 Q.    Is this the letter we just discussed?

19 A.    It is.

20 Q.    And turning your attention to the signatures on the

21 bottom, you mentioned that's Congressman Fortenberry's

22 signature in the middle there?

23 A.    Yes.

24 Q.    Was he the primary author of that letter?

25 A.    I don't know what you mean by primary.

**105**

1  Q.    I guess was it authored by all three of you?

2  A.    Yes.

3  Q.    And just turning to the first paragraph, could you read

4  to the jury what that first -- just the first sentence?

5  A.    "Dear Mr. President.  We write to express our grave

6  concerns about the ongoing genocide against Christians and

7  other religious minorities in Iraq, especially in the Nineveh

8  Plains."

9  Q.    Could you go on for just two more sentences, please?

10  A.    Sure.  "The Islamic State of Iraq and Syria, commonly

11  known as ISIS, has consolidated control over a transnational

12  territory that reaches from Syria deep into Iraq.  Today, ISIS

13  is waging a systematic and targeted campaign of religious and

14  ethnic cleansing against minority groups, forcing thousands of

15  innocent civilians from their ancestral homelands and

16  triggering a refugee crisis that demands urgent international

17  intervention."

18  Q.    And the date on this letter again?

19  A.    August 1, 2014.

20  Q.    Why did you co-author that letter to President Obama?

21  A.    It was urgent.

22  Q.    What made --

23  A.    It was -- this was urgent.  It -- we -- this had to be

24  paid high attention to by the administration.  And when I say

25  "the administration," it's the White House but it's also the

**106**

1  State Department and all of the apparatus that is there, as

2  well as our military.

3  Q.    Are you familiar with a group called In Defense of

4  Christians?

5  A.    I am.

6  Q.    What is that group, as you understand it?

7  A.    It was -- I did -- was not aware of In Defense of

8  Christians until I started working with Jeff on this issue, and

9  so they, along with others, attended meetings that we had, you

10  know, to help build support in the Congress.  We also -- I

11  remember at some of those meetings we had the Knights of

12  Columbus.  And I thought my father would be proud from Heaven

13  because he was a fourth degree Knight.  And so that's -- I

14  became aware of In Defense of Christians when we were working

15  on this.

16  Q.    Did you understand them to be a criminal organization?

17  A.    Excuse me?

18  Q.    Did you perceive them as a criminal organization?

19  A.    No.

20  Q.    Why not?

21  A.    No.  I mean, they were there in defense of Christians.  I

22  mean, that was...

23  Q.    Did they ever donate any money to you?

24  A.    No.

25  Q.    I'm showing you what's been previously admitted as

 1  Government's Exhibit 184.  Do you see that?

 2  A.    I do.

 3  Q.    And do you see yourself in that picture?

 4  A.    I do.  Younger.

 5  Q.    Can you describe what's happening there?

 6  A.    Well, I think that -- I think we were given awards for

 7  our work.  I see -- I think he was Attorney General at the

 8  time, Ashcroft, Mr. Fortenberry.  I don't remember the name of

 9  the man from In Defense of Christians, but I recognize him.

10  And I'm not sure I remember who the one on the right is.

11  Q.    And can you describe to the jury what the award is that

12  you're holding in your hand?

13  A.    You know, I don't know the name of the award, but it

14  was -- you know, organizations give plaques and, you know,

15  engraved nice things, and sometimes it's in glass.  These are

16  wooden, and I think it may be of a wood that is from a

17  particular region in the Middle East, if I'm not mistaken.

18  Q.    And do you know which region that is?

19  A.    I think from the region where all the problems were.

20  Q.    Now, I want to -- so overall, how many years have you

21  known Congressman Fortenberry?

22  A.    Maybe 15 years.

23  Q.    And you both work in the House of Representatives; is

24  that correct?

25  A.    We do.

1  Q.    Does Congressman Fortenberry have an established

2  reputation in the House of Representatives?

3  A.    I would say he's respected by his colleagues.

4  Q.    Does he have a reputation as a truthful person?

5  A.    Yes.

6  Q.    And do you have an opinion about whether he is a truthful

7  person?

8  A.    Very much so.  When you -- you don't get to know all 435

9  members, but when you do work with them or serve on a committee

10  together, because you're together on a regular basis or working

11  on legislation, you get to know the person.  You get to know

12  the person.  And that's how I got to meet and worked with Jeff.

13  He's an honorable person.

14  Q.    When you say "honorable," what do you mean?

15  A.    I think he brings honor to what he does because of the

16  kind of -- because of the individual that he is.  He's

17  faith-filled.  He's honest.  His word is always good.  And I

18  can't say that about all members of Congress.  And you find out

19  the hard way.  You know?

20  Q.    Did he have a reputation in the House of Representatives

21  as a law-abiding person?

22  A.    Yes.

23  Q.    Tell me about that reputation.

24  A.    Well, I can't speak for others, but my sensibilities are

25  that he brings integrity to everything that he does.

**109**

1  Q.    What do you mean when you say "integrity"?

2  A.    He doesn't put his name to something unless he believes

3  in it, and then he works hard at what he believes in.

4              MR. LITTRELL:  May I have a moment, your Honor?

5              THE COURT:  Yes.

6              MR. LITTRELL:  No further questions.  Thank you,

7  Congresswoman.

8              THE COURT:  Cross-examination?

9              MR. JENKINS:  Just one moment, your Honor.

10              THE COURT:  Yes.

11              MR. JENKINS:  We just need to get set up real

12  quickly.

13                      CROSS-EXAMINATION

14  BY MR. JENKINS:

15  Q.    Good morning.  Thank you for being here today.  I just

16  want to start where you began your testimony with Mr. Littrell.

17  You were asked about what Congress does.  Do you recall those

18  questions?

19  A.    Not every single one, but...

20  Q.    Okay.  You were asked about how you got to Congress,

21  correct, how you got elected.  Do you remember being asked

22  those questions?

23  A.    Yes.

24  Q.    And one of the things you mentioned was that because you

25  weren't self-funded, you had to do fundraisers, correct?

1  A.     (Nods.)

2  Q.     You have to say yes or no just for the record.

3  A.     Yes.  Yes.

4  Q.     It sounds like you have --

5  A.     Tell me your name.

6  Q.     My name is Mack Jenkins.  I'm an Assistant United States

7  Attorney.  Thank you.

8         And you had to do a lot of fundraisers, I think you

9  said, right?

10 A.     Oh, yes.

11 Q.     Because you were sort of the odd woman out, right?

12 A.     (Nods.)  Or in.

13 Q.     Well, certainly now.  Certainly now.  It seems like you

14 opened the door for a lot of other women to follow you.

15 A.     Yes.

16 Q.     That must have been hard, right?  It sounds like it was

17 very hard to do that.

18 A.     It's hard, but it's a -- it's a joyful journey because

19 there are so many good people.  You can have the best ideas in

20 the world, all of that.  If you don't have good people with

21 you, you're absolutely nothing.  So people step up.  They care.

22 They care about issues.  They care about their government.

23 They care about their country.  And if they choose you to be

24 the vehicle for all of that, that's -- it's a privilege.  It's

25 a blessing.

1  Q.    And is it fair to say one way that it's critical for

2  those people to step up is to provide donations?  Right?

3  A.    Yes.  And sometimes they do in-kind contributions.

4  Q.    And can you --

5  A.    So if someone has a house party and there are foods or

6  wine and cheese, someone may pay for that, and then that's an

7  in-kind contribution.

8  Q.    And is that something you would have to report on your

9  FEC forms?

10  A.    Sure.  Absolutely.  Uh-huh.

11  Q.    It sounds like you're pretty knowledge on your FEC

12  knowledge of the rules and regulations.

13  A.    Well, you have to be.

14  Q.    Because it's important, right?

15  A.    Of course, it is.  It's the law.

16  Q.    It's the law.  And, particularly, it's important for you,

17  right?  That's one of your causes is election integrity, right?

18  A.    It is.  And campaign finance reform.

19  Q.    Election integrity and campaign finance reform?

20  A.    Uh-huh.

21  Q.    And focusing on the latter, is that because one of your

22  views is that there's too much money influencing politics?

23  A.    Well, there is too much money in politics, and for an

24  average person to want to run for Congress and have to meet

25  that steep hill of having to raise such significant dollars,

1  it's done something else, too.  I think it has chipped away at

2  the confidence that the American people have in our system.

3  Q.    And that confidence that's chipped away is because people

4  with money have an outsized influence, right, in your view?

5  A.    Yes.  I think the real culprit is dark money.

6  Q.    And can you explain to the jury what dark money is?  Is

7  that -- in my short version, is that when people don't know who

8  the true source of the money is and that's concealed?

9          MR. LITTRELL:  Objection.  403.  Leading.  Well, he

10  can lead, but --

11          THE COURT:  The objection is overruled.

12  A.    No.  It's actually -- I think you're talking about

13  foreign sources of dollars in Federal elections are not

14  allowed.  You have to be a U.S. citizen to participate.  No.

15  This actually needs to be addressed by the Congress.  We

16  haven't accomplished it yet.  There are political action

17  committees with unlimited, unlimited, sums of money that are

18  pumped into them.  We don't know who the people are.  We don't

19  know how much they've put into it.  So that is, in my view,

20  antidemocratic, and that's why I think it needs to be outlawed.

21  Q.    And do you think it's antidemocratic because it conceals

22  the true source of that money?

23          MR. LITTRELL:  Objection.  Scope.  Argumentative.

24  403.

25          THE COURT:  Overruled.  You can answer.

1   A.     Well, I think that the American people should be able to

2   make a determination themselves.  So if, you know, you don't

3   know who the donors are and you don't know how much money

4   they're putting into the system, again, I think that's

5   antidemocratic.

6   BY MR. JENKINS:

7   Q.     Would you also agree another form of that antidemocratic

8   money is when it's that foreign national that you mentioned?

9   Is that another thing that you believe to be --

10  A.     Actually, what I just described are the real culprits.

11  Q.     Okay.

12  A.     Because it's massive.

13  Q.     The dark money is massive, correct?

14  A.     Yes.  Today.  Right now.

15  Q.     And to you, it's a massive problem when you can't

16  identify the source of that dark money, right?

17  A.     Well, it should just be outlawed, those sums.

18  Q.     I apologize, your Honorable Eshoo.  I interrupted.

19  A.     That's all right.

20  Q.     You also mentioned in discussing dark money and

21  fundraising that it's a steep climb.  And are you referring to

22  for Congress members to become elected it's a steep climb

23  needing to fundraise?

24  A.     It is.  Most frankly, if I had to do what so many members

25  do today, I wouldn't stay in the Congress.

1  Q.    Because it's hard to have to fundraise, to be on a steep

2  climb throughout your entire career, and you've been in there

3  15 years?

4  A.    Yeah.  I don't want to spend most of my time raising

5  money.  I want to be a legislator.  I'm a legislator.  And

6  so -- but it's a challenge for many members because they have

7  different districts than I do.

8  Q.    Is it fair to say on a scale of importance of 1 to 10, 1

9  being not important, 10 being important, the need to fundraise

10 for Congress members is about an 11 or 12?

11 A.    Well, I don't know why you go beyond the 10, but if you

12 want to take it to 12, you can.

13 Q.    What would you take it to?  How about -- where would you

14 go?

15 A.    Whatever the top number is.

16 Q.    Then we'll go with 10 out of 10 for you.  Now, and is

17 that true throughout the Congress member's career, meaning it's

18 not just to get elected; you need to stay at that level 10 to

19 get re-elected, correct?

20 A.    Correct.

21 Q.    And that cycle continues every two years for House

22 members because they run every two years, right?

23 A.    Correct.

24 Q.    And is there -- are you familiar with the term "war

25 chest" in the fundraising context?

1  A.     Uh-huh.

2  Q.     Can you explain to the jury what a war chest is as it

3  relates to fundraisers?

4  A.     Well, it's a bank account.

5  Q.     And is it a bank account for a politician to run and

6  re-run in elections?

7  A.     Yes.  It's all -- the FEC -- the Federal Election

8  Commission puts forward all that needs to be complied with, and

9  there are many, many specifics to it.  So it is -- you have to

10  report, you have to report on time, you have to know what is --

11  must be reported.  It's not just the amount; it's the

12  individuals, their names, their addresses, their occupations.

13  So you have to keep very careful records.

14          And we have, I think, many lawyers in this room.  A

15  campaign -- in my case, and I think for many members, it's

16  not -- it's not mandated, but you really have to have a lawyer

17  that reviews everything that you are going to submit so if

18  there are mistakes, inaccuracies, questions, that those can be

19  corrected before your report is sent in to the Federal Election

20  Commission.

21  Q.     And is all that that you just described, that reporting,

22  the use of lawyers --

23  A.     And that all costs money.  Lawyers cost money.

24  Q.     And those lawyers that cost money and the review of those

25  forms, is that all because it's critical for the American

1  people to have transparency in their political candidates'

2  fundraising?

3  A.    It's the law, and when it's the law, then there's

4  transparency to it.  That's what's so good about laws.

5  Q.    I agree with you there, Congresswoman.

6         And is also that -- that law is something you

7  personally support, it's one of your causes, right, that

8  transparency we've been talking about?

9  A.    Oh, absolutely.  Yes.

10  Q.    And, in fact, you passed HR 1, the For the People Act?

11  A.    Uh-huh.

12  Q.    An historic reform package to restore the promise of our

13  nation's democracy, end the culture of corruption in

14  Washington, and reduce the role of money in politics to return

15  power to the American people.  Does that fairly describe one of

16  your causes?

17  A.    Yes.  I have more than one bill -- more than one piece of

18  legislation that is part of HR 1.

19  Q.    And HR 1 is what I just described?

20  A.    Yeah.  You didn't describe all of it, but it -- because

21  it has many -- several policies in it, but you read from, I

22  believe, the campaign finance portion of it.

23  Q.    Correct.  And that portion is important to you.  Fair to

24  say?

25  A.    Well, yes.  Absolutely.

1  Q.    On those reporting requirements you've been talking

2  about, who is ultimately responsible, the candidate, for the

3  accuracy of those forms, or someone else?

4  A.    Oh, at the end of the day, we are.

5  Q.    The candidate is?

6  A.    The members are, yes.

7  Q.    And you also mentioned, I think --

8  A.    For candidate or a member that's also a candidate.

9  Q.    Yeah.  Someone who actually has the job and someone who's

10  looking for the job, right?

11  A.    Right.

12  Q.    You also mentioned referencing correctly that there's a

13  lot of lawyers in the room and that lawyers cost money, right?

14  A.    Uh-huh.

15  Q.    Does that money come from that war chest that we've been

16  talking about?

17  A.    It comes from the -- your account, yes.  In my case, it

18  would be Anna Eshoo for Congress.

19  Q.    And what other types of expenses come from your account?

20  There's --

21          MR. LITTRELL:  Objection.  403 at this point.

22  Cumulative.

23          THE COURT:  Sustained.

24  BY MR. JENKINS:

25  Q.    Fair to say there's lots of expenses associated with

**118**

1  being a political candidate or having that job, correct?

2  A.    Uh-huh.  Yes.

3  Q.    Now, I want to talk about something else you said -- or

4  two more quick questions.  When you're running for re-election,

5  is it important, in your view, to have a lot of money in that

6  war chest to deter other candidates?

7  A.    Well, that's what money does.

8  Q.    Deters other viable candidates, correct?

9  A.    Uh-huh.

10 Q.    And, for example, you have about a million dollars cash

11 on hand in your account, but do you still do fundraisers?

12 A.    Yes.

13 Q.    Okay.  Now, I want to talk -- focus on something you

14 brought up related to foreign nationals.  And so you described

15 that you're aware that it's illegal for foreign nationals to

16 donate to U.S. politicians in any way, correct?

17 A.    Correct.

18 Q.    And is it fair to say that's sort of FEC 101, meaning

19 that's a basic law or...

20 A.    I think if you raised that with many members, they

21 wouldn't say it's number one because it's -- you know what?

22 It's not something that is common.  They would go to, I think,

23 maybe some other things.  So I don't think --

24 Q.    I apologize.  Let me rephrase it.

25        It sounds like that information, that foreign

 1  nationals can't donate to U.S. campaigns, is something that's

 2  readily knowable to you.  Is that what you're --

 3           MR. LITTRELL:  Objection.  403.  Cumulative.

 4           THE COURT:  Overruled.  You can answer.

 5  BY MR. JENKINS:

 6  Q.    Would you like me, Honorable --

 7  A.    Would you just ask again?

 8  Q.    Sure.  On direct examination and cross-examination, you

 9  talked about your knowledge of FEC laws?

10  A.    Uh-huh.

11  Q.    And you also mentioned that you're aware that one of

12  those laws includes that it's illegal for foreign nationals to

13  donate.  Are you with me so far?

14  A.    Yes.

15  Q.    And it sounds like to me that that's something that was

16  readily knowable to you.  Is that a basic law to you?

17  A.    Well, I know of the law, certainly.  Yes.

18  Q.    And then my next question was that -- sort of how you

19  understand whether that was -- that other Congress members that

20  you deal with, is that something known to them or unknown to

21  them, if you know?

22  A.    I don't know how to answer that because I don't think

23  I've -- I don't recall having a conversation with any member

24  about foreigners contributing to our campaigns.

25  Q.    And is that, like -- that's sort of a rare topic to come

1  up, right?  It's not something you bring up with other Congress

2  members?

3           MR. LITTRELL:  Objection.  Asked and answered.

4           THE COURT:  Sustained.

5  BY MR. JENKINS:

6  Q.    All right.  To your knowledge, has a foreign national

7  ever donated to your campaign?

8  A.    No.

9  Q.    Have you ever suspected a foreign national to donate to

10  your campaign?

11  A.    When I was first running for Congress, there -- some from

12  my community, from the Assyrian-American community, who have --

13  well, let's just put it this way:  They're not Irish names, so,

14  you know, they're unusual names.  And it crossed my mind that

15  when the FEC would pour over my report, would they think that

16  they are not Americans because they -- you know, they're

17  foreign sounding names?  They're not names that are very

18  familiar sounding.  But that can be said for people of many

19  backgrounds.

20  Q.    Absolutely.

21  A.    Of many, many backgrounds.  And that's the United States

22  of America.

23  Q.    I agree with you there.

24  A.    There are people from every background, which makes us...

25  Q.    Makes us America?

1  A.    A magnificent nation, yeah.

2  Q.    I agree with you again.  I'll ask a better question, but

3  I appreciate your answer.

4         Has anyone ever told you that a foreign national had

5  donated to your campaign?

6  A.    No.

7  Q.    If someone had told you that, would you find that

8  concerning?

9         MR. LITTRELL:  Objection.  403.  Argumentative.

10 Beyond the scope.

11        THE COURT:  Rephrase your question.  I'm going to

12 sustain that objection.

13        MR. JENKINS:  Okay.

14 BY MR. JENKINS:

15 Q.    I'll just back up two.  So my last question, Honorable

16 Eshoo, has anyone ever told you that a foreign national has

17 ever donated to your campaign?

18 A.    No.

19        MR. LITTRELL:  Objection.  403.

20        THE COURT:  I'm going to allow it.  The answer

21 stands.

22 BY MR. JENKINS:

23 Q.    And my next question, based off your testimony today,

24 including that you know the law and transparency in election

25 integrity are important to you, had someone told you that, do

**122**

 1  you expect that's something that you would remember?

 2          MR. LITTRELL:  Objection.  403 and vague as to

 3  "that."

 4          THE COURT:  Sustained.

 5  BY MR. JENKINS:

 6  Q.    Based off your testimony today, Honorable Eshoo, that

 7  election integrity is one of your causes, that transparency is

 8  vital to democracy, and that you know that foreign nationals

 9  can't donate, if someone told you that a foreign national

10  donated to your campaign, would you expect that that is

11  something that you would remember?

12          MR. LITTRELL:  Objection.  403.  Also, this is an

13  improper guilt-assuming hypothetical.  I'd cite *United States*

14  *vs. Shwayder,* 312 F.3d 1109.  It assumes guilt, your Honor.

15          THE COURT:  The objection is sustained, not

16  necessarily on that ground.

17          MR. JENKINS:  Okay.  We'll move on.  And by "move

18  on," I'll ask this question:

19  BY MR. JENKINS:

20  Q.    Would it be important to you to learn if a foreign

21  national had donated to your campaign?  Would that be important

22  for you to learn?

23          MR. LITTRELL:  Objection.  Same objection.

24          THE COURT:  I'm going to sustain it on 403.

25          MR. JENKINS:  Okay.

1  BY MR. JENKINS:

2  Q.    Now, you also mentioned that you worked on -- you were

3  asked on cross-examination about some committees and caucuses

4  you worked on, or participated in, and I believe you mentioned

5  the intelligence committee was one.  And approximately how long

6  have you been or -- I don't mean to --

7  A.    Eight years.

8  Q.    And you mentioned you dealt with the FBI --

9  A.    Excuse me.  Members are term limit at that committee.  So

10 I served the full...

11 Q.    You maxed out at eight?

12 A.    I maxed out, right.

13 Q.    During that term of eight years, it sounds like you dealt

14 with the FBI, the CIA.  Did I get that right?

15 A.    Yes.

16 Q.    Have you traveled overseas as part of your role in the

17 Intelligence Committee?

18 A.    Yes.

19         MR. LITTRELL:  Objection.  Scope.  Relevance.  403.

20         THE COURT:  I'll give you a little leeway to connect

21 this up.

22         MR. JENKINS:  Understood.

23         THE COURT:  So it's overruled, but connect it

24 quickly, please.

25         MR. JENKINS:  Yes.

**124**

1  BY MR. JENKINS:

2  Q.   And I believe you said you have traveled overseas as part

3  of your Intelligence Committee duties, right?

4  A.   Yes.

5  Q.   When you travel overseas as a Congress member, you're

6  aware that you get FBI briefings about warnings about being

7  aware of foreign influence, correct?

8  A.   We receive briefings from the State Department before we

9  depart.  I don't recall what you described relative to the FBI.

10 Q.   Understood.

11 A.   They may be made available to us so that if we have

12 questions that rest with the FBI that they can answer the

13 questions, but I don't remember a specific presentation by the

14 FBI.

15 Q.   Okay.  Let's focus, then, on your memory on the State

16 Department briefings before you go overseas as a Congress

17 member.  Do you recall that --

18       MR. LITTRELL:  Objection.  403 again.  Cumulative.

19 Relevance.

20       THE COURT:  Let me hear the questions.

21       MR. JENKINS:  And this is my last question on this

22 topic, your Honor.

23 BY MR. JENKINS:

24 Q.   My question would be, Honorable Eshoo, on the briefings

25 you do remember, do you recall the State Department warning

1  Congress members to be aware of foreign nationals attempting to

2  influence U.S. politicians during those trips?

3  A.    Not the way you describe it, no.

4  Q.    How would you describe it?

5        MR. LITTRELL:  Objection.  Vague as to what it is.

6  There's no --

7        THE COURT:  Overruled.  You can answer.

8  A.    The briefings that we receive before traveling to

9  whatever region in the world or specific country, sometimes

10  there is a classified portion of the briefing by necessity,

11  whatever that necessity is at that time with the country or

12  region you're traveling to.  But, otherwise, the State

13  Department gives an overview of not only the -- some of the

14  economic issues but also where there may be tensions between

15  the United States and areas that we're traveling to.  So it's

16  very broad but specific as well.

17  BY MR. JENKINS:

18  Q.    Okay.  Thank you for that explanation.  Let's switch

19  topics like I promised.  Just a few more.

20        You mentioned IDC, In Defense of Christians,

21  correct?

22  A.    Yes.

23  Q.    You also were shown some defense exhibits about

24  resolutions that you co-authored, right?

25  A.    Yes.

1  Q.    And those were resolutions about genocide and other sort

2  of horrific activities related to religious minorities,

3  correct?

4  A.    Correct.

5  Q.    And I think everyone in this room would agree that those

6  are righteous causes, right?  Or you would --

7  A.    They're not only -- yes.  They're not only righteous, but

8  it is a rarity for a genocide resolution to be passed by the

9  Congress.  In our nation's history, I believe only three have

10  been deemed genocide.  Darfur, the resolution that we're

11  talking about here today, and the Armenian Genocide Resolution,

12  which I had the privilege of bringing to the floor of the

13  House.

14  Q.    Just recently, correct?

15  A.    Yes.

16  Q.    I recall.  And just focusing on sort of that -- the

17  resolutions we're talking about, you also testified that,

18  notwithstanding that it's a righteous and very meaningful

19  cause, you had to work hard to get co-sponsors, right?

20  A.    Very hard.

21  Q.    You had to work hard to get people to vote for it, right?

22  A.    Once they become co-sponsors, they're going to vote for

23  it.

24  Q.    And were there additional people who you wanted to vote

25  for it along with the co-sponsors?

1  A.    Well, there were, if my recollection is correct, there

2  were 213 co-sponsors, and the majority, the magic number in the

3  House, is 218 to pass something.  So we were just five of, you

4  know, the majority of the House, and I believe it -- I think

5  this is correct:  I looked at it last night, and let's see if I

6  remember it correctly.  I think it passed unanimously, 393 to

7  zero.

8  Q.    And so your hard work paid off on that resolution,

9  correct?

10  A.    It did.  And Mr. Fortenberry's, not just mine.

11  Q.    And Mr. Fortenberry's hard work?

12  A.    Yes, very much so.

13  Q.    And Mr. Fortenberry had to do a lot of hard work for that

14  resolution, too, right?

15  A.    He did.

16  Q.    Even though it's a good cause, it's still a lot of hard

17  work to get all those co-sponsors, right?

18  A.    It does.  It takes time to find the members, have them

19  return your call, find them on the floor, explain to them

20  what's taking place, why we're doing what we're doing.  And you

21  need to capture their attention, and you get maybe about a

22  minute or less.  So this is a lot of work.

23  Q.    Because --

24  A.    It really is.

25  Q.    -- you have a lot to do, right?

1  A.    Yes.

2  Q.    And so sometimes you only have a minute to try to

3  persuade another Congress member of even your righteous cause,

4  right?

5  A.    Yes.

6  Q.    Mr. Littrell also asked you about whether it was legal if

7  your constituents could donate.  Do you recall that question,

8  if there was anything improper about your constituents donating

9  to your campaign?

10  A.    Say that again.

11  Q.    Sure.  Mr. Littrell asked you basically your

12  understanding of, is there anything wrong with constituents

13  donating to candidates they favor, and I believe your answer

14  was --

15  A.    Well, I think it's one manifestation of our democracy

16  where they participate.  They choose to.  It's voluntary.  I

17  mean, you can't force anyone to support you or to donate,

18  whether it's in-kind or a $5 check or a $500 check.

19  Q.    And you would also agree with me, Honorable Eshoo, that

20  if that person donated in return for an official act, though,

21  that would be illegal, correct?

22              MR. LITTRELL:  Objection.  403.  Relevance.

23  Cumulative.

24              THE COURT:  Sustained.

25  BY MR. JENKINS:

1  Q.    Now, I want to focus on -- I'm winding down on just a

2  couple of topics.  If we can show Exhibit 184 previously

3  admitted and shown on direct.  And this is this photograph that

4  was shown earlier.  Do you see it in front of you?

5  A.    I do.

6          MR. JENKINS:  Can you highlight the person in the

7  middle with a circle?

8  BY MR. JENKINS:

9  Q.    Do you recognize the person that has a red circle as

10  someone connected with IDC, I believe?

11  A.    He was -- I don't remember his name right now, but he was

12  the head of In Defense of Christians.

13  Q.    And it's fair to say, Honorable Eshoo, that you don't

14  always know everything about the people you work with, correct?

15  A.    Everything?  What does that mean, everything?

16  Q.    Let me ask you, are you aware that the person standing

17  next to you on your right admitted to committing various

18  Federal election crimes?

19          MR. LITTRELL:  Objection.  403.  Relevance.

20          THE COURT:  Overruled.  I'll allow it.

21  BY MR. JENKINS:

22  Q.    Do you want me to repeat my question?

23  A.    Please.

24  Q.    Sure.  My first question before the question was, you

25  don't know everything about everyone you work with, and you

1  said "What do you mean," so I said, "For example, the person

2  who's circled in the red who is next to you in this picture,

3  you're not aware that that individual admitted in Federal Court

4  to committing Federal election crimes, correct?"

5  A.    No.

6  Q.    Okay.  And you -- this award, I think you understood, was

7  related to In Defense of Christians.  Do you recall that

8  generally, that that's what the award was connected to?

9  A.    I do in looking at the picture, uh-huh.

10  Q.    And were you aware that the individual who founded IDC

11  also admitted to committing Federal election crimes?  Are you

12  aware of that?

13         MR. LITTRELL:  Objection.  Relevance.  403.

14  Argumentative.

15         THE COURT:  Sustained.

16  BY MR. JENKINS:

17  Q.    I want to focus you here on your knowledge now of the

18  defendant.

19         MR. JENKINS:  You can take that down.

20  BY MR. JENKINS:

21  Q.    And I believe using -- just quickly summarizing, you've

22  known him for 15 years.  Is that approximately -- or at least

23  what you testified about?

24  A.    I believe so.

25  Q.    And the words you described him with I wrote down,

1  respected, truthful, honorable, faith-filled, integrity, his

2  word is always good.  Do you recall testifying that way about

3  the defendant?

4  A.    I do.

5  Q.    On that last one, you said his word is always good, but

6  that's not always true in Congress, right?

7  A.    It's not always true in life.

8  Q.    Because some Congress members lie, right?

9  A.    Yeah, some people lie.

10        MR. LITTRELL:  Objection.  Relevance.  403.

11        THE COURT:  Overruled.  The answer will stand.

12  BY MR. JENKINS:

13  Q.    Now, is it fair to say that, based off your description

14  of the defendant, he cares a lot about his reputation?

15        MR. LITTRELL:  Objection.  Beyond the scope and

16  relevance.

17        THE COURT:  I'm going to sustain it on foundational

18  grounds.

19        MR. JENKINS:  Okay.

20  BY MR. JENKINS:

21  Q.    The words I just described, you were describing the

22  defendant's reputation to you, right, what you think of the

23  defendant?  Those words that you testified, you were talking

24  about the defendant's reputation as you know it?

25  A.    Yes.

1  Q.    Okay.  And just based off your knowledge, is your view

2  about that reputation based off interacting with the defendant?

3  A.    Yes.

4  Q.    And working with him?

5  A.    Yes.

6  Q.    Based off your interactions, is it clear to you that the

7  defendant's worked hard to build up that positive reputation

8  that you described?

9          MR. LITTRELL:  Objection.  Foundation.

10          THE COURT:  Overruled.

11 A.    Can you repeat the question?

12 BY MR. JENKINS:

13 Q.    Certainly.  You've known the defendant for 15 years.  You

14 used a lot of positive attributes.  You've described impressive

15 resolutions you've worked on together, him literally crossing

16 the aisle, and so my question to you is, does it appear to you

17 that the defendant has worked hard to build up the reputation

18 that you ascribed to him?

19 A.    I think that those that are very serious about their

20 work, always with the intent to build a good reputation in the

21 House of Representatives, which becomes a building block to get

22 even more done in other areas for our constituents.

23 Q.    And an individual like -- a Congress member like the

24 defendant has a lot of building blocks, as you described them,

25 right?  To get stuff done, he's created a lot of building

 1   blocks for himself?

 2            MR. LITTRELL:  Objection.  Vague.  Misstates her

 3   testimony.

 4            THE COURT:  Sustained on vagueness grounds.

 5   BY MR. JENKINS:

 6   Q.    Now, I'm just focusing on sort of the words you used,

 7   meaning building blocks, so maybe you can just explain to me,

 8   at least, if I'm the only one that didn't follow, what you do.

 9   A.    Well, I think that -- I think it's important to

10   understand that each two-year term is another building block.

11   Most people don't know the following or quite understand it:

12   You can have a great idea in this Congress.  That idea may not

13   mature for another decade.  You have to keep working on it.

14   Everything that is introduced in each Congress does not become

15   law.  Some 20 to 25,000 bills are introduced in every two-year

16   session of Congress.  Less than 200 become law, including our

17   national budget.  So when I say "building blocks," yes, you

18   continue to build.  You build on the co-sponsors that you had

19   in a previous Congress.  You bring more on, or new members come

20   in, and you approach them.  So when I say building blocks,

21   that's -- that's what I mean by "building blocks."  It's not --

22   this is not about your own ego, you know, blocks in your mind

23   about how great you are.  That's not my -- I want my words to

24   be understood.

25   Q.    Thank you.  I appreciate that.  And I definitely

1  understand them better.  So using your definition of building

2  blocks, is it fair to say that your view is the defendant has

3  built up a lot of those building blocks you just described?

4  A.    Yes.

5  Q.    And is it fair to say that someone who has built up that

6  many building blocks has a lot to lose also?

7           MR. LITTRELL:  Objection.  Argumentative.  403.

8  Relevance.

9           THE COURT:  Sustained.

10 BY MR. JENKINS:

11 Q.    Let me put it a different way.  Do you believe as a

12 Congressperson that your reputation with other Congress members

13 is important to get things done?

14 A.    Absolutely.

15 Q.    Would you agree with me that your reputation as a

16 politician is important to your constituents?

17 A.    Absolutely.  They're the ones I'm representing.

18 Q.    Would you agree that your reputation as a Congress member

19 is important for fundraising?

20 A.    I think your effectiveness is.

21 Q.    And what do you mean by that?

22 A.    Well, I think that, you know -- let me turn it around

23 another way.  Who wants to be with someone that doesn't work

24 hard and get things done?

25 Q.    And would you say another way it could impact the

1   effectiveness is, if your constituents feel betrayed by you,

2   they may not donate to you?

3        MR. LITTRELL:  Objection.  Relevance.  403.

4   Cumulative.

5        THE COURT:  Overruled.

6   BY MR. JENKINS:

7   Q.    I said whether reputation can affect fundraising, and you

8   sort of threw it back at me that it affects effectiveness.  My

9   question to you -- and I think it's close to the last one -- is

10   that, is another way that that effectiveness is adversely

11   impacted is if your constituents feel betrayed by you?

12   A.    I think that it's essential to have the confidence of

13   your constituents.  And we work very hard to not only create

14   that confidence but also to keep their trust.  So, you know,

15   now, you know, are 750,000 people going to agree with every

16   single vote I cast?  My own children don't agree with me.  So

17   it's -- that's not what I'm referring to because that is our

18   democracy.  We're people -- we don't agree with each other, and

19   we celebrate it.

20   Q.    Sure, but just focusing you back on your last question

21   about how that effectiveness and fundraising can be undermined

22   by betrayal, my last question here is --

23   A.    I don't think it's -- you keep going to fundraising.  I

24   think that lack of confidence can come about on many fronts.

25   Q.    Is fundraising one of those fronts?

**136**

1   A.     Well, I think that if you're -- if a member is -- say a

2   member just doesn't show up to vote unless he or she just feels

3   like it. Well, that's all public, and I think that those

4   constituents would -- their confidence would diminish. And

5   when the confidence diminishes, the poll numbers show it and

6   then there isn't support. It all rolls downhill.

7   Q.     And by support, we can agree you mean to include

8   fundraising, correct?

9   A.     To include it. It's not the only factor.

10           MR. JENKINS: May I have one moment, your Honor?

11           THE COURT: Yes.

12           MR. JENKINS: Just one moment to check my notes.

13           Nothing further for this witness, your Honor.

14           THE COURT: Mr. Littrell, redirect?

15                       REDIRECT EXAMINATION

16   BY MR. LITTRELL:

17   Q.     Congresswoman Eshoo, just a few questions. You mentioned

18   it can be -- it's hard to fundraise, right?

19   A.     Uh-huh.

20   Q.     And you have to fundraise every election cycle, right?

21   But there's a -- you don't live in a very -- you're not in a

22   very competitive Congressional district; is that true? Not

23   right now?

24   A.     Not right now. Well, actually, I have seven opponents,

25   so that's competitive. But over the years that I have served,

**137**

1  it has not been at the top of -- top of the list nationally as

2  being a highly competitive district.

3  Q.    And up until recently, the District of Nebraska was also

4  not a competitive district, was it?

5          MR. JENKINS:  Objection.  Foundation.

6          THE COURT:  Sustained.

7  BY MR. LITTRELL:

8  Q.    You testified that you had a number of constituents who

9  are Assyrian-American who donated to your campaign at one

10 point, right?

11 A.    When I was first running, yes.

12 Q.    And you noticed that they had names that sounded foreign

13 or could be perceived as sounding foreign?

14 A.    Yes.

15 Q.    Did you assume that those people were not born in the

16 United States?

17 A.    No, I didn't because I knew them.

18 Q.    Did you --

19 A.    And I knew where they lived and I knew their families.

20 It's not a huge community.  Let me...  Most people don't know

21 what Assyrian even is.  They ask, what country is that?

22 Q.    So you trusted them?

23 A.    Yes.

24 Q.    Now, Mr. Jenkins asked, if you heard that someone who is

25 a foreign national had donated to your campaign, you would have

**138**

1  returned the money, right?

2  A.    Yes.

3  Q.    Now, if Congressman Fortenberry was told that a foreign

4  national had donated to his campaign, what would you expect him

5  to do?

6             MR. JENKINS:  Objection.  403.

7             THE COURT:  I believe I cut this off previously with

8  him, so I'll sustain the objection.

9  BY MR. LITTRELL:

10 Q.    You testified that the FBI briefs you on the risks posed

11 by a potential foreign influence, right?

12 A.    No.  I think I described the -- how we're prepared for

13 Congressional travel abroad, but I don't recall the FBI doing

14 specific briefings.  They may be part of the briefing team but

15 not quite the way you just described it.

16 Q.    I'll get right to it.  If the FBI suspected that a

17 foreign national had donated to your campaign, you would expect

18 them to warn you about that, right?

19            MR. JENKINS:  Objection.  403.  Foundation.

20 Relevance.

21            MR. LITTRELL:  I think he opened the door to that

22 one, your Honor.

23            THE COURT:  Please don't respond.  Overruled.  You

24 may answer.

25 BY MR. LITTRELL:

1    Q.    You would expect the FBI to warn you if you were the

2    victim of an illegal campaign contribution?

3    A.    Oh, I would hope so, yes.  I would think so, not just

4    hope.

5                MR. LITTRELL:  No further questions.

6                THE COURT:  Anything further of this witness, Mr.

7    Jenkins?

8                MR. JENKINS:  No further questions, your Honor.

9                THE COURT:  You're excused.  Please watch your step

10   going down.  Thank you.

11               And, Mr. Littrell, your next witness?

12               MR. LITTRELL:  Your Honor, the defense calls Trey

13   Gowdy to the stand.

14                     HAROLD W. GOWDY, III,

15   called as a witness by the defense, was sworn and testified as

16   follows:

17               COURTROOM DEPUTY:  Would you please state and spell

18   your full name for the record.

19               THE WITNESS:  My legal name is Harold, H-A-R-O-L-D,

20   Watson, W-A-T-S-O-N, Gowdy, G-O-W-D-Y, III.  I go by Trey.

21               COURTROOM DEPUTY:  Thank you.

22               THE COURT:  Mr. Littrell, you may inquire.

23               MR. LITTRELL:  Thank you, your Honor.

24

25