# Exhibit 5

**1**

1                    UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2      HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

3

4  UNITED STATES OF AMERICA,

5                      Plaintiff,

6    v.                                    Case No.
                                           2:21-cr-00491-SB-1
7  JEFFREY FORTENBERRY,

8                      Defendant.
   _____
9

10

11

12                REPORTER'S TRANSCRIPT OF PROCEEDINGS
                              JURY TRIAL
                           MARCH 23, 2022
13                            8:01 A.M.
                        LOS ANGELES, CALIFORNIA
14

15

16

17

18

19

20

21

22   _____

23                   JUDY K. MOORE, CRR, RMR
                   FEDERAL OFFICIAL COURT REPORTER
                      350 WEST 1ST STREET, #4455
24                 LOS ANGELES, CALIFORNIA 90012
                           213.894.3539
25

```
 1                              APPEARANCES

 2  FOR THE GOVERNMENT:       MR. MACK E. JENKINS
                              MS. SUSAN S. HAR
 3                            MR. J. JAMARI BUXTON
                              Assistant United States Attorneys
 4                            312 North Spring Street
                              Suite 1500
 5                            Los Angeles, California 90012

 6

 7  FOR THE DEFENDANT:        MR. JOHN L. LITTRELL
                              Bienert Katzman Littrell Williams, LLP
 8                            903 Calle Amanecer
                              Suite 350
 9                            San Clemente, California 92673

10                            MR. RYAN V. FRASER
                              Bienert Katzman Littrell Williams, LLP
11                            601 West 5th Street
                              Suite 720
12                            Los Angeles, California 90071

13                            MR. GLEN E. SUMMERS
                              Bartlit Beck, LLP
14                            1801 Wewatta Street
                              Suite 1200
15                            Denver, Colorado 80202

16                            MS. KALLY A. KINGERY
                              Kingery Law
17                            9595 Wilshire Boulevard
                              Suite 900
18                            Beverly Hills, California 90212

19

20

21

22

23

24

25
```

1                         I N D E X

2    GOVERNMENT WITNESSES:
       SPECIAL AGENT EDWARD CHOE
3          Cross-Examination by Mr. Fraser, Page 28
           Redirect Examination by Ms. Har, Page 57
4


5
     DEFENSE WITNESSES:
6      HONORABLE ANNA ESHOO
           Direct Examination by Mr. Littrell, Page 89
7          Cross-Examination by Mr. Jenkins, Page 109
           Redirect Examination by Mr. Littrell, Page 136
8

9      HAROLD W. GOWDY, III
           Direct Examination by Mr. Littrell, Page 140
10         Cross-Examination by Mr. Buxton, Page 177
           Redirect Examination by Mr. Littrell, Page 209
11

12     ANDREW R. BRANER
           Direct Examination by Ms. Kingery, Page 216
13         Cross-Examination by Mr. Buxton, Page 265
           Redirect Examination by Ms. Kingery, Page 276
14

15

16

17   EXHIBITS                      OFFERED      RECEIVED

18   Defense Exhibit 1129             49           49

19   Defense Exhibit 1013            102          102

20   Defense Exhibit 1014            104          104

21   Defense Exhibit 1109            149          149

22   Defense Exhibit 1110            155          155

23

24

25

1   Braner.

2   　　　　THE COURT:  Very well.

3   　　　　　　　ANDREW BRANER,

4   called as a witness by the defense, was sworn and testified as

5   follows:

6   　　　　COURTROOM DEPUTY:  Would you please state and spell

7   your full name for the record.

8   　　　　THE WITNESS:  Andrew R. Braner.  Andrew,

9   A-N-D-R-E-W.  R.  Braner, B-R-A-N-E-R.

10  　　　　COURTROOM DEPUTY:  Be sure to speak into the

11  microphone.

12  　　　　THE WITNESS:  Yes, ma'am.

13  　　　　　　　DIRECT EXAMINATION

14  BY MS. KINGERY:

15  Q.    Good afternoon, Mr. Braner.

16  A.    Good afternoon.

17  Q.    How are you doing today?

18  A.    Well.  Thank you.

19  Q.    Great.  Thank you for being here.  Can you tell us a

20  little about your background, your educational background?

21  A.    I went to school -- I went to college at Baylor

22  University in Waco, Texas, an undergraduate degree in theater

23  and performance, then I went and did my post-graduate work in

24  Denver in philosophy and religion.

25  　　　　THE COURT:  And, Mr. Braner, you're a bit

 1  soft-spoken, so perhaps if you could just make sure that the

 2  microphone is in front of your mouth, just as you see me doing,

 3  I mean, just a couple of few inches away from it.

 4          THE WITNESS:  Is this better?

 5          THE COURT:  It is better.  The trick is to be just

 6  far away enough so that you are not having any feedback or

 7  hitting it but close enough so that we can all hear you.  Okay?

 8          THE WITNESS:  Yes, sir.  Thank you.

 9          THE COURT:  Thank you.

10  BY MS. KINGERY:

11  Q.    Did you run a Christian sports camp in Colorado?

12  A.    Yes, ma'am.

13  Q.    And at sometime did you become a pastor?

14  A.    Yes, ma'am.

15  Q.    And when was that?

16  A.    In 2007.

17  Q.    And how did you meet Congressman Fortenberry?

18  A.    We met through a mutual friend when I was in Washington

19  D.C.  My sports camp in Colorado was focused on helping

20  students in relationships in the Middle East, and I met the

21  Congressman and recognized his affinity for the Middle East and

22  helping people, religious minorities, in the Middle East.

23  Q.    When was that that you met the Congressman?

24  A.    2015.

25  Q.    And did you and the Congressman have anything in common?

**218**

1  A.    The human dignity of religious minorities in the Middle

2  East was something that we found an affinity for, and we had

3  many conversations about that, yes, ma'am.

4  Q.    And tell me about how your relationship with the

5  Congressman developed after that point.

6  A.    At the time, I was running a -- along with the camp, I

7  was running a gap year program for students to travel the world

8  and specifically was in the Middle East, so I had a network

9  throughout the Middle East that was just -- it was interesting.

10 We had business leaders and government leaders and all kinds of

11 people, religious leaders, that were a part of that.  So as our

12 friendship grew and I saw him more and more, I'd share that

13 with him, like, these are the issues we're dealing with, this

14 is what students are hearing, this is what is going on on the

15 ground.

16         THE COURT:  A little slower please, if you would.

17         THE WITNESS:  Yes, sir.

18 A.    And about that time I was invited to be a fellow at the

19 Johns Hopkins School of Advanced International Studies in their

20 Middle East department.

21         THE COURT:  Mr. Braner, I know that this is

22 difficult to do because you're speaking at a normal pace, but

23 this woman over here, she has to take all of this down.

24         THE WITNESS:  It's so nerve racking.  I'm sorry.

25         THE COURT:  It's okay.  Just take a breath, slow

1    down a little bit, and just be mindful of the pace of your

2    speech.

3              THE WITNESS:  Thank you, sir.  Yes sir.

4              THE COURT:  Thank you.

5    A.    So I was invited to be a fellow at Johns Hopkins in their

6    Middle East department, and that opened another arena for me in

7    Washington D.C.  And I always wanted to be a part of policy,

8    geopolitical conversations, and the Congressman afforded me a

9    fellowship in his office.  And so that's where I started a

10   fellowship in his office to discuss these Middle East issues.

11   BY MS. KINGERY:

12   Q.    And I know you touched on it a bit, but can you explain

13   to us what a fellowship is?

14   A.    A fellowship is kind of like an unpaid internship.  So

15   it's -- it afforded Johns Hopkins to have a presence on Capitol

16   Hill and for the Congressman to have a presence in the academy.

17   So it was -- it's kind of a marriage between the two.

18   Q.    And what were the main topics that you were involved with

19   in your fellowship?

20   A.    We discussed Israel, Palestine quite a bit.  We discussed

21   Iraq, defense, human dignity, the rights of the religious

22   minorities around the world.

23   Q.    And when did the fellowship begin?

24   A.    It would have been late 2016, I believe, maybe '17, early

25   2017.

1  Q.    Did you work with Congressman Fortenberry often when you

2  were doing that fellowship?

3  A.    I would be in the office two days a week, three days a

4  week in the fellowship.

5  Q.    And did you communicate with him often when you were in

6  the office?

7  A.    When we talked about those specific issues, yes, ma'am.

8  Q.    And at some point your fellowship ended?

9  A.    Yes.  So the fellowship with Johns Hopkins ended 2018,

10 and that's when the Congressman invited me to come and be a

11 part of his staff.

12 Q.    What position did he invite you to take on?

13 A.    So we call it the body man, which is a term of --

14 basically an executive assistant.  So I was responsible for

15 driving him to places, setting up meetings, making sure that

16 the venues that he was in were set up so that he could come in

17 and do what he does best.

18 Q.    And when you were serving as -- should I say body man or

19 should I say executive assistant?

20 A.    Whatever you want.  Formally probably executive

21 assistant.

22 Q.    Okay.  When you were serving as his executive assistant,

23 how often were you with the Congressman?

24 A.    All -- when he was in -- when he was in D.C., I was with

25 him.

1  Q.    Was there anytime that he was in D.C. that you weren't

2  with him?

3  A.    If he has to go to the floor and make votes or he has to

4  go, you know, to a private meeting, then he would take those

5  things where members -- Congressional members only could go,

6  but most of the time I was side-by-side.

7  Q.    Would you say that your relationship with Congressman

8  Fortenberry at that time was closer than his relationship with

9  anyone else that worked in his office?

10  A.    Approaching, yeah.  It evolved to be that way, yes.

11  Q.    And at some point did you begin working as his Chief of

12  Staff?

13  A.    Yes, ma'am, in -- so this would be the spring of 2020, we

14  had a transition in the office, and he asked me if I would

15  serve as his Chief of Staff.

16  Q.    What's the difference between an executive assistant and

17  Chief of Staff?

18  A.    So the executive assistant position was mainly -- solely

19  focused on making sure that his life, you know, when he was

20  traveling or when he was speaking or when he was, you know -- I

21  was just with him all the time as a staff member.  As a Chief

22  of Staff, we have 20-ish -- I mean, it fluctuates but about 20

23  employees, so as a Chief of Staff, I'm responsible for the

24  employees, the budget, the office in general, constituent

25  relationships, schedule, all the things that comprise a

1 Congressional office.

2 Q. So you took on a lot more responsibility?

3 A. Incredibly more.

4 Q. And would you say that your relationship with Congressman

5 Fortenberry insofar as how close you were with him is the same

6 as it was when you were his executive assistant?

7 A. We are much closer. We talk all the time.

8 Q. What about Congressman Fortenberry's campaign? Did you

9 ever work on that?

10 A. So the difference between -- there's a separation between

11 the official office and a campaign office, and those things are

12 clearly separated in the Ethics Committee in the House. And so

13 it is demanded that I work on a -- if I choose to work on a

14 campaign as a volunteer that I do that on my own time. And so

15 as the Chief of Staff -- and some offices do it different. As

16 a Chief of Staff, I did work on the campaign.

17 Q. And did you volunteer on his campaign in 2018 and 2019?

18 A. 2018, 2019, yes.

19 Q. And do you ever work in -- or do you work only in D.C.

20 with the Congressman, or have you ever worked in Lincoln?

21 A. Both.

22 Q. Both? Okay. How often would you say you work from

23 Lincoln?

24 A. Oh, maybe two or three times a quarter I'll be in

25 Lincoln. And then -- but mostly I'm in D.C. I live in D.C.

**223**

1  Q.   Have you ever been to the Congressman's home?

2  A.   I have.

3  Q.   You have, okay.

4         MS. KINGERY:  I'd like to publish previously

5  admitted Exhibit 1077.

6         THE COURT:  I'm not sure that this was previously

7  admitted.

8         MS. KINGERY:  I'm sorry.  I thought it was.

9         MR. BUXTON:  Objection, your Honor.

10        THE COURT:  All right.  There is an objection to

11 this?

12        MR. BUXTON:  Yes, your Honor.

13        THE COURT:  All right.  So the objection at this

14 point is sustained, as there's been no foundation.

15        MS. KINGERY:  Okay.  Can I publish this exhibit just

16 to the witness, please?

17        THE COURT:  You may.

18        MS. KINGERY:  Thank you.

19 BY MS. KINGERY:

20 Q.   Mr. Braner, do you know what this picture is?

21 A.   That's Mr. Fortenberry's office in his home.

22 Q.   All right.

23        MS. KINGERY:  Can I now publish this to the jury?

24        MR. BUXTON:  Your Honor, the Government objects as

25 to vague as to time.

1          THE COURT:  Agreed.  Sustained.

2          MS. KINGERY:  Okay.  We'll move on.

3   BY MS. KINGERY:

4   Q.    Mr. Braner, can you tell us a little bit about your job

5   responsibilities as the Chief of Staff?

6   A.    As I previously mentioned, the Congressman's -- the

7   Congressman's job is to represent a little over 700, 800,000

8   people in the 1st District of Nebraska, and so my job is to

9   coordinate a staff of 20 people that help him to do that in an

10  effective way.  So everything from managing the budget to make

11  sure that we're not spending taxpayer money on anything

12  inappropriate; managing the communications; managing the

13  constituent services.  We have people that call in every day

14  with a wide variety of issues.  Managing the staff.  So it's a

15  boss position.

16  Q.    And how involved is Congressman Fortenberry in all of

17  that?

18  A.    Very.  Very involved.

19  Q.    How so?

20  A.    He and I speak about almost every decision that is made,

21  and so we are -- we like to use the word "tethered" together,

22  as the decisions that I make he is involved in and the

23  decisions he makes I'm involved in, so we coordinate that

24  relatively well.

25  Q.    Is your job difficult?

1  A.    I work a lot of hours, if that's what you're asking,

2  yeah.  It's demanding.

3  Q.    And how is it -- how is it difficult specifically working

4  with Congressman Fortenberry?

5  A.    I'd say when I met Mr. Fortenberry the first time I was

6  impressed because he -- he's one of what I would call the last

7  great statesmen that I've seen.  He carries himself in a very

8  dignified way and he demands excellence.  He demands excellence

9  from the staff.  He demands excellence from the product that we

10  produce.  He demands excellence in the communications that go

11  out the door.  He demands that we take care of the people in

12  Nebraska.  So he's on top of all those issues.

13  Q.    And from what you've seen or observed working with the

14  Congressman, what sort of mind does he have?

15         MR. BUXTON:  Objection, your Honor.  Vague.

16         THE COURT:  Sustained.

17  BY MS. KINGERY:

18  Q.    Based on what you've seen, how would you describe the way

19  the Congressman thinks?

20         MR. BUXTON:  Same objection, your Honor.

21         THE COURT:  Sustained.

22         MR. BUXTON:  And foundation.

23  BY MS. KINGERY:

24  Q.    From what you've observed, is it difficult to keep the

25  Congressman on track?

1       MR. BUXTON:  Objection, your Honor.  Leading.

2       THE COURT:  Sustained.  It's also a little bit

3  vague.

4       MS. KINGERY:  Okay.

5  BY MS. KINGERY:

6  Q.   Tell me about the challenges at your workplace with

7  respect to speaking with Congressman Fortenberry.

8  A.   I would characterize it as Mr. Fortenberry thinks in --

9  he's got big ideas.  He's a visionary.  And often with

10 visionaries it's difficult to execute those things and so they

11 need somebody -- and, again, this isn't braggadocios about me,

12 but my gift is I'm an executor, I'm an operational guy.  So I

13 have to translate where Mr. Fortenberry's mind is into

14 practical operational day-to-day things.  So I think we make a

15 good team in that regard.

16 Q.   Does the Congressman generally take phone calls by

17 himself?

18      MR. BUXTON:  Objection, your Honor.  Foundation.

19      THE COURT:  I'll allow it.  You have knowledge based

20 upon your position and your experience with him to be able to

21 answer this question.  Am I correct or incorrect?

22      THE WITNESS:  Yes, sir.

23      THE COURT:  So the question is, does he take phone

24 calls himself?  Is that the question?

25      MS. KINGERY:  By himself.  Thank you, your Honor.

1          THE COURT:  You can answer.

2    A.    Normally I would -- we -- no.  And so how this works is

3    if you have two policymakers on a conversation together talking

4    about a big idea to get something done, it's always best

5    practice to have the staff that are going to execute those

6    ideas on the phone as well so that we can disseminate that

7    information into something that we can actually produce.  And

8    so -- and by the time, you know, the policymakers have decided

9    on something, they've moved on to the next big idea.  So it's

10   constant big idea, big idea, big idea, big idea, so we have

11   staff that handle different portfolios in the office so that

12   they can actually execute what was talked about on the phone.

13   BY MS. KINGERY:

14   Q.    And what happens if there aren't other people from the

15   staff that are on the phone with the Congressman?

16          MR. BUXTON:  Objection, your Honor.  Vague.

17          THE COURT:  Sustained.  Let's try to get more

18   focused on some of the issues, please.

19          MS. KINGERY:  Okay.

20   BY MS. KINGERY:

21   Q.    Do you know whether the Congressman takes phone calls by

22   himself without other staff members on the phone?

23          MR. BUXTON:  Objection, your Honor.  Asked and

24   answered.

25          THE COURT:  Sustained.

**228**

1  BY MS. KINGERY:

2  Q.    Is the Congressman busy?

3         MR. BUXTON:  Objection, your Honor.  Vague as to

4  time.

5         THE COURT:  I'll allow it.  You can answer the

6  question.

7  A.    In short, of course, yes.  He has a portfolio of AG

8  security.  We call it -- in our office, we have principles of

9  AG security, health security, and national security which span

10 a tremendous amount of oversight.  And so as he represents the

11 people of Nebraska, he's also thinking about the mind of

12 America in those areas.  So it's constant.

13 BY MS. KINGERY:

14 Q.    And in any given day, how many phone calls would you say

15 that the Congressman takes or is involved on?

16 A.    We are on the phone all day long.

17 Q.    All day long.  And when he's taking a call by himself,

18 how is that information delivered to his staff?

19        MR. BUXTON:  Objection, your Honor.  Foundation.

20        THE COURT:  Sustained.

21 BY MS. KINGERY:

22 Q.    Does the Congressman sometimes take phone calls by

23 himself, to your knowledge?

24        MR. BUXTON:  Objection, your Honor.  Asked and

25 answered.

1          THE COURT:  Sustained.  It's also vague.  We need to

2     get more specific to the issues, please, and the appropriate

3     time frame.

4          MS. KINGERY:  Okay.  I'd like to move into evidence

5     Defense Exhibit 1050, Congressman Fortenberry's calendar.

6          THE COURT:  Is there an objection at this point?

7          MR. BUXTON:  Your Honor, there is no objection as to

8     a specific date of that calendar, but as to the remainder, yes,

9     your Honor.  That's June 4, 2018.

10          THE COURT:  All right.  And so you can publish that

11     particular date.  And I do recall this particular exhibit.

12          MS. KINGERY:  We'd like to move the entire calendar

13     into evidence, your Honor.

14          THE COURT:  At this point there is an objection?

15          MR. BUXTON:  That's correct, your Honor.

16          THE COURT:  The objection at this point is

17     sustained.

18          MS. KINGERY:  I'm sorry.  What are the grounds for

19     the objection?

20          THE COURT:  Mr. Buxton?

21          MR. BUXTON:  It's 403, your Honor.

22          THE COURT:  There's also been no foundation,

23     Counsel.

24          Ladies and gentlemen, we'll go ahead and take our

25     afternoon break.  It's now just about 2:20.  We'll break until

1   2:35.  Please remember, don't speak to anyone about the case,

2   the people, or the subject matter involved.  Continue to keep

3   an open mind.  Leave your notebooks behind.  Take everything

4   else with you, please.

5           (Jury out.)

6           THE COURT:  And, Mr. Braner, you're ordered back at

7   2:35.  And, Mr. -- please be seated, everyone.  You're ordered

8   back.  You're free to leave the courtroom, please.  Thank you.

9           Let me just get a sense as to how much more time and

10  what additional witnesses the parties anticipate.  Mr.

11  Littrell?

12          MR. LITTRELL:  Your Honor, we have maybe 30 or 40

13  minutes with Mr. Braner.  We also have Chief Bliemeister here

14  which I think would be -- we may put him on today.  That will

15  probably take up the day.  Well, looks like Mr. Braner may take

16  up the whole day.

17          THE COURT:  All right.  Very well.  And then let me

18  just quickly hear from -- you said Mr. Bliemeister?

19          MR. LITTRELL:  Yes.  He's the former police chief of

20  Lincoln, Nebraska.

21          THE COURT:  And real briefly, just give me an

22  estimate, a time estimate, on him.

23          MR. LITTRELL:  That should be quite short, 15

24  minutes, I think.

25          THE COURT:  Okay.  And then who thereafter?

**231**

1          MR. LITTRELL:  Probably Luke Wenz.

2          THE COURT:  And how long?

3          MR. LITTRELL:  He may be 30 to 40 minutes.

4          THE COURT:  And anyone else?  Of course, I'm not

5   talking about your client.  I know you may not have decided

6   that yet.

7          MR. LITTRELL:  We have cut a couple of witnesses.

8   We do at this point intend to call Celeste Fortenberry.  We may

9   be missing somebody.  Oh, Special Agent Carter also.

10          THE COURT:  All right.  And you'll remind the Court,

11   when we're done with the jury, I indicated at sidebar I was

12   going to let you expand on the record.  I had heard enough to

13   be able to make a ruling, but I will give you that opportunity

14   as I indicated I would.

15          MR. LITTRELL:  Thank you, your Honor.  One more

16   witness would be Dr. Castel.  We do need a ruling on that.

17          THE COURT:  I believe I already have ruled on that,

18   but I'll hear from the parties after we have excused the jury

19   for the day on that issue as well.  Okay?  All right.  We're in

20   recess until 2:35.

21          (Recess from 2:20 p.m. to 2:35 p.m.)

22          THE COURT:  On the record in U.S. versus Fortenberry

23   outside the presence of the jury with the defendant and all

24   counsel present.

25          In order, perhaps, to give the parties further

 1  guidance on Exhibit 1050 to try to move this along, it is not
 2  likely that the Court is going to allow the entire exhibit in.
 3  What I would suggest you consider doing is having the witness,
 4  who I believe is not in the courtroom, correct?
 5              COURTROOM DEPUTY:  I sent him out.
 6              THE COURT:  Is having him, if this is accurate, to
 7  say whether this is typical of what his day looks like.  And
 8  maybe I'll give you a little more leeway than that.  I haven't
 9  heard what you may want, so if you think that you -- you're
10  entitled to get more, you can, but I'm just trying to give you
11  a little guidance, perhaps, to move this along.
12              MR. LITTRELL:  The specific entries, I think, we'd
13  like to introduce are going to be relevant to this case.
14  They're going to be the weeks of both the June 4, 2018, call
15  and then also the week of the interview.  So I do -- and Ms.
16  Kingery is going to handle that examination, but we are going
17  to walk him through those dates, and they are relevant.
18              THE COURT:  All right.  My inclination is going to
19  be to allow it around the relevant dates, but make sure you
20  stay within that so that -- and, if you can, think about
21  saying, is this typical of his day if, in fact, that's the case
22  and that's the information that you wish to obtain from him.
23  But let's go ahead, and if there's an objection -- is there
24  anything you wish to bring to the Court's attention before we
25  proceed, Mr. Buxton, real quickly?

 1          MR. BUXTON:  Just a quick objection.  I haven't

 2   heard a foundation.

 3          THE COURT:  Well, of course.  I haven't made any

 4   ruling.  I haven't even heard a question, a first question that

 5   would enable me to allow this in.

 6          MR. LITTRELL:  I think I can lay a foundation.  It's

 7   accompanied by a 902(11) declaration, so it's

 8   self-authenticating.

 9          THE COURT:  This is -- on his calendar?

10          MR. LITTRELL:  Yes.  We've already admitted it.  The

11   Government didn't have an authenticity objection before.  We

12   admitted a portion of it.  There was no objection on

13   authenticity previously, and the Court's already ruled on that.

14          THE COURT:  All right.  I'm still going to need to

15   get some basic information.  This applies to both sides.  When

16   there's an objection, there has to be some reference before the

17   jury what the document is with the witness, what the date is,

18   some very basic parameters for admissibility of exhibits.

19          MR. LITTRELL:  Understood, your Honor.

20          THE COURT:  All right.  Let's go ahead and bring

21   them in, please.

22          COURTROOM DEPUTY:  Would you like the witness to

23   take the witness stand?

24          THE COURT:  Yes, let's go ahead and have the witness

25   resume the witness stand, please.  You can resume the witness

1  stand.  You can go ahead and walk around, please, Mr. Braner.

2                 MR. LITTRELL:  May I hand this to the witness?

3                 THE COURT:  Yes.  You need to go around, though,

4  please.

5                 Go ahead and just walk around and please take the

6  witness stand.  The jury is going to be coming in in just a

7  moment.

8                 (Jury in.)

9                 THE COURT:  We remain on the record now, joined by

10  the jury.  We also have Mr. Braner, the witness, who has

11  resumed the witness stand.  And you understand, sir, that you

12  remain under oath?

13                 THE WITNESS:  Yes, sir.

14                 THE COURT:  You may continue with your direct

15  examination.

16                 MS. KINGERY:  Thank you, your Honor.  So I'd like to

17  please publish for the witness Exhibit 1050, Page 2.

18                 THE COURT:  And this will be just to the witness,

19  yes.

20  BY MS. KINGERY:

21  Q.    Mr. Braner, do you see this document?

22  A.    Yes, ma'am.

23  Q.    What is this?

24  A.    This is the -- Mr. Fortenberry's calendar.

25  Q.    How do you know that?

1  A.    I'm in charge of the calendar now, so I know what the
2  calendar looks like.

3  Q.    Thank you.  And what's the date on the page that we're
4  looking at here?

5  A.    June 1, 2018.

6  Q.    Okay.  And what was the Congressman doing on June 1st,
7  2018?

8  A.    This looks like he was in Helsinki or getting ready to go
9  to Helsinki.  These are the --

10            MR. BUXTON:  Objection, your Honor.

11            THE COURT:  On what ground?

12            MR. BUXTON:  This is not admitted into evidence.

13            THE COURT:  Is there an objection to this particular
14  page?

15            MR. BUXTON:  Yes, your Honor.

16            THE COURT:  I'm going to allow it.  This is June 1st
17  of 2018?

18            MR. BUXTON:  Yes, your Honor.

19            THE COURT:  All right.  I'll allow -- I'll allow
20  this to be received.

21            MS. KINGERY:  So can we publish this to the jury?

22            THE COURT:  You can.

23            MS. KINGERY:  Thank you.

24  BY MS. KINGERY:

25  Q.    Mr. Braner, is this entry in Congressman Fortenberry's

**236**

1  calendar, is this typical of the Congressman's calendar?

2  A.    This is typical, yeah.  He's -- he's clearly getting

3  ready to go to a meeting or is in a meeting in Helsinki.

4  They're having -- they're updating him and briefing him on the

5  issues that he'll be discussing and the people that he's going

6  to meet.  So yes.

7  Q.    Okay.  And can you tell us what he's doing in Helsinki

8  that day?

9  A.    Here we're talking about national security issues with

10  the Aspen Institute, it seems.  And you'll see there's

11  several -- several pages to cover the date June 1.

12  Specifically, we're looking at U.S./Russia relationships in and

13  around Ukraine.

14  Q.    Okay.  And is this referring to a CODEL?

15  A.    Yes, ma'am.

16  Q.    What is a CODEL?

17          MR. BUXTON:  Objection, your Honor.  403.

18          THE COURT:  Sustained.

19          MS. KINGERY:  Your Honor, can we publish -- or can

20  we admit all of June 1st into evidence?

21          THE COURT:  Why don't you establish a little bit

22  more of a foundation, please, for this.

23          MS. KINGERY:  Okay.

24  BY MS. KINGERY:

25  Q.    Mr. Braner, you said that June 1st was the -- the

1  calendar for June 1st was more than one page in this document?

2  A.    Yes, ma'am.

3  Q.    How many pages in this document is his calendar for

4  June 1st?

5  A.    It looks like it goes from Page 1 to Page 6.

6  Q.    And are you familiar with all six of those pages in his

7  calendar?

8  A.    Yes, ma'am.

9  Q.    Okay.

10        MS. KINGERY:  Can we move those into evidence, your

11  Honor?

12        MR. BUXTON:  Your Honor, objection as to foundation

13  regarding his knowledge of it in June 2018.

14        THE COURT:  All right.  Let's go ahead and -- I

15  didn't realize there was a foundational issue, so let's go

16  ahead and establish that, please.

17  BY MS. KINGERY:

18  Q.    Mr. Braner, were you working for the Congressman as a

19  fellow in 2018?

20  A.    Yes, ma'am.

21  Q.    And were you familiar with his calendar in 2018?

22  A.    I did have access to the calendar in 2018, yes, ma'am.

23  Q.    And is this representative of his calendar on June 1st,

24  2018?

25  A.    Yes, ma'am.

1  Q.    Okay.

2          MR. BUXTON:  No objection, your Honor.

3          THE COURT:  You may publish the portions for this

4  day.

5  BY MS. KINGERY:

6  Q.    So let's go to Page 3 of the exhibit.  What's happening

7  here, Mr. Braner?

8  A.    So am I looking at your page or this page?

9  Q.    Page 3.  So it looks like Page 2 at the bottom.

10  A.    Okay.  Yeah, I have it.  So this is a briefing page to

11  tell the Congressman this is what to expect, these are the

12  parameters of the conversation.  There are some people that are

13  listed here that he'll meet, some people that will be in the

14  meetings.

15  Q.    Okay.  And let's go to the next page.  What does this

16  page show?

17  A.    So there's a certain process by which the Congressman

18  will go on trips like this, and this sort of outlines the -- we

19  check the box on who's actually paying for this trip, has the

20  ethics committee been notified, what does that look like, where

21  the Congressman will meet.  So, again, it's just overall

22  briefing to make sure that we keep records of the trip.

23  Q.    Okay.  And let's go to the next page.  And this page is

24  still June 1st, correct?

25  A.    Yes, ma'am.

1  Q.     And what's next on the Congressman's schedule that day?

2  A.     Okay.  So the way that -- the way that the calendar

3  works -- everybody's calendar, I assume, is a little bit

4  different.  The way this calendar works, we talk about terms of

5  his voting schedule in D.C.  So you see at the top where it

6  says, "No votes"?  That means there are no votes to be had that

7  day on the House of Representatives floor in Washington D.C.

8  So then you see on the side, the left side talks -- there's a

9  time frame there, which is Central Time, and then you see over

10 to the right where it says, like, "Breakfast 7:00 a.m. to 8:30

11 Helsinki time."  So there's a dual time frame going on here.

12 So he has breakfast in Helsinki.  Again we've got a roundtable

13 discussion with certain VIP's, what the discussion is about,

14 questions that they're going to go over and talk about.  And

15 the Congressman reviews all this before he enters the meetings.

16 Q.     Okay.  And is the next page June 1st as well?

17 A.     Yes, ma'am.

18 Q.     And what's the next thing on his calendar on June 1st?

19 A.     He's got a roundtable discussion, another working lunch,

20 which is usually another discussion with different people.

21 Then he's got individual discussions.  So it's just meetings,

22 meetings, meetings, meetings.

23 Q.     So he has meetings all day on June 1st?

24 A.     Yes.

25 Q.     Is the next page of the calendar June 1st as well?

**240**

1  A.    The half, yes, ma'am.

2  Q.    So how many pages in his calendar are just for June 1st?

3  A.    Looks like six.

4  Q.    Is that pretty representative of a single day in the

5  Congressman's schedule?

6  A.    This is probably a little bit more because of the fact

7  sheet for the trip, but yeah.  It's usually extensive.

8  Q.    Okay.  And I'd like to just show the witness Saturday,

9  June 2nd, as well.

10  A.    Yes.

11         THE COURT:  Is there an objection?

12         MR. BUXTON:  Objection, your Honor.  403 and not

13  representative.

14         THE COURT:  Well, I am going to require you to lay a

15  foundation as to relevance, pursuant to the guidance that I

16  gave previously.

17         MS. KINGERY:  Okay.  May I have a moment, your

18  Honor?

19         THE COURT:  You may.

20         MS. KINGERY:  Can I have the witness please view

21  Page 7 of Exhibit 1050, referring to Saturday, June 2nd, in the

22  Congressman's calendar?

23         THE COURT:  Yes.  Just -- this will be only

24  something that the witness views.  And, actually, let me have

25  the screen, please, so that I can see it, the portion, but the

 1   jury can't see it.  And show me the portion that you're showing

 2   to the witness so that I can determine its relevance.

 3          Do you have a question for the witness?

 4   BY MS. KINGERY:

 5   Q.    Mr. Braner, does this reflect any travel plans?

 6   A.    Yes, ma'am.

 7   Q.    Where is the Congressman traveling?

 8          MR. BUXTON:  Objection, your Honor.  Reading

 9   information into evidence.

10          THE COURT:  Sustained.

11   BY MS. KINGERY:

12   Q.    What travel plans are reflected?

13          MR. BUXTON:  Same objection, your Honor.

14          THE COURT:  It's the same question.

15          MS. KINGERY:  Your Honor, can we conditionally admit

16   this exhibit under 104(b) until we can establish the relevance

17   as to June 4th?

18          THE COURT:  I'm not sure precisely what you're

19   asking me, but we can take this up.  There's no need to

20   conditionally admit it at this point.  You can ask him if he

21   has independent knowledge of the travel, if that would be

22   useful.

23          MS. KINGERY:  Your Honor, the point that we're

24   trying to make here is that the Congressman --

25          MR. BUXTON:  Objection, your Honor.

1            THE COURT:  Hold on.  I understand.  Just please

2    proceed with your questions, and I'll just rule on the

3    objections as they come.

4    BY MS. KINGERY:

5    Q.    Mr. Braner, do you know what the Congressman was doing on

6    June 2nd, 2018?

7            MR. BUXTON:  Objection, your Honor.  It appears to

8    the Government that the defendant is looking at the document.

9            THE COURT:  That's fine.  Please look up.  And just

10   separate and apart from the document, would you know or do you

11   know what the Congressman was doing on June 2nd of 2018?

12           THE WITNESS:  Not -- not to recall from memory, no,

13   sir.  I mean, our travel -- or our life is really busy and

14   hectic, and every day we have to look at it, so I would not

15   remember four years ago, no, sir.

16           THE COURT:  All right.

17   BY MS. KINGERY:

18   Q.    Does this refresh your recollection as to what the

19   Congressman was doing on June 2nd, 2018?

20   A.    Of course.  If I'm looking at it, I would know what he

21   was doing and why he was there and who he spoke to, yes.

22   Q.    And what was the Congressman doing on June 2nd, 2018?

23   A.    So he's in Helsinki.  We're traveling on a ferry to meet

24   with --

25           THE COURT:  The objection's overruled.

1  A.     -- to meet with various VIP's.  He's a Prime Minister of

2  Estonia.  He's got another conversation about the Baltics, with

3  U.S./Russia relations --

4            THE COURT:  Without just -- not to read the document

5  itself.  It refreshes your memory that, in fact, he was

6  traveling during this time period?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  All right.  Next question, please,

9  Counsel.

10  BY MS. KINGERY:

11  Q.     And do you know, Mr. Braner, without looking at the

12  exhibit, what the Congressman was doing on June 3rd, 2018?

13  A.     He clearly -- I mean, he was having a meeting about

14  U.S./Russia relationships and how it affects the Balkin areas.

15  Q.     And on June 4th, 2018, do you know what the Congressman

16  was doing?

17  A.     Do I get to look?

18  Q.     I'm sorry, Mr. Braner, do you recall what the Congressman

19  was doing on June 3rd, 2018, without looking at the exhibit?

20  A.     He's in Helsinki having discussions with leaders from

21  around the world to talk about the United States and Russian

22  relationships and how that affects the Balkin States.

23  Q.     And when does he return from Helsinki?

24  A.     I'd have to look.

25  Q.     Okay.  If you could take a look, please, at Page 8 of

**244**

1  this exhibit and let me know if that refreshes your

2  recollection as to what he was doing on June 3rd, 2018.

3  A.     So we were traveling on June 3rd, 2018.

4  Q.     Traveling where to where?

5  A.     From Helsinki to Chicago, Chicago to Lincoln.

6  Q.     What time did the Congressman get back -- around what

7  time did the Congressman arrive in Lincoln?

8  A.     Well, it says the plane lands at 10:17.  He has to get a

9  rental car turned back in.  He has to get home, get his bags,

10  so I would assume around 11:00-ish --

11         THE COURT:  There is an objection.  Mr. Buxton is

12  standing.  I am going to sustain it.  I'm going to ask you to

13  please move on.  If you want to ask him general questions,

14  please establish, first of all, whether he has foundation to

15  begin with, knowledge; and then if he doesn't remember, ask him

16  to read it, please, and see if it refreshes his memory.  He has

17  to say yes or no, and then he cannot read from the document.

18  It has to be by what he remembers if, in fact, it refreshes his

19  memory.  Okay.

20         MS. KINGERY:  I understand, your Honor.  Thank you.

21  BY MS. KINGERY:

22  Q.     Do you know, Mr. Braner, without looking at the document,

23  do you recall what the Congressman was doing on June 4th, 2018?

24  A.     Traveling from Helsinki back to the United States.

25  Q.     On June 4th, 2018?

1  A.    Again, I'd have to look.

2  Q.    Okay.  Please turn to Page 8 of the exhibit and read that

3  to yourself and let me know if that refreshes your recollection

4  as to what the Congressman was doing on June 4th, 2018.

5  A.    Okay.  Yes.

6  Q.    What was the Congressman doing on June 4th, 2018?

7  A.    He's arrived home on June 3rd, so on June 4th he's

8  preparing to go to Washington again.  So the way our system

9  works, when he's at home, he's representing the State of

10  Nebraska.  So I don't know exactly what meetings he has, but my

11  assumption is he's going to be in the office in Lincoln,

12  Nebraska, working for the people.

13          MR. BUXTON:  Objection.  Speculation.

14          THE COURT:  Sustained.

15          MR. BUXTON:  Move to strike, your Honor.  Apologize.

16          THE COURT:  Stricken.

17  BY MS. KINGERY:

18  Q.    So on June 3rd, 2018, the Congressman was traveling from

19  Helsinki to Lincoln, Nebraska; is that correct?

20  A.    Correct.

21  Q.    And on June 4th, the next day, he had meetings.  Is that

22  your recollection?

23  A.    Yes.

24  Q.    And based on your recollection, the Congressman was

25  preparing to return to D.C.?

1          MR. BUXTON:  Objection.  Leading.

2          THE COURT:  Sustained.

3  BY MS. KINGERY:

4  Q.    Based on your recollection, what was the Congressman

5  doing on June 4th, 2018?

6  A.    He would be in the office in Lincoln and then he'd be

7  preparing to come the next day to Washington D.C.

8          MS. KINGERY:  May I have a moment, your Honor?

9          THE COURT:  Yes.

10  BY MS. KINGERY:

11  Q.    Mr. Braner, to your knowledge, are these documents, these

12  pages that you've look at, are these created and maintained in

13  the ordinary course of business?

14  A.    Yes.

15  Q.    And are these -- are these pages accurate, to the best of

16  your recollection?

17  A.    Yes.

18  Q.    Okay.

19          MS. KINGERY:  Your Honor, can we please move these

20  pages into evidence?

21          MR. BUXTON:  Your Honor, unclear as to which pages.

22          MS. KINGERY:  May I?

23          THE COURT:  Which pages are you seeking?

24          MR. BUXTON:  The Government has no objection to Page

25  8.

1        MS. KINGERY:  Pages 2 through 8, your Honor.

2        THE COURT:  Any objection?

3        MR. BUXTON:  Your Honor, the Government objects to

4   everything besides 7 and 8 as 403, your Honor.

5        THE COURT:  If that's the grounds of the objection,

6   the objection is overruled.

7        MR. BUXTON:  Foundation as well, your Honor.

8        THE COURT:  You had your chance, Mr. Buxton.  I've

9   made my ruling.  That was an objection I would have sustained,

10  but I'd like to see them contemporaneously, please.  So this

11  will be received.

12       MS. KINGERY:  Thank you, your Honor.  Can we please

13  publish Page 7 to the jury?  I'm sorry.  Let's go to Page 6.

14  BY MS. KINGERY:

15  Q.    Mr. Braner, is this the day that the Congressman was

16  traveling?

17  A.    No.

18  Q.    Sorry.  Is this the day that the Congressman is

19  traveling?

20  A.    Yes.

21  Q.    And what time does he leave Helsinki?

22  A.    Oh, to America?  It's 2:20 p.m. Helsinki time.

23  Q.    And what time is that in Lincoln, Nebraska?

24  A.    Seven hours ahead.  So I think it's at 6:00, 6:00 or 7:00

25  in the a.m.

**248**

1   Q.   And what time does he arrive in Lincoln, Nebraska?

2   A.   9:17 p.m.

3   Q.   On what day?

4   A.   June the 3rd.

5   Q.   And can you please take a look at Page 9, which I believe

6   was the page that was previously admitted.

7          THE COURT:  It has not been previously admitted.

8          MS. KINGERY:  Okay.

9   BY MS. KINGERY:

10  Q.   Mr. Braner, is Page 8 of this exhibit -- or Page 9,

11  excuse me -- of this exhibit a record that's created and

12  maintained in the ordinary course of business?

13  A.   Yes, ma'am.

14  Q.   And is this a record that you have personal knowledge of?

15  A.   Yes, ma'am.

16  Q.   How do you have personal knowledge of it?

17  A.   I control the calendar.

18  Q.   Okay.

19         MS. KINGERY:  Your Honor, we'd like to admit Page 9

20  as well.

21         MR. BUXTON:  Your Honor, the Government has no

22  objection to the calendar entry for June 4th, but we would ask

23  that it stop at June 5th, for the objections we articulated

24  before, including foundation and 403.

25         THE COURT:  All right.  So it will be received up to

1  what the Government has agreed to, but they do reserve whether

2  the foundation the Court has heard is sufficient under the

3  business records exception.

4  BY MS. KINGERY:

5  Q.    What is the Congressman doing on June 4th, 2018, Mr.

6  Braner?

7  A.    June 4th?  He's in Lincoln, Nebraska, having meetings.

8  Q.    Do you see for these meetings that it says, "All day"?

9  A.    Yes.

10 Q.    What does that mean?

11 A.    So that would be the -- all day is equal to the "No

12 votes" part in the middle, so that means that there are no

13 votes on the House floor all day that day.  And then when you

14 go down the middle and you see Tuesday, he has to be in

15 Washington D.C. at 6:30 to vote on the House floor for his --

16 for his responsibilities, Federal responsibilities.  Then, of

17 course, Wednesday at 1:30 there will be votes, Wednesday at

18 9:00 there will be votes, Thursday at 1:30 there will be votes,

19 Thursday at 9:00 there will be votes, Friday at 11:30 a.m.

20 there will be votes.  And then presumably the business of the

21 House would be finished there Friday afternoon and he'll fly

22 back to Nebraska.

23 Q.    So all four of these bullet points for Tuesday,

24 Wednesday, Thursday, Friday, those times, they indicate times

25 that he has to vote; is that correct?

1  A.   Yes.

2  Q.   So he needs to be in Washington D.C. to vote?

3  A.   Correct.  And these are guideline times.  It depends

4  whether we're debating a Federal issue or debating some bill or

5  something, they'll fluctuate, but yeah, this is sort of our

6  guide and how to manage his time in D.C.

7  Q.   Do you know when the Congressman went to D.C.?

8  A.   I don't know off the top of my head this particular date

9  without looking at the calendar.

10  Q.   If you look at the next day of the calendar, can you tell

11  me if that refreshes your recollection?

12  A.   Let's see.  Yes.  So he would have left --

13           THE COURT:  One second, please.  Was this page

14  received without objection, Mr. Buxton?

15           MR. BUXTON:  No, it was not, your Honor.

16           THE COURT:  Is there an objection to the next page?

17           MR. BUXTON:  Yes, your Honor.  Foundation.  403.

18           THE COURT:  So please make sure that you establish

19  whatever appropriate foundation that you would like, Counsel.

20           MS. KINGERY:  Okay.  Just to clarify, though, the

21  next page does have June 4th, and the Government represented

22  they had no objection to the June 4th part, so can we at least

23  publish the first part?

24           THE COURT:  Mr. Buxton?

25           MR. BUXTON:  Certainly, your Honor.  My

1  understanding is that's in evidence up to the end of June 4th.

2          THE COURT:  Yes.

3  BY MS. KINGERY:

4  Q.    What is the Congressman doing for the rest of the day on

5  June 4th?

6  A.    So it looks like "Steve at 4:30" is a reference to the

7  accountant, so I'm sure they either had a -- they had a meeting

8  there.  And then at 6:00 p.m. he met with Colonel Manion.

9  Q.    And is the Congressman at home in Lincoln, Nebraska, or

10  is he in his office?

11          MR. BUXTON:  Objection, your Honor.  Foundation.

12  BY MS. KINGERY:

13  Q.    Do you know if on June 4th the Congressman was at home,

14  or was he in his office?

15  A.    Usually he would be in his office, but it doesn't say,

16  and I can't recall four years ago.

17  Q.    Okay.  Let's move on to Page -- or I'm sorry.  Do you

18  know what the Congressman was doing on March 15th, 2019?

19  A.    Can I look?

20  Q.    Do you recall independently?

21  A.    I do not.

22  Q.    Then you can look at -- yes, you can look, to refresh

23  your recollection, at Page 590.

24  A.    March 19th.  Okay.  The Congressman is in Kenya.

25          THE COURT:  One second.  The jury is to disregard

**252**

1  that.

2         Go ahead and ask your next question, please.

3  BY MS. KINGERY:

4  Q.    Have you read that page of the exhibit, Mr. Braner, to

5  yourself?

6  A.    Yes.

7  Q.    Does that refresh your recollection as to what the

8  Congressman was doing on March 15, 2019?

9  A.    Yes.

10 Q.    And do you know what he was doing on March -- or how do

11 you know what he was doing on March 15th, 2019?

12 A.    One of the priorities in our office is conservation and

13 protection of the environment, and the Congressman's Co-Chair

14 of the Conservation Caucus in the House, which is the largest

15 caucus that we have.  He's concerned about the conservation in

16 Africa.  He was in Kenya with the International Conservation

17 Caucus.

18        MR. BUXTON:  Objection, your Honor.  Non-responsive.

19        THE COURT:  Sustained.  The jury is to disregard the

20 response.

21 BY MS. KINGERY:

22 Q.    Is this page of the Congressman's calendar something that

23 was created and maintained in the ordinary course of business?

24 A.    Yes.

25 Q.    And is this something that you're personally aware of?

1  A.    Yes.

2  Q.    And how would you be personally aware of this?

3  A.    The principles in our office to be aware of conservation

4  and to be attuned to the environment leads me to know that he

5  has been to this place.  I know what the meetings were about.

6         MR. BUXTON:  Objection, your Honor.  Foundation.

7  401 and 403.

8         THE COURT:  Sustained.

9  BY MS. KINGERY:

10  Q.    My question is a little bit different, Mr. Braner.  I'm

11  asking you, how do you know what is on his calendar.  Is that

12  part your job or is that --

13  A.    Yes, it's part of my job to maintain the calendar.

14         MR. BUXTON:  Objection, your Honor.  Leading.

15         THE COURT:  I'll allow it.  Overruled.

16  BY MS. KINGERY:

17  Q.    On March 15th, 2019, what was the Congressman doing?

18  A.    He was in Kenya.

19  Q.    Why was he in Kenya?

20  A.    For the International Conservation Caucus.

21  Q.    Do you know when he returns from Kenya?

22  A.    Not off the top of my head.

23  Q.    Can you look at Page 131?  The Bates number is 904 in the

24  bottom right corner.  Read that to yourself, please, and tell

25  me if it refreshes your recollection.

1  A.     Yes.

2  Q.     That does refresh your recollection?

3  A.     Yes.

4  Q.     Okay.  When did the Congressman return to Nebraska?

5  A.     It was on March the 22nd at 5:04 p.m.

6  Q.     Okay.  And what time does the Congressman get into

7  Nebraska?

8              MR. BUXTON:  Objection.  Foundation.

9              THE COURT:  Please establish the foundation for the

10  next question, please.

11  BY MS. KINGERY:

12  Q.    Do you know what the Congressman does when he returns to

13  Nebraska?

14              MR. BUXTON:  Objection.  Vague as to time.

15  BY MS. KINGERY:

16  Q.    On March -- sorry.

17              THE COURT:  Go ahead.  You can rephrase your

18  question, please.

19              MS. KINGERY:  Thank you.

20  BY MS. KINGERY:

21  Q.    On March 22nd when the Congressman returns to Nebraska,

22  do you know what he does?

23  A.    Traditionally, he'll land in Omaha and he'll have

24  meetings in Omaha and as he drives back to his home in Lincoln.

25  Q.    Do you know specifically on March 2nd what he was doing

1  when he returned to Nebraska?

2  A.    I do know this time that there was -- there was a lot of

3  attention being paid to the Air Force Base and I know that he

4  had meetings in and around the Air Force Base for flooding

5  issues.

6  Q.    Why would that concern the Air Force Base?

7  A.    The Congressman represents the Air Force Base.

8           MR. BUXTON:   Objection.

9           THE COURT:   What's the objection?

10          MR. BUXTON:   Relevance.

11          THE COURT:   Sustained.

12          Let me see both lead counsel at sidebar for a

13 minute.

14          (The following proceedings were held at the bench,

15 outside the hearing of the jury.)

16          THE COURT:   Let me just suggest to all counsel that

17 this is not serving anyone's purpose.   It's not serving the

18 Government by objecting a lot and it's not serving the defense

19 that she's having difficulty establishing basic foundations for

20 things that readily could be established.   I'm going to suggest

21 to the Government that perhaps you be a little bit more lenient

22 in how you allow this to proceed.

23          MR. JENKINS:   I understand.

24          THE COURT:   Because I don't think that I can do very

25 much.   And I mean to not be disrespectful.   We've both been

 1  where she is, and I'm sympathetic to that and probably the jury

 2  is as well.  So I'm going to rule as I see them, but let me

 3  just suggest to you that you may want to give her a little

 4  leeway here.

 5          MR. JENKINS:  Understood, your Honor.  And if I can

 6  just be brief.  Our position is that we're objecting to this

 7  Kenya information as 403, but to the extent the Court's going

 8  to let it in, it's not a foundational issue.

 9          THE COURT:  This is -- I gotta tell you something.

10  This is a hoe-hum, and we're making it a big deal.

11          MR. JENKINS:  Okay.  If the Court's going to let it

12  in, we'll withdraw our objection.

13          THE COURT:  I'm going to let it in.

14          MR. JENKINS:  Understood, your Honor.  Thank you.

15          THE COURT:  For the relevant dates, tell her not to

16  go into that much detail.  It's just simply for the business.

17  He's busy.  I don't want to hear --

18          MR. LITTRELL:  But I think that the important thing

19  is, these dates are -- it is admissible for both purposes, just

20  the sheer volume, so the whole thing is admissible for that

21  purpose, but these dates are relevant.  And just our proffer

22  is, on June 4th is when he gets the call, so his state of mind

23  that day is relevant.

24          THE COURT:  I've allowed for the business.  I've

25  already given that this is typical and the dates that matter,

**257**

1   and that's all I'm going to let in.  Okay?

2          MR. LITTRELL:  Very well.

3          (The following proceedings were held in open court.)

4          THE COURT:  You may proceed when you're ready.

5          MS. KINGERY:  Thank you, your Honor.

6   BY MS. KINGERY:

7   Q.    Mr. Braner, is this document created and maintained in

8   the ordinary course of your business?

9   A.    Yes, ma'am.

10  Q.    And is it true and accurate, to the best of your

11  knowledge?

12  A.    Yes, ma'am.

13  Q.    Is that true with this entire document in front of you?

14  A.    Yes, ma'am.

15  Q.    Thank you.

16         MR. BUXTON:  The Government has no objection to that

17  page, your Honor.

18         THE COURT:  All right.  And so you could have the --

19  it's the March 15, 2019, date?  Is that what you're looking to

20  have admitted?

21         MS. KINGERY:  Your Honor, we would like to admit the

22  entire document.

23         THE COURT:  I'm not going to allow that, but

24  March 15th right now, that's what you're asking him about,

25  right?

**258**

1      MS. KINGERY:  Yes, we'd like to admit March 15th
2   through March 23rd.
3      THE COURT:  All right.  The Court will allow at this
4   point the March 15th only.  And I'll discuss later with counsel
5   about perhaps further, but right now just March 15th.  Okay?
6      MS. KINGERY:  Okay.
7   BY MS. KINGERY:
8   Q.    Mr. Braner, can --
9      MS. KINGERY:  I'm sorry.  One moment, please.
10  BY MS. KINGERY:
11  Q.    Mr. Braner, can you please flip through the calendar up
12  through March 23rd?
13  A.    Yes.
14  Q.    Are those pages of the calendar created and maintained in
15  the ordinary course of business?
16  A.    Yes, ma'am.
17  Q.    And are they true and accurate, to the best of your
18  knowledge?
19  A.    Yes, ma'am.
20  Q.    Can you please turn --
21     MS. KINGERY:  Your Honor, can we please admit
22  March 15th through March 23rd?
23     THE COURT:  I'm going to allow it in.  I was
24  misfocused on the date that's March 23.  But please go through
25  this quickly, Counsel.

**259**

```
 1            MS. KINGERY:  Okay.
 2   BY MS. KINGERY:
 3   Q.    Mr. Braner, could you please go to March 22nd on the
 4   calendar.
 5   A.    Yes, ma'am.
 6            MS. KINGERY:  Can we publish this page to the jury,
 7   please.
 8   BY MS. KINGERY:
 9   Q.    Mr. Braner, what is Congressman Fortenberry doing on
10   Friday, March 22nd?
11   A.    He's traveling.  He's traveling from New York to Omaha.
12   Previously he had traveled from Kenya, so he's continuing his
13   flight.
14   Q.    And what's on his schedule that day?
15   A.    He immediately gets off and goes to Offutt Air Force Base
16   that evening to speak to Colonel Manion, the Base Commander.
17   He's looking at the flood and the damage that was caused by the
18   flood at Offutt Air Force Base because that's under our
19   representation.
20   Q.    Okay.  And can you please turn to March 23rd?
21   A.    Yes, ma'am.
22   Q.    What is the Congressman doing on March 23rd?
23   A.    He's meeting with local mayors.  He's -- again he's
24   surveying the flood damage and assessing flood damage.  He's
25   going -- he's going on a tour here.  It looks like he's going
```

1  to Columbus, Nebraska, to meet with other leaders.  It's a full

2  day.

3  Q.    Does he have any meetings scheduled with the FBI that

4  day?

5  A.    Not that I see, no, ma'am.

6  Q.    Okay.  And from March 15th until March 23rd, how many

7  pages are in his calendar in that one week?

8  A.    So that goes 92 to -- I think it goes 892 to 905.  So 18

9  and five, 22?  Is that right?  22 pages?

10 Q.    Is 22 pages an accurate representation of how many pages

11 would be in the Congressman's calendar in one week?

12 A.    Give or take, yes.

13 Q.    Okay.  Moving on from the calendar, Mr. Braner, as the

14 Congressman's Chief of Staff, do you speak frequently with

15 other members of Congress and their staff?

16 A.    Yes, ma'am.

17 Q.    And do they often share their views of the Congressman

18 with you?

19 A.    Yes, ma'am.

20 Q.    And based on those conversations, does the Congressman

21 have a reputation among his fellow members of the House of

22 Representatives as to whether or not he's honest?

23 A.    High integrity, yes.  Honest.

24 Q.    What is that reputation?

25 A.    High integrity.  On both sides of the aisles.

1  Q.     Does the Congressman have a reputation as to whether he

2  follows the rules?

3  A.     Of course.

4  Q.     What is that reputation?

5  A.     To the letter.

6  Q.     I'm sorry.  Can you --

7  A.     To the letter.

8  Q.     So does that mean that he follows the rules to the

9  letter?

10 A.     Yes, he follows the rules to the letter.

11 Q.     Does the Congressman insist that his staff carefully

12 follow the rules?

13 A.     Absolutely.

14 Q.     And so is it your opinion that the Congressman is honest

15 and follows the rules to the letter?

16 A.     Yeah.  One of the first -- one of the first meetings that

17 I had with the Congressman as the executive assistant, he asked

18 me to mail a letter for him, and so I --

19            MR. BUXTON:  Objection, your Honor.

20            THE COURT:  On specific instance, the Court's

21 allowing the specific instance.

22 A.     I took the letter and just went to the cabinet, opened

23 the cabinet, put a stamp on the letter, and put this letter in

24 the out box and forgot about it.  About an hour later he called

25 me into his office and he said, "Now how did you get that

1  letter out?"  And I said, "Well, I just went to the cabinet and
2  got a stamp and put it on and sent it like we would."  And he
3  reached in his back pocket and he pulled out his wallet and he
4  said, "We do not allow the taxpayers to pay for my personal
5  mail" and he pulled a stamp out of his wallet and said, "Now go
6  put that back," so I did.
7  Q.     Thank you, Mr. Braner.  So based on your observations,
8  then, is the Congressman a man of integrity?
9  A.     To the minutia, yes, ma'am.
10 Q.     And do you have -- can you share other examples of when
11 you've seen the Congressman being a man of integrity?
12 A.     Well, he -- in constant conversations we're talking about
13 just making sure that everybody knows everything that's going
14 on and there's no -- there's no wonder, there's no cloud.  And
15 so he's involved in every decision that we make.
16 Q.     And so is it your opinion that the Congressman is a
17 scrupulous rule follower?
18 A.     Yes.
19 Q.     And do you have any examples of that?
20 A.     I know when he -- when we have to file reports or we have
21 to file ethics reports or we have to file anything with the
22 House of Representatives, the Congressman reviews every single
23 line.
24 Q.     And does Congressman Fortenberry take his job seriously?
25 A.     Yes.

1  Q.    Was there anything that happened specifically around

2  April 2019 that would lead you to believe that the Congressman

3  is a scrupulous rule follower?

4  A.    April 2019.  So I'm still a fellow and I was under the

5  Middle East -- I had the Middle East portfolio.  The

6  Congressman had spent some time in Egypt as a college student

7  and had an affinity for Egypt, and that's another connection

8  that we had.  And so I got to be friendly with the Egypt

9  Embassy.  About that time, it was President Sisi of Egypt was

10 coming to meet with the President in the Oval Office, and the

11 Embassy reached out to us to see if we could provide a room for

12 them to hold a panel discussion.  The Congressman allowed me to

13 do that.  I went and reserved a room, got everybody set up.

14 The Embassy told me that they were going to invite somebody

15 that I didn't know to come and facilitate that panel

16 discussion.

17        When the day came for the event, I felt obligated to

18 go and just make sure that everything was set up and everybody

19 was taken care of, and if they needed any help, I could come

20 and do that.  So I met this individual and asked him if he

21 needed anything from us or from our office or if I could be of

22 any assistance, and he pulled me out into the hallway and he

23 said, "We'd like to thank you for your" -- "for your help" and

24 he reached into his coat and he pulled out an envelope of cash

25 and was, like, handing me this envelope of cash.  And

1   immediately I was like, no, we don't do this, like, this is the

2   Government.  We don't do business like this.  He -- he shook my

3   hand, I shook his hand.  Oh, I'll owe you dinner when we go to

4   New York or whatever.

5           And so when I walked away, again, I was a fellow in

6   the office, so I went to the foreign affairs special staff

7   member and I told him of this example.  And he goes, "Well,

8   that's really odd."  So we talked about it for a little bit,

9   "Does the Congressman need to know this?  I don't know.  Maybe

10  we should sit on this and wait.  I don't know.  We'll just

11  wait."

12          THE REPORTER:  I need you to please slow down.

13          THE WITNESS:  I'm so sorry.

14  A.    We waited for I think a day or two before we approached

15  the Congressman.  We just didn't feel right about it.  So we

16  walked into his office and I told him what had happened, and he

17  was irate.

18  BY MS. KINGERY:

19  Q.    What did the Congressman say?

20  A.    "Call the Sergeant of Arms right now, get him up here.

21  We're going to report this right now and tell him everything

22  that happened."  And within an hour, we had the Sergeant of

23  Arms, the FBI, and the Capitol Police in the office to

24  interview us, myself and then our foreign affairs specialist.

25  So he was quick to make sure that that never happened again.

**265**

1   Q.    Thank you, Mr. Braner.  So in your opinion, the

2   Congressman is definitely a man of integrity?

3   A.    Yes, ma'am.

4             MS. KINGERY:  Thank you, Mr. Braner.

5             I have no further questions, your Honor.

6             THE COURT:  Mr. Buxton?

7             MR. BUXTON:  Just one moment, your Honor.

8             THE COURT:  Yes.

9                       CROSS-EXAMINATION

10  BY MR. BUXTON:

11  Q.    Good afternoon.

12  A.    Good afternoon.

13  Q.    Now, on direct, you described the defendant as, I

14  believe, the last great statesman; is that right?

15  A.    That's my personal opinion, yes, sir.

16  Q.    And you also described him as a visionary?

17  A.    Yes, sir.

18  Q.    And you look up to the defendant, right?

19  A.    Yes, sir.

20  Q.    He means a lot to you?

21  A.    Of course.

22  Q.    You share the same beliefs?

23  A.    Yes.  Yeah.  We argue a lot, we disagree a lot.  We agree

24  a lot.

25  Q.    I believe you.  I thought you said that you connected

**266**

1  over some shared beliefs.  Did I mishear you?

2  A.    Specifically we did have some beliefs that come together

3  and we share those, yes.

4  Q.    And I think you said that you are tethered together?

5  A.    Yes.

6  Q.    Right?

7  A.    Yes.

8  Q.    Fair to say you're very close?

9  A.    Yes.

10 Q.    In fact, he took you from an unpaid intern to a body man

11 or body person, and eventually you became his Chief of Staff?

12 A.    Yes, sir.

13 Q.    Which is a very big job?

14 A.    Yes, sir.

15 Q.    And you owe him a lot, do you not?

16 A.    I mean, I have a friendship with him, I have a

17 personal -- professional relationship with him, so yes.  Of

18 course.

19 Q.    And your job depends on his job?

20        MS. KINGERY:  Objection, your Honor.  Argumentative.

21 403.

22        THE COURT:  Overruled.  You can answer.

23 A.    In the strictest sense of the word, sure.

24 BY MR. BUXTON:

25 Q.    Now, on direct -- I'm putting up on the screen what has

1    been admitted in evidence.  This is a calendar entry for

2    June 4, 2018.  Do you see that there?

3    A.     Yes.

4    Q.     And this is the defendant's calendar, correct?

5    A.     Yes, sir.

6    Q.     And I believe that you testified on direct that the

7    defendant is a very busy person?

8    A.     Yes.

9    Q.     He's jam-packed, correct?

10   A.     Yes.

11   Q.     So let's look at this calendar entry.  I want to focus

12   on -- do you see the section where it says, "All day"?

13   A.     Yes, sir.

14   Q.     Okay.  And you said this describes his agenda for the

15   week, correct?

16   A.     For the D.C. week, yes, sir.

17   Q.     So if we're going backwards, let's start on Friday.  Are

18   you with me?

19   A.     Friday.  About middle at the bottom there.

20   Q.     Yeah.  So it looks like on Friday he's got a vote on --

21   at 11:30 a.m.?

22   A.     Right.  I think it would be helpful to know this is a

23   summary of the week.  This isn't the whole -- this isn't

24   everything that would be happening on Friday.

25   Q.     Thank you.  That is helpful.  So on Thursday, he's got

**268**

1  votes at 1:30 and -- 1:30 p.m. and 9:00 p.m.?

2  A.    Correct.

3  Q.    On Wednesday, he's got two more votes.  This is 1:30 p.m.

4  and 9:00 p.m.?

5  A.    That's incorrect.  The voting -- that's the voting

6  schedule.  That's when they will call votes.  They could vote

7  from 1:30 until 9:00.

8  Q.    And on Tuesday he's got another entry for votes, that's

9  6:30 p.m.?

10  A.    Correct.

11  Q.    And June 4th, 2018, was a Monday, according to this.  Do

12  I have that right?

13  A.    Correct.

14  Q.    And he's got no votes that day?

15  A.    Correct.

16  Q.    Now, looking again at his schedule, do you see the very

17  first entry there?

18  A.    Which one?

19  Q.    I'm circling --

20  A.    Yes.

21  Q.    -- on the screen an entry for 11:45 a.m. to 12:45 p.m.

22  Do you see that there?

23  A.    I do.

24  Q.    It says, "Dr. Ayoub" in that entry?

25  A.    Sure.

**269**

1   Q.    And this is the first calendar entry, the first thing he

2   has in his day on Monday, June 4th, 2018, correct?

3   A.    Yeah, but remember, on June the 3rd, he's traveled --

4            MR. BUXTON:  Your Honor, move to strike.

5   A.    -- seven hours to be --

6            THE COURT:  Hold on.  When you hear an objection,

7   please pause.  The objection is sustained.  The jury is to

8   disregard the response.  Please just answer the question that

9   he's asking.

10           THE WITNESS:  Yes, sir.

11  BY MR. BUXTON:

12  Q.    So it's fair to say the very first thing the defendant

13  had on his calendar on June 4, 2018, was a meeting -- or excuse

14  me -- an entry just before noon?

15  A.    Yes, sir.

16  Q.    Now, you weren't with him on June 4th, 2018, correct?

17  A.    Physically with him, in the office with him?

18  Q.    Were you physically colocated with the defendant on

19  June 4th, 2018?

20  A.    I was not.

21  Q.    And you weren't present for any telephone call the

22  defendant had physically colocated on June 4th, 2018, correct?

23  A.    Correct.

24  Q.    Now, do you see some other entries on June 4th, 2018?

25  A.    Yes.

**270**

1  Q.    He's got a lunch at 1:00, and then at 2:15 there's an

2  interview?

3  A.    Yes.

4  Q.    And then at about 4:30 to 5:30 there's an entry for

5  Steve.  Do you see that there?

6  A.    I can't see the whole page.  Can you move it down a

7  little bit?  Thank you.  Yes.

8  Q.    And then another entry at 6:00, 6:00 to 6:15?

9  A.    Yes, sir.

10 Q.    Now, you said on direct testimony, if I heard you

11 correctly, that the calendar entry for June 1st, 2018, was

12 representative of other days in his calendar, including

13 June 4th, correct?

14 A.    Yeah.  The days all fluctuate, but yes, it's -- more or

15 less that's kind of how his days go, yeah.

16 Q.    Well, that's not what you said, is it?  You said it's

17 representative.

18 A.    It's representative.

19         MR. LITTRELL:  Objection, your Honor.

20         THE COURT:  Overruled.  You may answer.

21 A.    It's representative of a day, but there are many days

22 that would be different.

23 BY MR. BUXTON:

24 Q.    So I'm putting on the screen the calendar entry for

25 June 1st, 2018, and this was a Friday.  Do you see that there?

1   A.    Yes, sir.

2   Q.    Does this appear to be a little bit more busy than

3   June 4, 2018?

4   A.    Well, it's hard to say because those are -- these are

5   notes and briefing notes about what he -- who he's talking to,

6   what he's talking about, and the level of people that are going

7   to be in the meetings.

8   Q.    So your testimony is that this is representative of

9   June 4th?

10  A.    I'm sorry.  I can't see it again.  It's -- again, I'm

11  sorry -- I'm sorry to be -- can you pull it down a little bit?

12  There you go.  So this is June 1st.

13          THE COURT:  And the question is?  Is the June 1st

14  date and the entry here...

15  BY MR. BUXTON:

16  Q.    Representative of his calendar on June 4th?

17  A.    I don't understand the question.  What are you asking?

18  Q.    Well, I believe on direct you said that the calendar

19  entry for June 1st was representative of other dates in his

20  calendar, including June 4th.

21  A.    Yes.  Okay.  This is generally how we keep the calendar.

22  If he's got a meeting or he's got things that he's doing, we

23  make sure he has the information that he needs to go and do the

24  meetings or the travel.

25  Q.    But you would agree that the defendant was less busy on

1  June 4th when his very first meeting was just before noon?

2  A.    I mean, he had -- again, I can't see the calendar, but I

3  recall when I looked at it he had four or five meetings that

4  day.  So, yeah, I think they're about the same.

5  Q.    Now, I believe you said that the defendant's time was

6  pretty scarce.  Is that correct?

7  A.    His time is scarce?  Like he doesn't have enough time?

8  Q.    Well, he's busy?

9  A.    Is that what you're asking?  He's busy, correct.

10  Q.    He doesn't have a lot of free time?

11  A.    Correct.

12  Q.    So an hour, if you block out an hour, that's a pretty

13  substantial amount of time for a busy Congressperson's day to

14  conduct some business, correct?

15  A.    Yes, sir.

16  Q.    I believe you...  And you testified on direct about an

17  event that took place in April of 2019; is that right?

18  A.    Yes, sir.

19  Q.    And in that event, someone presented you with some cash;

20  is that right?

21  A.    Yes, sir.

22  Q.    And that person thought that -- and you represent

23  Congressman Fortenberry, correct?

24  A.    As a fellow at that time, yes, sir.

25  Q.    And that person thought that the defendant's office

**273**

1  accepted cash, did they not?

2         MS. KINGERY:  Objection, your Honor.  Foundation.

3  Calls for speculation and misstates the record.

4         THE COURT:  I'll sustain it on the "calls for

5  speculation" in terms of what the other person thought without

6  the foundation, Mr. Buxton.

7  A.    The gentleman hadn't met Mr. Fortenberry.

8         THE COURT:  That's okay.  He's going to ask you

9  another question.

10  BY MR. BUXTON:

11  Q.    Now, I believe on direct the defense counsel pointed out

12  another calendar entry for the defendant; is that right?

13  A.    I'm sorry.  Say that again.

14  Q.    The defense counsel on direct examination asked you about

15  some things that occurred on March 23rd, 2019?

16  A.    I believe so.

17  Q.    And you looked at the defendant's calendar for that day?

18  A.    Yes, sir.

19  Q.    I believe the question was whether there was a calendar

20  entry for interview with the FBI?

21  A.    Yes, sir.  She asked me that, yes.

22  Q.    And you didn't see a calendar entry for that?

23  A.    No, sir.

24  Q.    Now, March 23rd, 2019, is about a month before this event

25  occurred when someone handed you cash, correct?

1   A.    Yes.

2   Q.    So, in other words, the FBI had already interviewed the

3   defendant about crimes before --

4   A.    No.  No.  No.

5   Q.    He directed you to talk to --

6   A.    April was after March.

7          THE COURT:  One second.  Rephrase your question,

8   please.

9   BY MR. BUXTON:

10  Q.    You saw a calendar entry for March 23rd?

11  A.    Correct.

12  Q.    You were asked a question about the FBI?

13  A.    Correct.

14  Q.    The event when someone handed you cash as a

15  representative of the defendant, that occurred about a month

16  later?

17  A.    Correct.

18  Q.    In April of 2019?

19  A.    Correct.

20  Q.    After the FBI had interviewed the defendant and asked him

21  about crimes, correct?

22          MS. KINGERY:  Objection, your Honor.  Foundation.

23          THE COURT:  Sustained on foundation grounds.

24  BY MR. BUXTON:

25  Q.    Do you know if the defendant was interviewed by the FBI

**275**

1  and asked about Federal crimes on March 23rd, 2019?

2  A.    I did not know.

3          MS. KINGERY:  Objection, your Honor.  Foundation as

4  to time.

5          THE COURT:  He answered that he didn't know at the

6  time, so I'm going to let that stand.  You can ask your next

7  question.

8  BY MR. BUXTON:

9  Q.    Do you know now whether the FBI interviewed the defendant

10  on March 23rd, 2019?

11  A.    I don't know the specific --

12          MS. KINGERY:  Objection, your Honor.  Calls for

13  hearsay and it's beyond the scope.

14          THE COURT:  Overruled.

15  A.    I don't know the specific date.

16  BY MR. BUXTON:

17  Q.    But it's your understanding that he was interviewed by

18  Federal agents about Federal crimes in March 2019, correct?

19  A.    Yes, sir.

20          MR. BUXTON:  Nothing further, your Honor.

21          THE COURT:  Any redirect?

22          MS. KINGERY:  Just briefly, your Honor.

23          THE COURT:  All right.

24

25

276

1                       REDIRECT EXAMINATION

2   BY MS. KINGERY:

3   Q.    Mr. Braner, would you ever lie for the Congressman?

4              MR. BUXTON:  Objection, your Honor.  Argumentative.

5              THE COURT:  Overruled.

6              MR. BUXTON:  403.

7              THE COURT:  Overruled.  He can answer the question.

8   A.    I wouldn't have this job if I lied to the Congressman or

9   for the Congressman.

10  BY MS. KINGERY:

11  Q.    Is that a no?

12  A.    No.

13             THE COURT:  You are excused.  Please watch your step

14  going down.

15             Members of the jury, we are going to conclude for

16  the day, and I will provide you with an update since I told you

17  that I would let you know where we stand.  The status still

18  appears to be as I have previously reported to you.  My best

19  estimate is that we likely will get through the evidence

20  tomorrow.  I think we should get through the evidence tomorrow.

21  There are things I just simply don't know, so I can't guarantee

22  that, but basically from what I do know, I think we're on track

23  from my update as to what I previously advised.  Also, please

24  make sure that you come early tomorrow because we are going to

25  have another jury selection panel come in tomorrow.  It's going