UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEFFREY FORTENBERRY,<br><br>    *Defendant*. | Criminal No. 1:24-cr-221 (TNM) |

**UNITED STATES' OPPOSITION TO
DEFENDANT'S MOTION TO OBTAIN DISCOVERY**

The United States of America, by and through the undersigned attorneys, respectfully submits this opposition to the Defendant's Motion to Obtain Discovery on Selective Prosecution and Selective Enforcement (ECF No. 25). Through that motion, the Defendant asks this Court to take the highly unusual and intrusive step of allowing discovery into baseless claims that he has been selectively prosecuted because of his political affiliations and viewpoints. Because the Defendant has not and cannot make a colorable showing of discriminatory effect or purpose, the Court should deny the motion.

## I.    BACKGROUND

### a.  Fortenberry's Involvement in "Operation Titan's Grip" (2016-2019)

This case centers on the Defendant, Jeffrey Fortenberry, repeatedly lying about his receipt and knowledge of illegal contributions that his congressional campaign received at a 2016 fundraiser in Los Angeles, California. The Government's investigation into the illicit contributions to Fortenberry's campaign stemmed from a much broader corruption and foreign influence investigation the Government was conducting into foreign billionaire Gilbert Chagoury, his associates, and several illegal campaign contribution schemes they facilitated, including to Fortenberry. The investigation was dubbed "Operation Titan's Grip." The general contours of the

1

investigation are likely familiar to the Court by now. *See, e.g.*, ECF Nos. 8 at 1-3; 31 at 1-3. It may be less apparent that, for much of the broader Operation Titan's Grip investigation, Fortenberry was a peripheral and minor component.

Individual H, a Chagoury associate and the Government's key source in the investigation, began cooperating with federal officials in 2016. A year later, in September 2017, federal agents first sought approvals to potentially interview Fortenberry. The initial approval request reflects how, at the time, the Federal Bureau of Investigation (FBI) was primarily focused on illicit contributions from Chagoury to other members of Congress, and that the FBI was prioritizing interviewing several members of Congress other than Fortenberry. *See* Under Seal Defense Ex. 7 at 2-4. As part of this September 2017 approval, the FBI indicated that it would notify House Counsel. At the time, the FBI never got around to interviewing Fortenberry—he was not the priority.

Six months later, in March 2018, Individual H informed the FBI that Fortenberry had unexpectedly contacted him. As is routinely the case with conversations involving a confidential human source that may be relevant to an ongoing investigation, the FBI sought to record the follow-up conversation between Individual H and Fortenberry. Prior to taking that step, the lead case agent sought and obtained approval from no fewer than five senior members of FBI Headquarters. *See* Under Seal Defense Ex. 8 at 3. The approval explained that the purpose for setting up the call was "[t]o understand the nature of the communications between Fortenberry, his staff, and Chagoury's surrogates, [and to] determine if Fortenberry makes reference to [Toufic] Baaklini, the FBI investigation, or contributions from Chagoury and/or his surrogates." *Id.* at 2. The approval further explained that "House Counsel will not be notified as this sensitive contact and its investigative use has yet to be determined." *Id.* There was nothing improper about this

process—and investigators reasonably concluded that notifying House Counsel would present an intolerably high risk that Individual H would be outed as a source or Fortenberry would alter his planned discussion with Individual H.

With the appropriate approvals in hand, the FBI recorded the follow-up call that Fortenberry had with Individual H in April 2018. On that call, Fortenberry asked Individual H to host another fundraiser for him in California. By that time, the FBI knew that the prior (and only) fundraiser that Individual H had hosted for Fortenberry in California involved illegal conduit and foreign contributions that were part of Chagoury's broader scheme. The investigative questions that arose from this factual universe were evident and important. They included, among other things: if Fortenberry knew that the 2016 fundraiser involved illegal contributions but he was still seeking a similar source of funds again; whether Fortenberry had any other illicit motive for seeking another fundraiser; whether Fortenberry knew of other illegal conduct by Chagoury, Baaklini, and their associates; if Fortenberry would express any surprise at being told that the 2016 fundraiser involved illegal contributions; and whether Fortenberry would take any other relevant action once he was unambiguously notified by Individual H that the 2016 fundraiser involved illegal contributions.

To try to answer such looming questions, the FBI recorded another call in June 2018 between Individual H and Fortenberry. During that call and at the FBI's direction, Individual H explicitly and repeatedly told Fortenberry that the 2016 fundraiser had involved illicit contributions.

On the June 2018 call, Fortenberry continued to ask Individual H for help setting up another fundraiser—even *after* Fortenberry was informed of the illegal nature of the 2016 contributions. When Individual H suggested Baaklini could ask Chagoury to "give us some money to donate to

[Fortenberry]," Fortenberry agreed and stated that he could "certainly discuss that with [Baaklini]." *See* ECF No. 38-6 at 8:20. The FBI also learned that just after that June 2018 call with Individual H, Fortenberry contacted Baaklini. And in the months following the June 2018 call with Individual H, Fortenberry took no steps to alert authorities (such as the FBI or the Federal Election Commission) about the 2016 fundraiser or to return the funds his campaign collected from it. These developments again raised more pertinent questions. So, to follow the facts where they led and uncover the truth, FBI agents decided to approach Fortenberry for a voluntary interview at his home in Nebraska. Before doing so, the lead case agent again sought and obtained approval from no fewer than five senior members of FBI Headquarters. *See* Under Seal Defense Ex. 12.

Federal investigators approached Fortenberry at his home in Nebraska in March 2019. During that interview, which was also recorded, Fortenberry lied about the illicit contributions from 2016 and his knowledge of them. Shortly after the interview in Nebraska, Fortenberry (through his counsel) requested a follow-up interview with federal investigators. During that second interview, held in July 2019 in the District of Columbia, Fortenberry lied again.

  b. **Resolutions of Other Matters (2019-2021)**

Operation Titan's Grip revealed that multiple people had violated federal criminal laws, including by lying about their knowledge of Chagoury and his associates' corrupt political influence schemes. Those individuals, save one, have since acknowledged their criminal conduct and agreed to cooperate with federal investigators. The outlier is Jeffrey Fortenberry.

Individual H was the first person to admit wrongdoing and cooperate with the Government. He was granted immunity and not prosecuted.

In October 2019, and despite residing abroad in France, Chagoury entered into a deferred prosecution agreement (DPA) with the Justice Department. *See United States v. Chagoury*, DPA

4

(C.D. Cal. Oct. 20, 2019), *available at* https://www.justice.gov/usao-cdca/press-release/file/1382076/dl?inline.  As part of the DPA, Chagoury admitted to violating federal campaign finance laws by illegally funneling money to four different federal political candidates (one of whom was Fortenberry).  Though he resided outside of the United States, Chagoury also agreed to pay a $1.8 million fine and cooperate with the Government's investigation.  *Id*.

In December 2019, former United States Secretary of Treasury Ray LaHood admitted that he had: (1) accepted a $50,000 personal check from Baaklini with an understanding that the money had come from Chagoury: (2) failed to disclose the $50,000 check as required on two government ethics forms; and (3) made misleading statements to Federal Bureau of Investigation (FBI) agents who were investigating Chagoury.  *See* U.S. Attorney's Office, C.D. Cal., *Lebanese-Nigerian Billionaire and Two Associates Resolve Federal Probe into Alleged Violations of Campaign Finance Laws* (Mar. 31, 2021), https://www.justice.gov/usao-cdca/pr/lebanese-nigerian-billionaire-and-two-associates-resolve-federal-probe-alleged.  LaHood resolved the matter through a non-prosecution agreement (NPA) with the Justice Department in which he paid a $40,000 fine, repaid the $50,000 loan, and agreed to cooperate with the Government's investigation.  *Id*.

In November 2020, Joseph Arsan, one of Chagoury's associates, entered into a DPA in which he admitted to helping Chagoury funnel illegal campaign contributions to a federal elected official's campaign fund.  *See United States v. Arsan*, DPA (C.D. Cal. Nov. 10, 2020), *available at*  https://www.justice.gov/usao-cdca/press-release/file/1382081/dl?inline.  Though he resided outside of the United States at the time of the resolution, Arsan still agreed to pay a $1.7 million penalty to resolve tax violations.  *Id*.  He also agreed to cooperate with the Government's investigation.  *Id*.

In March 2021, Baaklini entered into a DPA with the Justice Department through which he admitted to giving the $30,000 from Chagoury to Individual H for Individual H to contribute to Fortenberry's campaign. *See United States v. Baaklini*, DPA (C.D. Cal. Mar. 1, 2021) *available at* https://www.justice.gov/usao-cdca/press-release/file/1382086/dl?inline. Baaklini also agreed to pay a $90,000 fine and cooperate with the Government's investigation. *Id*.

### c. The Government's Prosecution of Fortenberry (2021 – present)

After entering into the DPA with Baaklini and securing his cooperation, prosecutors turned their attention to addressing Fortenberry's lies to federal agents in 2019. When attempts to resolve the matter prior to indictment failed, the Government sought charges against Fortenberry. The case was initially indicted by a Central District of California federal grand jury in October 2021. After a seven-day jury trial, Fortenberry was convicted on all three counts charged. He was then sentenced to two years' probation, 320 hours of community service, and a $25,000 fine. In late-December 2023, the Ninth Circuit reversed the conviction on venue grounds without prejudice, thus allowing the Government to recharge and retry Fortenberry in a proper forum.[1]

In early May 2024, a federal grand jury in the District of Columbia indicted Fortenberry. The matter is set for trial in February 2025.

---

[1] Prior to oral argument in his Ninth Circuit appeal, Fortenberry submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j) "to bring to the Court's attention the Supreme Court's recent decision in *Smith v. United States*, 143 S. Ct. 1594 (2023)," holding that retrials of a defendant were permitted following a trial in an improper venue. The letter stated: "Accordingly, in the event the Court agrees that venue was improper in this case, the appropriate remedy would be vacatur so that the Congressman could be retried in an appropriate venue." *United States v. Fortenberry*, No. 22-50144, ECF No. 43 (9th Cir.). The implication is clear. Fortenberry sought to assuage concerns that a reversal would deprive the Government of an opportunity to hold Fortenberry accountable for his crimes, reassuring the panel that the prosecution would be permitted to proceed with a retrial in a proper venue.

In June 2024, the Government presented Fortenberry with a plea offer. *See* ECF No. 25-29 at 6. The Government's proposal involved: Fortenberry pleading guilty to one of the two counts in the D.C. Indictment (the jury in California convicted him on three counts); the Government agreeing to cap its allocation at time-served (Fortenberry still had approximately a quarter of his probationary sentence remaining at the time of the Ninth Circuit's decision), and completion of any outstanding portion of community service (which may have been none); and the parties agreeing that Fortenberry's $25,000 fine would be reinstated (which was less than the fines Chagoury, Baaklini, Arsan, and LaHood each paid as part of their respective agreements). *Id.*

Fortenberry, through his counsel, immediately rejected the plea offer and demanded that the Government "drop the case." *Id.* The Government declined.

## II.     RELEVANT LEGAL PRINCIPLES

In requesting an order to compel discovery to support a selective prosecution claim, Fortenberry asks this Court "to exercise judicial power over a 'special province' of the Executive." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). Because "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings [or] dismiss a proceeding once brought[,] the presumption of regularity applies to prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (citing *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016)).

A selective prosecution claim has two elements. Fortenberry must establish that: (1) the Government treated similarly situated persons differently (*i.e.*, "discriminatory effect"); and (2) his prosecution was because of his membership in an identifiable group (*i.e.*, "discriminatory

7

purpose"). *Judd*, 579 F. Supp. 3d at 4-5 (citing *Armstrong*, 517 U.S. at 465-68). To obtain discovery in support of his claim, Fortenberry "must present '*at least* a colorable claim' as to both of these elements." *Id*. (emphasis added).

The "'colorable claim' standard is a 'significant' and 'rigorous' one not easily surmounted." *Id*. (citing *Armstrong*, 517 U.S. at 464, 468). The defense must show "some evidence" of discriminatory effect and purpose. *Id.* "[F]or neither prong can a defendant rely on personal conclusions based on anecdotal evidence." *Id*. Rather, the evidence must be credible and more than mere speculation. *United States v. Stone*, 394 F. Supp. 3d 1, 30-31 (D.D.C. 2019).

With respect to the first prong, identifying similarly situated persons is a "threshold" issue. *Judd*, 579 F. Supp. 3d at 8 (citing *Att'y Gen. v. Irish People, Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982)); *cf. Stone*, 394 F. Supp. 3d at 32 (providing examples of cases in which defendants' selective prosecution claims failed because they were unable to properly identify similarly situated individuals). The term "similarly situated" is construed narrowly. *Judd*, 579 F. Supp. 3d at 4 (citing *Stone*, 394 F. Supp. 3d at 31). Individuals are similarly situated to a defendant when their "circumstances present no distinguishable legitimate prosecutorial factors that might justify different prosecutorial decisions between [them]." *Id*. (citing *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000)). "Legitimate prosecutorial factors 'include relative culpability, the strength of the case against particular defendants, willingness to cooperate, and the potential impact of a prosecution on related investigations.'" *United States v. Navarro*, 651 F. Supp. 3d 212, 235 (quoting *United States v. Khanu*, 664 F. Supp. 3d 28, 332 (D.D.C. 2009)).[2]

---

[2] Fortenberry makes a passing reference to selective "enforcement" claims. *See* ECF No. 25 at 16. While citing to out-of-circuit precedent, Fortenberry does not elucidate what standard should govern that claim or how it applies in this case. But none of that matters. Whatever Fortenberry's view of the differences between "selective enforcement" and "selective prosecution" as it relates to his motion, he is still required to identify similarly situated individuals who have been treated

8

### III. ARGUMENT

Fortenberry's motion and the accompanying exhibits span hundreds of pages. Perhaps hoping that volume will make up for lack of relevant substance, most of the motion relies on extraneous assertions about Fortenberry and inaccurate, incomplete, or speculative assertions about the case. But in the end, Fortenberry does not and cannot present a colorable claim of selective prosecution.

#### a. There is No Colorable Claim of Discriminatory Effect

##### i. Fortenberry fails to make the requisite threshold showing of disparate treatment of similarly situated individuals.

Fortenberry fails to identify similarly situated individuals who have been treated differently for something other than legitimate prosecutorial reasons. This failure on a threshold issue is fatal to his motion.

Fortenberry was a sitting member of Congress when he participated in a recorded conversation that openly and repeatedly discussed his campaign's receipt of illegal conduit and foreign campaign contributions. As a federal elected official who admittedly knew the pertinent campaign finance rules, he undoubtedly realized that this was a big deal—and a big problem. He also understood that lying to federal agents is a federal crime—in part because he was expressly advised of that before each of his federal interviews. Despite this, he repeatedly lied about and sought to conceal from federal investigators both the facts of the illegal contributions and his

---

differently based on something other than legitimate prosecutorial considerations—something he fails to do. *See Frederick Douglas Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) (explaining the need for the movant to identify "similarly situated" individuals as that term is defined by *Armstrong* and its progeny when seeking to establish a "selective enforcement" claim). Even under the least demanding articulation of the "selective enforcement" standard, Fortenberry would still need to present "something more than mere speculation" to support his motion. *See United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018). But this is also something he fails to do.

knowledge of them. That was a crime which implicates clear federal interests and is only prosecutable in federal court. A jury previously found beyond a reasonable doubt that Fortenberry committed three federal felonies. The Ninth Circuit did not call into question the factual or evidentiary basis for the jury's finding but vacated Fortenberry's conviction without prejudice on venue grounds. As is his right, Fortenberry has categorically refused to accept responsibility in this matter or otherwise acknowledge any wrongdoing. As is its right, the Government decided to continue the prosecution in an appropriate venue.

The first question for the Court should be: *against this backdrop, who is similarly situated to the defendant?* The answer is likely: *no one*. That, in and of itself, is fatal to his claim. *See Judd*, 579 F. Supp. 3d at 8 (noting that if a defendant fails to identify anyone "to whom he could be compared," then "he has failed to make out one of the elements of his case." (citing *Irish People*, 684 F.2d at 946)).

The closest Fortenberry comes to identifying similarly situated individuals is a single paragraph reference to some of the other individuals who resolved matters related to Operation Titan's Grip. *See* ECF No. 25 at 19. Fortenberry's discussion of those individuals is unsurprisingly fleeting as there are numerous "legitimate prosecutorial factors" that explain why their cases were resolved short of indictment and trial. Unlike Fortenberry, all those other individuals publicly acknowledged felony criminal wrongdoing and agreed to cooperate with the Government. Unlike Fortenberry, none of them was a sitting member of Congress when he: received illegal conduit and foreign contributions; openly discussed the illicit nature of those contributions during a recorded call (while continuing to press for another fundraiser with the same host); and then repeatedly lied to federal agents about the contributions and his knowledge of them during recorded interviews. Unlike Fortenberry, all those individuals other than Individual H

10

voluntarily agreed to pay a fine. Unlike Fortenberry, two of those individuals resided in foreign countries, thus making prosecution of them more difficult.

It is legitimate for the Government to consider: an individual's willingness to accept responsibility and cooperate with an investigation; whether an individual is a public official concealing material facts related to his or her public office; the strength of the evidence against an individual in a matter that can only be addressed in federal court; whether an individual has voluntarily agreed to pay a fine; and whether an individual is residing outside of the United States.

To the extent that other people impacted by Operation Titan's Grip are "similarly situated" to Fortenberry, any different treatment they received is anchored in legitimate prosecutorial considerations.[3]

### ii. Fortenberry's inapt focus on procedural posture does not save his deficient argument.

The entirety of the defense's "discriminatory effect" argument focuses on the Government's decision to retry Fortenberry following the Ninth Circuit's reversal of his prior conviction. In support, Fortenberry claims that "the government does not re-prosecute defendants facing similar circumstances, but who lack the same political profile as the Congressman." ECF No. 25 at 18. Fortenberry's myopic focus on post-conviction, post-appeal procedural posture is a red herring—an effort to gerrymander a category of cases so narrow as to eliminate apt comparisons. That carving only damages his claim. *See Judd*, 579 F. Supp. 3d at 8 (noting that if a defendant fails to identify anyone "to whom he could be compared," then "he has failed to make

---

[3] Notably, Fortenberry does not challenge the propriety of the broader investigation or even the initial C.D. Cal. prosecution. Rather, his focus is on the decision to re-try his case in the District of Columbia following the Ninth Circuit's decision. But, to state the obvious, that procedural posture cannot be compared to the status of cases of other individuals who accepted responsibility and resolved their matters prior to indictment.

11

out one of the elements of his case.") (citations omitted). The sample cases he cites do little more than show how misplaced his focus is.

The first case cited is *United States v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015). Fortenberry notes that in *Casellas-Toro*, "the defendant was sentenced to 21 months' imprisonment on a false-statements charge[,] the First Circuit reversed on venue grounds after he had served 15 months of that sentence," and that Fortenberry has "been unable to find evidence of the government retrying the defendant elsewhere following remand." ECF No. 25 at 18. This much is true. But the slightest bit of digging reveals far more. Casellas-Toro's false-statement charge stemmed from lies he told to the FBI in 2012 about a carjacking. *Casellas-Toro*, 807 F.3d at 383. In a parallel local proceeding, he was charged with and convicted of murdering his wife. *Id*. At that trial, the Commonwealth of Puerto Rico alleged that he staged the carjacking to make the murder weapon look "stolen." *Id*. Casellas-Toro made his first appearance in federal court after being sentenced in the Commonwealth's case to 109 years imprisonment. *Id*. The First Circuit reversed Casellas-Toro's federal false-statements conviction on venue grounds. *Id*. at 392. Nothing about that decision changed the fact that Casellas-Toro continued to serve a century-long sentence on the local murder charge.[4]

The differences between Fortenberry and Casellas-Toro are so obvious as to barely merit discussion. Casellas-Toro was serving a 100+ year sentence on more serious local charges when his tangentially related federal false statements conviction was reversed. He was going to continue

---

[4] In 2023—which was well after the statute of limitations would have expired on the federal false-statements offense—Casellas-Toro was pending retrial on his first-degree murder conviction when he reached a deal with local prosecutors to plead guilty to second-degree murder. *See Son of Federal Judge in Puerto Rico Pleads Guilty to Killing Wife after Winning New Trial*, Associated Press (Oct. 26, 2023), https://apnews.com/article/pablo-casellas-puerto-rico-guilty-3e1104732115dd7306f5c3c499df0574.

serving that local sentence regardless of whether federal prosecutors pursued his federal charges in a different venue, as was their right. Fortenberry is subject only to federal prosecution, and there will be no conviction related to his conduct without retrial. These are legitimate prosecutorial considerations. Fortenberry is not similarly situated to Casellas-Toro.

The next case Fortenberry cites is *United States v. Abair*, 746 F.3d 260, 261-63 (7th Cir. 2014). In that case, a Russian immigrant (Abair) was charged with highly technical and *de minimis* violations of federal currency reporting requirements. *Id*. at 261-62. Those violations were connected to Abair's efforts to transfer her own money from her own account in Russia to her own account in the United States so that she could buy a new home in Indiana following her divorce. *Id*. In a split decision, the Seventh Circuit reversed Abair's conviction because of an improper evidentiary ruling. *Id*. at 266-68. Though divided on the merits of the pertinent evidentiary issue, the panel uniformly criticized the prosecution for even bringing the case. As the dissenting judge explained: "Finding no error, I would affirm, although not without serious misgivings about the wisdom of this prosecution. It is unclear to me how the interests of justice are served by saddling Abair with a felony conviction and forcing her to forfeit her home as punishment for a technical, trivial violation of the structuring statute." *Id*. at 272. The Seventh Circuit's collective admonishment to prosecutors in *Abair* was clear: you can retry this case, but you really should not. Fortenberry may disagree, but the Government, exercising its prosecutorial discretion, can reasonably conclude that a sitting Congressman's repeated and willful lies to federal investigators about his receipt and knowledge of illegal conduct and foreign campaign contributions is not a trivial matter. In deciding Fortenberry's appeal, the Ninth Circuit did not suggest otherwise. *See generally United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023). Fortenberry is not similarly situated to Abair.

Fortenberry's procedural-posture-focused-case-comparators end with references to *United States v. Rahman*, 805 F.3d 822 (7th Cir. 2015) and *United States v. Shelton*, 997 F.3d 749 (7th Cir. 2021). In each case, the appeal resulted in suppression of key government evidence. *Rahman*, 805 F.3d at 839 (assuming that the government's inability to present key evidence that should have been suppressed at trial would "undoubtedly be [the] dispositive" factor determining whether the government would dismiss the false statement charge); *Shelton*, 997 F.3d at 773 (evidence that should have been suppressed "shaped the entire trial"). In reversing Fortenberry's prior conviction, the Ninth Circuit did not suppress any evidence—nor did the Ninth Circuit call into question *any* of the evidence the Government presented or the jury's assessment of it. The strength of a case based on admissible evidence—here, one that already resulted in a guilty-on-all-counts conviction—is a legitimate factor in making prosecutorial decisions. Fortenberry is not similarly situated to the defendants in *Rahman* or *Shelton*.

As demonstrated above, Fortenberry fails to meet the rigorous and significant standard of showing a colorable claim of discriminatory effect. This alone dooms his motion.

### b. There is No Colorable Claim of Discriminatory Purpose

Fortenberry also cannot make a colorable claim of discriminatory purpose because this prosecution is not based on biased intent or any other improper motive. Fortenberry's proposed "evidence" of discriminatory purpose is limited to (i) an attack on a prosecutor's permissible, First Amendment-protected political donations, and (ii) false claims that internal Justice Department policies were not followed. Ultimately, Fortenberry does little more than present personal conclusions based on anecdotal evidence that amount to the type of speculation that courts rightly disregard when assessing selective prosecution claims.

### i. Fortenberry's attack on a prosecutor's political donations do not provide any evidence of improper intent.

Fortenberry baselessly attacks political contributions by a career prosecutor with nearly two-decades of experience, serving under various administrations and prosecuting public officials of various political affiliations along the way. As an initial matter, that targeted attorney has withdrawn as counsel of record in this case because he is leaving the Justice Department. *See* ECF No. 42. Yet the prosecution of Fortenberry continues in his absence. This is not surprising, as that attorney's personal, political affiliations had nothing to do with the decision to investigate, charge, try, and now retry Fortenberry—decisions that involved multiple individuals and supervisory chains, stretched across different political administrations, and were affirmed by the two grand juries that indicted the case and the trial jury that convicted on all counts.

Fortenberry fails to provide a single case cite to support the proposition that a career prosecutor's exercise of his First Amendment right to, in his personal capacity, support candidates of his choosing, provides "some evidence" of discriminatory purpose. But Fortenberry still wantonly seeks to publicize such personal contributions, regardless of their materiality (or lack thereof). *See, e.g.*, ECF No. 25-30 at 113 (including as part of a 150+ page exhibit a record of the targeted prosecutor's $5.00 contribution to a political action committee associated with the Congressional Hispanic Caucus). This is not the sort of evidence that can or should displace a court's presumption that "prosecutors have properly discharged their official duties." *Judd*, 579 F. Supp. 3d at 4; *see also United States v. Lazarro*, Case No. 21-cv-173-PJS, 2022 WL 17417970, at 1-4 (D. Minn. Oct. 12, 2022) (while assessing a selective prosecution claim based on political affiliation, court noting that defendant "has failed to produce *any* evidence that he was prosecuted with an improper purpose," even though defendant had presented evidence that "the lead

15

prosecutor on his case donated thousands of dollars to [the opposing political party]") (emphasis added).

> **ii. In carrying out this prosecution, the Government has appropriately sought to protect important federal interests by following the facts where they lead and applying the law to those facts.**

Having failed at every other turn, Fortenberry concludes his motion by pointing to alleged "procedural irregularities in this case." *See* ECF No. 25 at 21-26. Specifically, he condemns the Government for: not notifying House Counsel before interviewing him at his home in 2018; recording Fortenberry's conversations with Individual H; "utilizing a ruse" during federal investigators' initial approach to Fortenberry in 2018; not disclosing to Fortenberry's counsel in 2019 that the Government had a recording of Individual H telling Fortenberry about the illegality of the contributions from the 2016 fundraiser; and retrying this case after the Ninth Circuit's reversal. *Id*. These claims, even if true, fall well short of meeting the legal requirements for demonstrating a colorable claim of discriminatory purpose. But as a factual matter, and contrary to Fortenberry's narration, the procedural history of this case amounts to little more than this: the FBI appropriately sought the truth as it carried out a sprawling corruption and foreign influence investigation; when the FBI approached Fortenberry as part of that investigation, Fortenberry committed crimes by lying about and concealing relevant information that he knew; and the Justice Department is appropriately seeking to vindicate important federal interests by prosecuting Fortenberry for his unlawful conduct.[5]

---

[5] Fortenberry's alleged violations of Justice Department protocols are premised on incomplete references and half-truths. Regardless, Justice Department policies do not create rights for subjects, targets, or defendants. *See, e.g.*, *United States v. Lopez-Matias*, 522 F.3d 150, 155-56 (1st Cir. 2008) (collecting cases from various circuits explaining that Justice Department guidelines do not confer substantive rights on any party); *see also* Justice Manual § 9-27.150 (explaining that the Principles of Federal Prosecution are "intended solely for the guidance of attorneys for the government" and "may not be relied upon by a party to litigation with the United States"). And,

16

Consider, for example, Fortenberry's claim that the Government used an informant to record conversations "in violation of DOJ guidelines" and failed to "indicate whether DOJ's Public Integrity Section had been notified." ECF No. 25 at 27 (citing Justice Manual § 9-85.110). Despite his inflammatory claim of a "violation," no such "violation" occurred.

Or consider Fortenberry's complaints about the federal investigator's conduct at his home in Nebraska in March 2019 and the subsequent interview in D.C. As described above, before carrying out that investigative step to address pertinent questions raised by Fortenberry's call with Individual H, the lead case agent sought and obtained approval from some of the highest levels of the FBI. When agents first arrived at Fortenberry's home, his wife answered the door and informed the FBI that he was not home. The investigators did not share with her the purpose of their visit— nor did they have any obligation under law or policy to do so. Later that day, Fortenberry agreed to speak to the investigators. After Fortenberry expressed his anger at their unexpected approach to his home, the investigating agents quickly informed Fortenberry that: they were there to discuss "In Defense of Christian[s] and campaign funding;" the interview was voluntary; Fortenberry could stop it at any time; and it was a crime to lie to the FBI. *See* Ex. 1 at 4 (excerpt of transcript of recording from the March 2019 Nebraska interview). Fortenberry continued the voluntary interview and proceeded to lie about what he knew.

With respect to the subsequent interview in D.C., which was requested by Fortenberry's attorney, it was reasonable for the Government to expect that Fortenberry was seeking to cooperate with the investigation and share the full extent of his relevant knowledge—just as Individual H, Baaklini, and LaHood had done after they were first approached federal investigators. As part of

---

tellingly, Fortenberry does not argue that any evidence in this case was unlawfully obtained and thus warrants suppression.

17

that process, the Government was under no obligation to inform Fortenberry or his counsel that the Government knew of Fortenberry's June 2018 call with Individual H or that the call was recorded. In fact, doing so may have prevented the Government from fully assessing Fortenberry's honesty. During that second interview, Fortenberry lied again.

* * *

Fortenberry repeatedly lied to federal agents about important information related to illegal campaign contributions. The lies were recorded, as was a preceding conversation in which Fortenberry and Individual H clearly discussed the substantive information demonstrating those falsehoods. The Government possesses admissible evidence proving federal crimes that implicate substantial federal interests, and Fortenberry cannot be prosecuted for that conduct in a local court. Fortenberry, like many criminal defendants, believes the Government should just look the other way and move on. But based on entirely proper considerations, the Government commenced and continues this prosecution. *See* Justice Manual § 9-27.220 ("Grounds for Commencing or Declining Prosecution"). Abandoning the case now would undermine the Government's aim of deterring those who might otherwise knowingly lie to and obstruct federal investigations. And as the Government's recent time-served plea offer to Fortenberry makes clear, its interest in continuing this prosecution is not rooted in a desire to punish or embarrass him, but rather to vindicate important federal interests. *See id*. at § 9-27.230 ("Initiating and Declining Charges -- Substantial Federal Interest").[6] There is nothing inappropriate—let alone discriminatory—about that.

---

[6] Under the Justice Manual, in determining whether a prosecution serves "a substantial federal interest," prosecutors are instructed to consider "all relevant considerations, including: (1) Federal law enforcement priorities, including any federal law enforcement initiatives or operations aimed at accomplishing those priorities; (2) The nature and seriousness of the offense; (3) The deterrent effect of prosecution; (4) The person's culpability in connection with the offense; (5) The person's

18

## IV. CONCLUSION

The Government is continuing its prosecution by retrying Fortenberry in this District because he committed multiple felony crimes that implicate substantial federal interests. He cannot make a colorable claim that the prosecution involves either a discriminatory effect or purpose. He is not entitled to further discovery, which will only serve as as a fishing expedition for his baseless assertion of selective prosecution or enforcement. The Court should deny his meritless motion.

          Respectfully submitted,

          MATTHEW M. GRAVES
          UNITED STATES ATTORNEY
          D.C. Bar No. 481052

By:   */s/ Timothy Visser*
      TIMOTHY VISSER (DC Bar No. 1028375)
      Assistant United States Attorney
      601 D Street, N.W.
      Washington, D.C. 20530
      (202) 252-2590
      timothy.visser@usdoj.gov

      SUSAN HAR (Cal. Bar No. 301924)
      Special Assistant United States Attorney
      312 N. Spring Street, Suite 1200
      Los Angeles, CA 90012
      (213) 894-3289
      susan.har@usdoj.gov

---

history with respect to criminal activity; (6) The person's willingness to cooperate in the investigation or prosecution of others; (7) The person's personal circumstances; (8) The interests of any victims; and (9) The probable sentence or other consequences if the person is convicted."